IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


Stefan Woodson,

                                    Plaintiff,

                    versus          3:13CR134

City of Richmond, et al.,

                                    Defendants




Before:  HONORABLE ROBERT E. PAYNE
Senior United States District Judge


Pre-trial conference



August 21, 2013
Richmond, Virginia



Gilbert F. Halasz, RMR
Official Court Reporter
U. S. Courthouse
701 East Broad Street
Richmond, Virginia 23219
(804) 916-2248

1        THE COURT:  All right.

2        This is Woodson against the City of Richmond and a

3   number of other people, 3:13 CV 134.

4        Starting here and going around the table, please

5   put your name on the record and tell me who you

6   represent.

7        MS STINER:  Elyse Stiner, counsel for the

8   plaintiff, Stefan Woodson.

9        MR. CARROLL:  Seth Carroll, counsel for plaintiff.

10       MS CARROLL:  Lauren Carroll, counsel for the

11   plaintiff.

12       MR. ETHERINGTON:  Bill Etherington, counsel for

13   Mr. McRae.

14       MR. CORRIGAN:  David Corrigan, counsel for the

15   City of Richmond.

16       MR. ELLIOTT:  Kyle Eliott, City of Richmond.

17       MR. ROSEN:  Jeff Rosen, counsel for Sheriff Woody.

18       MR. McNELIS:  Edward McNelis, counsel for Dr. Moja

19   and Correct Care Solutions.

20       MR. McBETH:  Isaac McBeth, counsel for Dr. Moja

21   and Correct Care Solutions.

22       THE COURT:  Mr. Etherington, who do you represent?

23       MR. ETHERINGTON:  Ken McRae.  He is one of the

24   staff in Sheriff Woody's office.

25       THE COURT:  Okay.

1          According to our records there is a pending a

2    motion by the city to dismiss the Sheriff's cross claim

3    filed against the City; is that right?

4          MR. CORRIGAN:  Yes, sir.

5          THE COURT:  Any other motions pending now?

6          MR. CORRIGAN:  No, sir.

7          THE COURT:  All right.

8          Have you all had any settlement discussions?

9          MR. CARROLL:  We discussed settlement, and I think

10   agreed that at this time, prior to any discovery,

11   really, that we would have to address that issue later.

12   We weren't in a position to have formal settlement

13   discussions.

14         THE COURT:  I think you are.

15         MR. CARROLL:  Okay.

16         THE COURT:  The law is fairly well settled in this

17   area.  You ought to know the case by now and how to

18   figure it out.  You don't let people get in this

19   condition.  The Sheriff and the City have a

20   responsibility for maintaining the jail, depending upon

21   what facet their responsibility is linked to it.  You

22   didn't do it.  You know you didn't do it.  The City has

23   been after -- the people have been after the City for

24   years to take care of it.  They finally have gotten a

25   new jail being built.  In the meantime, it is up to the

1    Sheriff and the City to work out a way to keep the

2    place cool if the heat had anything to do with this.  I

3    don't know whether it did or not.  It looks like from

4    the medical reports it did.  And you need to get about

5    settling the case.  There isn't any reason to spend

6    anybody's money litigating this issue.  The question

7    is, what are the damages, really.

8         What are your damages?

9         MR. CARROLL:  Significant.

10        THE COURT:  You know what they are.

11        MR. CARROLL:  In terms of money?

12        THE COURT:  In terms of everything.  What are

13   you -- you have got to do your rule 26 disclosures,

14   don't you?

15        MR. CARROLL:  Yes, Your Honor.

16        THE COURT:  Have you done them?

17        MR. CARROLL:  I have.

18        THE COURT:  What did you disclose were your

19   damages?  That is what you have to do.

20        MR. CARROLL:  We currently have $300,000 in

21   medical bills -- and some change.

22        THE COURT:  Okay.

23        MR. CARROLL:  We are conducting a life care plan.

24        THE COURT:  What is his condition?

25        MR. CARROLL:  He is in a wheelchair, has severe

1    ataxia, 24 hours a day in-home care, according to his

2    doctor, Dr. Walker, at MCV.  I don't have formal

3    numbers from that.

4         THE COURT:  How come you don't have that yet?

5         MR. CARROLL:  My life care planner hasn't given me

6    formal numbers yet.  Given me some estimates.

7         THE COURT:  What is your ballpark?

8         MR. CARROLL:  Two to three million dollars.

9         THE COURT:  That is a big range.

10        MR. CARROLL:  It depends.

11        THE COURT:  Why was Mr. Woodson in the jail?

12        MR. CARROLL:  In the jail for assaulting a police

13    officer.

14        THE COURT:  Had he been tried, or was he pretrial

15    detention, or --

16        MR. CARROLL:  Inmate.

17        THE COURT:  He was being held under the eighth

18    amendment?

19        MR. CARROLL:  Had been convicted, yes, eighth

20    amendment.

21        THE COURT:  Okay.

22        MR. CARROLL:  Five-year felony conviction, six

23    months time.

24        THE COURT:  All right.  How old was he?

25        MR. CARROLL:  He is 43.

1          THE COURT:  Now or then?

2          MR. CARROLL:  At the time I believe he was 42.

3          THE COURT:  Okay.  What is his life expectancy?

4          MR. CARROLL:  Around 40 years.  A little shorter.

5          THE COURT:  Any pre-existing injuries?

6          MR. CARROLL:  Had a bullet in his spine, but no

7    injuries per se.  He has high blood pressure,

8    chronically high blood pressure.  Taking medicine for

9    that.

10          THE COURT:  Okay.  How much -- so you need to

11   formulate a demand so that they can get about the

12   business of assessing how they are going to deal with

13   it.

14          MR. CARROLL:  I will be happy to do so by the end

15   of the week, Judge.

16          THE COURT:  Have you sent them all the medical

17   records yet?

18          MR. CARROLL:  They have all the medical records.

19          THE COURT:  How long ago did you send it to them?

20          MR. CARROLL:  Month or two ago.  Not sure of the

21   exact date when we did our initial disclosure.

22          THE COURT:  Any dispute over the nature of what

23   caused his death?  I mean his injuries.

24          MR. CARROLL:  Not from my perspective.

25          THE COURT:  I mean, have they articulated any to

1    you?

2         MR. CARROLL:  They have not articulated any

3    dispute as to what caused the injury in terms of being

4    a heat stroke.  I think they have articulated a dispute

5    with respect to responsibility.

6         THE COURT:  Well, that is what the jury will sort

7    out and lay the wood on whoever it is supposed to, I

8    suppose.

9         MR. CARROLL:  Yes, Your Honor.

10         THE COURT:  What is the relationship of McRae to

11    Correct Care?

12         Or is he the Sheriff's man?

13         MR. ETHERINGTON:  He is a major in the Sheriff's

14    office.  Didn't have any relationship to C.C.S.

15         THE COURT:  Okay.

16         MR. ETHERINGTON:  In fact, he is in the office,

17    Judge, not out on the floor.

18         THE COURT:  Okay.

19         So, have you all talked about any rule 26

20    conference about the number of witnesses that it will

21    take?

22         MR. CARROLL:  We have, Your Honor.

23         THE COURT:  And then discovery and so forth?

24         MR. CARROLL:  Yes, Your Honor.

25         THE COURT:  Where do you stand on that?

1          MR. CARROLL:  We propose 20 depositions.  I am not

2     sure of the number of witnesses that the defendants are

3     going to call.  I expect to have ten to 15 witnesses

4     for Mr. Woodson.

5          THE COURT:  Well, have you talked to them about

6     the witnesses they are going to have?

7          MR. CARROLL:  We have talked about the number, not

8     about the specific.

9          THE COURT:  How can you talk about a number if you

10    don't know who they are?  Because then if there is

11    overlap the numbers change, you see.

12         MR. CARROLL:  Yes, they have all provided names of

13    people with potential information.

14         THE COURT:  And have you ascertained that they are

15    going to call the same people or different people?

16         MR. CARROLL:  I have not ascertained that yet.

17         THE COURT:  What do you think?  Who is going to

18    speak for the Sheriff?

19         MR. ROSEN:  Judge, Jeff Rosen for the Sheriff.

20         I believe we will be calling the involved, deputy

21    involved with Mr. Woodson.  The fact is that the

22    medical doctor will call their own doctor in their

23    processing.

24         THE COURT:  Processing what?  This didn't happen

25    during processing.  This is while confined.  Who are

1    the ones that ignored him?  Have you got who is on duty

2    when that happened?  You have got identified --

3         MR. ROSEN:  We have identified those.

4         THE COURT:  -- and given them to the plaintiff?

5         MR. ROSEN:  Identified them, provided initial

6    disclosures.  The evidence was nobody ignored him.  His

7    condition was forwarded on to the medical department.

8         THE COURT:  Forwarded when? is what makes a

9    difference, Mr. Rosen.

10        MR. ROSEN:  I agree with you, Judge.

11        THE COURT:  And according to the allegation in the

12   complaint, it was, if it was forward it was forwarded a

13   day late and a dollar short, it looks to me like.  If

14   they can prove what they said.

15        You know, the other thing is, this isn't the first

16   time this happened over there.  This kind of thing

17   happens over there, unfortunately, more often than it

18   should.  I have had at least two cases similar to this.

19   And one of them was several years ago.  I can't

20   remember the name of it.  I want to say it was Brown,

21   but I am not sure.  And so people are on notice of the

22   problems, and there has been -- I think it is in

23   Brown -- it may have been in another case -- there is a

24   long history of litigation over the inadequacy of the

25   jail.  The City has turned a blind eye to it.  Haven't

1    done a thing until recently.  Every once in a while

2    they get smacked with a suit and they study it.  And

3    the Sheriff -- I don't know what he has done about it,

4    but I know Sheriff Mitchell sued the City to try to get

5    them to do something about it.  They agreed to do

6    something about it and didn't do anything to speak of

7    except study it some more.  Study, study, study.  In

8    the meantime people are getting sick and hurt.  It is

9    over-crowded.  It is built for 800 people and they have

10   1,800 or 1,600 people in there.  And it is outrageous.

11       When's the new jail going to be completed?

12       MR. ROSEN:  2014.

13       THE COURT:  Actually going to be completed?

14       MR. ROSEN:  That is what I am told.  This was

15   supposed to be opened in 2014.

16       THE COURT:  In the meantime everybody knows that

17   something bad is going on over there.  You need to take

18   interim measures such as putting in blowers, changing

19   people around, figuring out other places to put them.

20   The time has come.  You can't stick -- you can't any

21   longer stick your head in the sand and say, oh my

22   goodness, terrible situation.  And the City says, oh,

23   it is a terrible situation.

24       So, between you have you sorted out, the defense,

25   how many witnesses and compared it to the number they

1   gave you, and figured out what a total number of

2   witnesses are going to need to be deposed?  Have you

3   done that yet?

4        Anybody?

5        MR. CORRIGAN:  I don't think we have a specific

6   number.  I think when he proposed 20, we thought that

7   was around the number for everybody.

8        THE COURT:  You mean includes everybody?

9        MR. CORRIGAN:  We think so.  Not including

10  experts.

11       THE COURT:  How many experts are you going to

12  have?

13       MR. CARROLL:  Four, I believe, Your Honor.

14       THE COURT:  On what topic?

15       MR. CARROLL:  I have an expert in applied

16  climatology.

17       THE COURT:  What is that, climatology?

18       MR. CARROLL:  He has done work with some cities,

19  like Philadelphia, for instance, to help public housing

20  in the summer time.  Just testifies about the problems

21  with no air conditioning and hot conditions in these

22  older buildings.  Has got experience with that.

23       THE COURT:  Don't most jurors know what happens

24  when you get in a closed building with no fan in the

25  heat of summer in Richmond, Virginia if you live in

1    this area?

2        MR. CARROLL:  I hope so.

3        THE COURT:  Why do you need an expert to hear

4    about what happens, then?  Or are you going to have him

5    testify about what you do to ameliorate those

6    circumstance?

7        MR. CARROLL:  Combination of the two.  How the

8    conditions in the jail likely are, and what should be

9    done.  What could be done about it.

10       THE COURT:  So actions could have been taken to

11   reduce the problem.

12       MR. CARROLL:  Which he has experience with helping

13   cities.

14       THE COURT:  All right.  And another expert.

15       MR. CARROLL:  Other experts would include a

16   correctional medicine expert.

17       THE COURT:  What is that person going to deal

18   with?

19       MR. CARROLL:  Talk about the standard for

20   providing adequate care and the Constitution in the

21   jail and how the defendants failed to do --

22       THE COURT:  I don't think he can testify about the

23   Constitution.

24       MR. CARROLL:  Sorry.

25       THE COURT:  He might be able to testify about what

1    is the standard of care in the area for treating

2    inmates.  Or people in confinement.  But, the

3    constitutional part I don't believe we need anybody on

4    that, do we?

5         MR. CARROLL:  Did not mean to suggest he was going

6    to testify about the Constitution.

7         THE COURT:  Okay.

8         All right.

9         So that is sort of the standard of care expert, is

10   he?

11        MR. CARROLL:  Yes, Your Honor.

12        THE COURT:  All right.

13        And then --

14        MR. CARROLL:  Life care planner.

15        THE COURT:  Now, those people, you know, they have

16   some of the most remarkable capacity to demonstrate

17   what people need.  And you could probably keep the

18   royal family in England for the amount of money some of

19   them lay out and think is necessary.  And jurors don't

20   pay much attention to that, because they can scope out

21   and have good common sense, you know, about what

22   actually it takes to take care of somebody in a

23   reasonably good way.  So, maybe you better make sure

24   your life care planner doesn't go off the reservation.

25        MR. CARROLL:  He is very conservative in choosing

1    that --

2         THE CLERK:  Three or four million a year?

3         THE DEFENDANT:  -- charge.  He needs

4    24-hours-a-day care.

5         THE COURT:  I will take the job.

6         MR. ROSEN:  I thought you meant total.

7         MR. CARROLL:  Sorry.  Total.  Not per year.

8         THE COURT:  For his life?

9         MR. CARROLL:  Sorry.  No.  A year.

10        THE COURT:  Okay.  Anything else?

11        MR. CARROLL:  Couple treating physicians is all we

12   have beyond that primary care doctor.  And likely

13   Dr. Walker.

14        THE COURT:  Is that the guy at VCU?

15        MR. CARROLL:  Yes, Your Honor.

16        THE COURT:  And they are going to the extent --

17   they are testifying what they did to treat him.  They

18   are not experts -- to the extent they testify about the

19   future and what life holds in the future and the

20   diagnosis and progress for the future they are going to

21   have to do a report, you know.

22        MR. CARROLL:  Yes.  I can share, Your Honor --

23        THE COURT:  You read the Chameleon article?

24        MR. CARROLL:  Have not.

25        THE COURT:  It is good reading.

 1          MR. CARROLL:  It is on my desk top, Your Honor.

 2          THE COURT:  So what is the City's defense here?

 3          MR. CORRIGAN:  Your Honor, Sheriff Mitchell -- you

 4     mentioned 2004 -- you made a lot of findings there.

 5     Certain themes, frankly, continued to be problems.

 6     There were a number of studies that didn't lead

 7     anywhere.  Since this incident I believe occurred

 8     summer of 2012.  In the summer of 2011 the City

 9     air-conditioned the mess hall where all the guys are

10     taken.  And also the kitchen.

11          THE COURT:  Where they eat?

12          MR. CORRIGAN:  Yes.  Taken --

13          THE COURT:  What do you mean?

14          MR. CORRIGAN:  Three times a day everybody goes in

15     there.

16          THE COURT:  Oh.

17          MR. CORRIGAN:  The area is air-conditioned where

18     people have an opportunity to be.  Also the kitchen and

19     laundry, two of the hottest in the building.  They have

20     air conditioning and --

21          THE COURT:  Air conditioned the laundry?

22          MR. CORRIGAN:  They did.  Again, the concern was

23     how hot it got there and the heat emanated out from

24     there.  So that positive steps have been taken.  The

25     place is not the same in 2010 as the incident that

1  occurred, as it had been throughout.  There is no

2  Constitutional right to air conditioning, but there is

3  a Constitutional right to not be treated with

4  deliberate indifference.  And the City's position is

5  they have not been treated with deliberate indifference

6  in that time frame.

7      THE COURT:  Your argument is that the fact that

8  you air conditioned the mess hall and the kitchen and

9  the laundry somehow shows that you have paid attention

10  to the problems in the living area.

11      MR. CORRIGAN:  Yes, it provides at least most of

12  the people going to the mess hall three times a day,

13  they are out of that condition into a cooler condition.

14      THE COURT:  What have you done to take care of

15  people who have high temperatures like this, this guy

16  was diagnosed with?  What did Dr. Moja do with a 102.3

17  fever?  That is an extremely high forever.  And, you

18  know, I would assume the doctor knows that.  If he

19  doesn't, I'm not quite sure why he is practicing

20  medicine.  But when I had a 102.3 fever recently I was

21  hospitalized to reduce it.  And in the process I was

22  told that 102, I think 102.5, whatever it was, was a

23  very high fever for an adult.  The doctor ought to know

24  that.  You have got to put people like that somewhere

25  else.  You have got to do something with them.  The

1    "take a Motrin and call me back in two days" approach

2    is not going to sit well with the jury.  It really

3    isn't.

4        Why did you sue McRae?  What did he do wrong?

5        MR. CARROLL:  He is the director of operation at

6    the jail.  Has been involved in the prior cases, and

7    has, in our opinion, has a part in making sure the

8    operations -- equipped the deputies, who we don't know

9    the specific ones that may or may not have done bad

10   things at this point, but to make sure that they are

11   operating the jail in a safe manner.  That is why we

12   named him.

13       THE COURT:  Well, you now have the names of each

14   of the deputies who were on duty.  And do you have what

15   their duties were at the time period?

16       MR. CARROLL:  I would be probably speaking with

17   ignorance.  I don't believe so.

18       THE COURT:  Give him the names of all the deputies

19   who were on duty on the day in issue.  What are they?

20   How many of them?  About six days, five days?

21       MR. CARROLL:  Between July 5 and 4.  Four days.

22       THE COURT:  Everybody on duty from the third of

23   July to the day after.  And the jobs they had and where

24   they did them.  And file that in writing.  And give

25   that to them.

1           What is today?

2           MR. CORRIGAN:  Tuesday or Wednesday.

3           THE COURT:  Give them by next Monday.

4           MR. ROSEN:  Next Monday.

5           THE COURT:  Monday.

6           MR. CARROLL:  Thank you, Judge.

7           THE COURT:  You need to start looking at and

8    figuring out who you are going to lay the wood on and

9    see who was doing what so that they can have an

10   intelligent approach to who they are going to defend

11   and how they are going to defend the case.  At least in

12   the Sheriff's office.

13          The City has a different situation.  But at least

14   in the Sheriff's office they are entitled to know that.

15          MR. ROSEN:  Could it be next Friday?  My contact

16   for the jail is out of town this week.  I can't get it

17   done to next Friday.

18          THE COURT:  All right.

19          What day is that?

20          MR. CARROLL:  30th, I believe, Judge.

21          THE COURT:  Okay.

22          MR. ROSEN:  That should be no problem.  By the

23   30th.  Thank you.

24          THE COURT:  That is by day and by shift.  Lay it

25   out for them.

1        MR. ROSEN:  We will do, Judge.

2        THE COURT:  So they know who was where when.

3        MR. ROSEN:  We will do that.

4        THE COURT:  You know just because somebody is on

5    duty doesn't necessarily mean they have any

6    responsibility.  You understand that.

7        MR. CARROLL:  I agree with that, Judge.

8        THE COURT:  Okay.

9        All right.

10       Okay.  Now, do you want in your suit against, the

11   cross claim against the City, are you seeking

12   contribution, indemnity, both, or what?  You -- they

13   moved to dismiss the cross claim.  I am having trouble

14   understanding what claim, what of the counts you are

15   proceeding under to assert a cross claim and what you

16   want to recover, either indemnity or contribution.

17       So, can you tell me which ones you are proceeding

18   under?

19       MR. ROSEN:  Proceeding on 1983 as an allegation.

20       THE COURT:  Which count?  Take the number.

21       MR. ROSEN:  Okay.

22       THE COURT:  Let's see.  We have got their amended

23   complaint.

24       MR. ROSEN:  There is an amended complaint, Judge.

25       THE COURT:  I don't know that I have that.

 1          MR. ROSEN:  I don't have it with me.

 2          THE COURT:  First amended complaint.  Yes, I have

 3     it.  Your cross claim seeks what against whom and why?

 4          MR. ROSEN:  Okay.  Judge, it is seeking indemnify

 5     against the City because under Virginia law, as

 6     outlined, the City is the one responsible for

 7     maintaining the air conditioning and ventilation system

 8     in the jail.  So, the allegation, I understand, is that

 9     that is a part and parcel of the claim.  That because

10     the jail, the temperature in the jail was hot that is

11     what caused Mr. Woodson's heat exposure and subsequent

12     brain injury.  And that it is our position that that

13     part of management of the facility is the City's

14     responsibility under Virginia law, as you so held in

15     the Mitchell case.  So therefore if we are sued we are

16     seeking contribution and/or indemnification from the

17     City because that is their responsibility.

18          THE COURT:  I understand that point.  I am asking

19     you this.  Of the claims the plaintiff asserted in the

20     complaint, amended complaint, which of those do you

21     believe, if there is a liability that attaches to you,

22     gives you a right to -- does the right to indemnify

23     arise under?

24          MR. ROSEN:  I understand --

25          THE COURT:  I don't know from your papers.  I

1    can't tell.  There is this general assertion and then

2    there is a co-mingling of the terms "contribution" and

3    "indemnity."  They are distinctly different legal

4    concepts with distinct different legal ramifications.

5    Particularly in the 1983 case.  Because most courts

6    have held contribution doesn't even apply in cases, not

7    as in 1983.  So I need to know that.  I can't proceed

8    on your papers.

9         MR. ROSEN:  Would you like me to file a brief?

10        THE COURT:  I would.  When would you like to do

11   that?

12        MR. ROSEN:  Two weeks would be great.

13        THE COURT:  Supplemental brief.  It is a motion to

14   dismiss, isn't it?

15        MR. ROSEN:  Yes.

16        THE COURT:  It is the City's motion to dismiss,

17   right?

18        MR. ROSEN:  Correct.

19        THE COURT:  That would be -- what day did you

20   want, sir?

21        THE CLERK:  Two weeks would be September 4, from

22   today.

23        THE COURT:  That is Labor Day weekend.

24        MR. ROSEN:  How about three weeks, Judge?

25        THE CLERK:  Do you want to do three?  That is

 1    September 11.

 2         THE COURT:  Ten is a Tuesday.

 3         THE CLERK:  Yes, sir.

 4         THE COURT:  Let's do ten.

 5         MR. ROSEN:  Thank you, Judge.

 6         MR. CORRIGAN:  Do I have a chance to respond?

 7         THE COURT:  No, you don't get any response.

 8         MR. CORRIGAN:  Thank you.

 9         THE COURT:  All right.

10         When do you want to respond?

11         MR. CORRIGAN:  I think we should be able to

12    respond certainly within ten days.

13         THE COURT:  So that is September 20; is that a

14    weekend?

15         THE CLERK:  September 20th is Friday.

16         THE COURT:  Okay.  All right.  That is your reply.

17         All right.  And if I need oral argument, I will

18    ask for it.

19         So have you all talked about a trial date?

20         MR. ROSEN:  We did, Judge.

21         THE COURT:  When do you want to try this?

22    December 21?

23         MR. ROSEN:  We are looking to February.  Looking

24    at February 18.  That seems to be a date available for

25    everyone.

1          THE COURT:  February 18th?  That is a long time.

2     Why do you need that much time?  The case has been

3     pending since the amended complaint was filed on

4     March 13.  I don't remember what the date was.

5          THE CLERK:  March 1 of 2013.

6          THE COURT:  Thank you.  Why do you need February?

7          MR. ROSEN:  The problem, only problem is we are

8     not able to propound discovery because we haven't had

9     the initial conference.  We exchanged disclosures, but

10    not able to propound discovery.

11         THE COURT:  You are going to do that when?

12    Monday?

13         MR. ROSEN:  Immediately.

14         THE COURT:  Yes.

15         MR. ROSEN:  So that is what held it up, in all

16    candor.

17         THE COURT:  That is a fault of the Federal Rules,

18    to tell you the truth.

19         MR. ROSEN:  I agree with you.

20         THE CLERK:  Utterly ridiculous.  You could have

21    been ready by now.

22         MR. ROSEN:  Absolutely.

23         THE COURT:  I think I will eliminate that from the

24    pretrial and say file discovery once the case is filed.

25    Do you find, as I do, that -- and be honest -- that it

1    is a hinderance to wait until you have a pretrial

2    conference --

3         MR. ROSEN:  Absolutely.

4         THE COURT:  -- to do discovery with it?

5         MR. ROSEN:  Absolutely.

6         THE COURT:  There is a fight over it, over you can

7    bring it in for a hearing and get it done.  I think the

8    pretrial order should be changed to take care of it.

9         MR. CORRIGAN:  Once you have disclosures exchanged

10   and the parties have had that, if for no other reason

11   not to start discovery.

12        THE COURT:  So that also means starting the

13   initial disclosure process earlier, too.

14        MR. ROSEN:  Um hum.

15        Well, that is still a long time.  But it seems to

16   me --

17         How long do you think it will take to try the

18   case if it goes to trial?

19        MR. McNELIS:  Four or five days.

20        MR. CORRIGAN:  The rest of the week, to the 21st.

21   Four days.

22        THE COURT:  Is everybody on board with that date?

23        MR. McNELIS:  Yes, sir.

24        MR. CARROLL:  Yes, Your Honor.

25        THE COURT:  All right.

 1      I think -- well, what is President's Day.  Is that

 2  a holiday?

 3      MR. ROSEN:  17th, Judge.

 4      MR. CORRIGAN:  If we started after --

 5      THE COURT:  Well, it looks to me like it is

 6  better.  Any reason you can't start on Flag Day?  That

 7  is the 24th of February.

 8      MR. CARROLL:  That was my conflict day.  A jury

 9  trial on the 25th that takes that week up.

10      THE COURT:  The problem I have is you break up the

11  jury's life because this case, if it goes into the

12  deliberations and everything, it is going to take the

13  jury, on your schedule it is going to take them over

14  into the next week.  That is what bothers me about the

15  19th.  Maybe we can go earlier.

16      MR. CARROLL:  Judge, the 24th would be okay.  I

17  can probably prep a colleague to try that one-day jury

18  trial.

19      THE COURT:  Would you rather do that?

20      MR. CARROLL:  Fine.

21      THE COURT:  I don't want the jury to have this

22  problem.  That is the only thing.  All right.

23      So February 24 starting at 9:30.  Initial pretrial

24  conference -- I mean final pretrial conference on

25  February -- I have February 18th at 10:00 o'clock.  Can

1   you do that?

2        MR. McNELIS:  Yes, sir.

3        MR. CORRIGAN:  Yes, Judge.

4        MR. ROSEN:  Yes, Your Honor.

5        THE COURT:  All right.

6        All the dates in the pretrial schedule will be

7   keyed to the date of the final pretrial conference, not

8   the trial date.

9        All right.

10       Such as designating witnesses, et cetera.

11       Judge Novak has had experience in a similar case,

12  a plaintiff named Sleeper, I believe.  Were you all in

13  that case?

14       MR. CORRIGAN:  Yes, sir.

15       MR. ROSEN:  Yes.

16       THE COURT:  I think I am going to ask Judge Novak

17  to handle the settlement in this case.  So you all need

18  to get with him.

19       MR. ROSEN:  Judge Lauck was settlement judge in

20  that case.  Judge Lauck settled the case and was

21  actually very instrumental.

22       THE COURT:  She did it?

23       MR. ROSEN:  She did.

24       MR. CORRIGAN:  Novak did the discovery issues in

25  that case, but did not do the settlement.

1        MR. ROSEN:  Judge Lauck did.

2        THE COURT:  Then since she is the one that knows

3   about the settlement, I will let her do that then.

4   Okay.

5        I will do that.

6        You all go on and get on her docket now, because

7   she keeps a busy docket.

8        MR. CORRIGAN:  Do that before we leave.

9        THE COURT:  You can go down and talk to her office

10   and see if she is willing to put you on.  I will get

11   the order out tomorrow.

12        Anything else you need to deal with?

13        MR. McNELIS:  No, Your Honor.

14        MR. ROSEN:  No, Your Honor, thank you very much.

15        MR. CORRIGAN:  Your Honor, there is a protective

16   order.

17        THE COURT:  Do you have it?

18        MR. ROSEN:  Endorsed by all counsel, Judge.

19        THE COURT:  Does it exclude the destruction or

20   return of documents, exhibits, in the court?

21        MR. CORRIGAN:  I don't remember.

22        THE COURT:  Which paragraph is that?

23        MR. CORRIGAN:  It would be near the end.

24        THE COURT:  I have amended it in paragraph 14 to

25   say at the beginning, "excluding documents filed with

1    The Court."  What is the date?  Twenty-one.  All right.

2        MR. CORRIGAN:  For my edification, to make sure I

3    don't make that mistake again, is that so that The

4    Court does not have any obligation to be involved with

5    it?

6        THE CLERK:  No, it is so you don't come over here

7    and try to destroy the documents of the court, which we

8    have actually had happen.

9        MR. CORRIGAN:  Okay.

10       THE COURT:  Somebody came in and asked the clerk

11   for the documents because they wanted to destroy them

12   pursuant to this instruction.

13       MR. CORRIGAN:  All right.

14       THE COURT:  It created some problem, as you can

15   imagine.

16       MR. CORRIGAN:  Lots of excitement.

17       THE COURT:  Well, I mean, it really meant tearing

18   apart -- this was back in the days when they were paper

19   files, it meant tearing apart the court files the way

20   that order read.  I had signed it without appreciating

21   it allowed them to do that.  So they saw their way

22   clear not to cause the clerk's office to go into

23   rebellion.

24       All right.

25       Thank you all very much.

1

2                        HEARING ADJOURNED

3

4          CERTIFIED TRUE AND CORRECT TRANSCRIPT

5

6                  GILBERT F. HALASZ, RMR

7                 Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25