# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

STEFAN WOODSON,                        :
                                          :

      Plaintiff,                   :
                                          :

v.                                   :     Case No.: 3:13-cv-00134-REP
                                   :

CITY OF RICHMOND, VIRGINIA,     :     JURY TRIAL DEMANDED
                                   :

      Serve:                      :
                                          :

      Allen L. Jackson, City Attorney   :
      Office of the City Attorney      :
      City of Richmond, Virginia       :
      900 E. Broad Street, Suite 300  :
      Richmond, Virginia 23219      :
      (City of Richmond)           :
                                          :

and                               :
                                          :

C.T. WOODY, JR., Sheriff,        :
City of Richmond, Virginia,      :
                                        :

ABRAHAM BUL,              :
Deputy of C.T. Woody, Jr.,      :
                                        :

DONALD PALMER,           :
Deputy of C.T. Woody, Jr.,      :
                                        :

JOHN WHITAKER,          :
Deputy of C.T. Woody, Jr.,      :
                                        :

JOHN DOE DEPUTIES       :
Deputies of Defendant C.T. Woody, Jr. :
                                        :

      Serve all at:              :
                                          :

      1701 Fairfield Way         :
      Richmond, Virginia 23223      :
      (City of Richmond)           :
                                          :

and                               :
                                          :

CORRECT CARE SOLUTIONS, LLC,          :
                                      :
JOHN DOE MEDICAL STAFF,               :
Staff of Correct Care Solutions, LLC, :
      Serve all at:                 :
                                      :
      Business Filings Incorporated :
      4701 Cox Road, Suite 301      :
      Glen Allen, Virginia 20360    :
      (Henrico County)              :
                                      :
and                                   :
                                      :
      MOTSUMI MOJA, M.D.,           :
                                      :
        Serve at:                 :
                                      :
      9114 Cardinal Creek Drive     :
      Mechanicsville, Virginia 23116 :
                                      :
        Defendants.               :

## SECOND AMENDED COMPLAINT

COMES NOW Plaintiff, Stefan Woodson ("Mr. Woodson"), by counsel, and moves this honorable Court for judgment against the City of Richmond, Virginia; C.T. Woody, Jr. ("Sheriff Woody"); Deputy Abraham Bul ("Deputy Bul"); Deputy Donald Palmer ("Deputy Palmer"); Deputy John Whitaker ("Deputy Whitaker"); John Doe Deputies (the "Deputies"); Correct Care Solutions, LLC ("Correct Care"); John Doe Medical Staff (the "Medical Staff"); and Motsumi Moja, M.D. ("Dr. Moja"), and, in support of his Complaint, states as follows:

## INTRODUCTION

1.      This Complaint asserts claims pursuant to 42 U.S.C. §1983.

2.      This Complaint details violations of the Eighth Amendment of the Constitution of the United States of America by Defendants, jointly and severally, occurring in the Richmond City Jail (the "Jail").

3.      Defendants City of Richmond and Sheriff Woody were responsible for maintaining and operating the Jail so as to not endanger the health and safety of those incarcerated or detained at the Jail.  Defendant Correct Care was responsible for the medical care of inmates at the Jail.  For years, Defendants have known of the deadly high temperatures in the Jail, but they have taken no steps to remedy these conditions.  As a result, there have been numerous incidents of heat-related injury and death at the Jail.  These Defendants' inaction has resulted in prior heat-related litigation involving inmates and detainees at the Jail, including suit previously pending in this Court styled **SLEEPER v. CITY OF RICHMOND, ET AL., Case No.: 3:12cv441** involving an alleged heat-related death of detainee Grant Rollins Sleeper ("Mr. Sleeper").

4.      Defendants City of Richmond, Sheriff Woody, Deputy Bul, Deputy Palmer, Deputy Whitaker and the Deputies, failed to provide a humane and livable environment at the Jail, failed to effectively operate the Jail, failed to perform their duties to care for inmates, including Mr. Woodson, and failed to prevent cruel and unusual conditions.  Through action and inaction, Defendants City of Richmond, Sheriff Woody, Deputy Bul, Deputy Palmer, Deputy Whitaker and the Deputies were grossly negligent and demonstrated deliberate indifference to human life, including that of Mr. Woodson, in violation of Mr. Woodson's constitutional rights.

5.      Defendants Correct Care, Medical Staff, and Dr. Moja failed to provide necessary, adequate, and timely medical care to Mr. Woodson.  Through action and inaction, Defendants Correct Care, Medical Staff, and Dr. Moja both failed to prevent and directly caused Mr. Woodson's injury through their gross negligence and deliberate indifference to human life, including that of Mr. Woodson, in violation of Mr. Woodson's constitutional rights.

## JURISDICTION

6.      This Court has federal question jurisdiction, pursuant to 28 U.S.C. §1331, over Mr. Woodson's 42 U.S.C. § 1983 claims.

7.      On November 6, 2012, notice was given to the City of Richmond pursuant to Virginia Code §15.2-209.  On this same date, notice was also provided to Sheriff Woody and the Attorney General of Virginia.  Copies of these notices are attached as Exhibit A.

8.      On December 4, 2012, updated notices were sent to the City of Richmond, Richmond Mayor Dwight Jones, Sheriff Woody and the Attorney General of Virginia

indicating Mr. Woodson's intention to pursue a 42 U.S.C. §1983 action against the Defendants.  Copies of these notices are attached as Exhibit B.

## VENUE

9.      Venue is proper pursuant to 28 U.S.C. §1391(b) because a substantial part of the acts and omissions giving rise to Mr. Woodson's claims occurred in this District.

10.     Assignment to the Richmond Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C), because a substantial part of the acts and omissions giving rise to Mr. Woodson's claims occurred in this division.

## PARTIES

11.     The Plaintiff, Stefan Woodson, resides in the City of Richmond and was an inmate at Richmond City Jail at the time of the heat-related injury alleged herein.

12.     The City of Richmond is, and at all relevant times was, a city within the Commonwealth of Virginia.  As discussed fully below, the City of Richmond was responsible for the design, construction, and structural maintenance of the Jail, including, but not limited to, the ventilation, cooling, and plumbing systems.  Final decision making for the City of Richmond's policies concerning Jail operations is delegated to its sheriff, who, during all relevant times, was Sheriff Woody.

13.     Defendant Sheriff Woody, as Sheriff of the City of Richmond, is a constitutional officer.  Sheriff Woody operated, directed and supervised the Jail and his deputies.  At all times while Mr. Woodson was an inmate in the Jail, Sheriff Woody had a duty to maintain the custody and care of Mr. Woodson, and otherwise delegated that duty

to his deputies, agents, and employees.  Sheriff Woody is sued in his individual and/or official capacity as charged herein.

14.     Deputy Bul, Deputy Palmer, Deputy Whitaker and John Doe Defendants were deputies, agents, and/or employees of Sheriff Woody.  These Defendants were on duty and assigned to work on the tier where Mr. Woodson was housed at the time of his injury, or otherwise had responsibilities related to Mr. Woodson.  Deputy Bul, Deputy Palmer, Deputy Whitaker and other Defendant Deputies are sued in their individual capacities.

15.     Defendants Correct Care and Medical Staff are contracted by Sheriff Woody to provide Medical Services and Resident Care for the Richmond City Jail. Pursuant to its contract with Sheriff Woody, Correct Care receives in excess of **FOUR MILLION DOLLARS** per year to provide constitutionally adequate health care services at the Jail.  Correct Care, its Medical Staff, and its employees, as agents or contractors of Sheriff Woody, are charged with providing adequate, appropriate, and timely medical care to inmates, including Mr. Woodson, at the time of Mr. Woodson's heat-related injury.  Correct Care and its Medical Staff failed to meet these responsibilities, were grossly negligent and showed deliberate indifference to human life, including that of Mr. Woodson, resulting in the heat-related injuries to Mr. Woodson.

16.     Upon information and belief, Defendant Dr. Moja is a Virginia licensed medical doctor employed by Correct Care to provide physician services at the Jail.  Dr. Moja was responsible for providing constitutionally adequate, appropriate, and timely medical care to inmates and detainees, including Mr. Woodson, at the time of Mr. Woodson's heat-related injury.  Dr. Moja failed to meet these threshold responsibilities,

was grossly negligent, and showed deliberate indifference to human life, including that of Mr. Woodson, resulting in the heat injury to Mr. Woodson.

17.     All Defendants are persons acting under color of state law pursuant to 42 U.S.C. §1983.

## FACTS

*I.*     ***Mr. Woodson's injuries occurred during a period of forecasted extreme heat.***

18.     According to the National Oceanic and Atmospheric Association ("NOAA"), July 2012 was the hottest month ever recorded in Virginia.

19.     The excessive heat in Richmond was particularly dangerous during the period of July 1, 2012, through July 9, 2012 (hereinafter, the "Heat Wave").

20.     On Wednesday, July 4, 2012, the National Climactic Data Center ("NCDC") recorded a high temperature of 98 degrees (all temperatures will be in degrees Fahrenheit and are quality controlled readings for Richmond, Virginia).

21.     On Thursday, July 5, 2012, NCDC recorded a high temperature of 102 degrees.

22.     On Friday, July 6, 2012, NCDC recorded a high temperature of 99 degrees.  A local Richmond news outlet warned of a "dangerous heat wave through weekend," as excessive heat warnings were extended through July 8, 2012.

23.     On Saturday, July 7, 2012,  NCDC recorded a high temperature of 104 degrees.

24.     On Sunday, July 8, 2012, NCDC recorded a high temperature of 103 degrees.  According to NCDC, this was the highest temperature ever recorded on July 8 in Richmond, Virginia.

25.     The National Weather Service issued a **heat advisory** on July 1, 5, 6, and

8, 2012.  The National Weather Service's public announcement issued with these heat

advisories stated as follows:

> IMPACTS: **PROLONGED EXPOSURE TO THE HEAT OR ANY STRENUOUS**
> **ACTIVITY OUTDOORS WILL LIKELY LEAD TO HEAT RELATED ILLNESSES**
> **THAT REQUIRE IMMEDIATE MEDICAL ATTENTION.**
> PRECAUTIONARY/PREPAREDNESS ACTIONS...
> A HEAT ADVISORY MEANS THAT A PERIOD OF HOT TEMPERATURES IS
> EXPECTED. **THE COMBINATION OF HOT TEMPERATURES AND HIGH HUMIDITY**
> **WILL COMBINE TO CREATE A SITUATION IN WHICH <u>HEAT ILLNESSES ARE</u>**
> **<u>POSSIBLE</u>. DRINK PLENTY OF FLUIDS...STAY IN AN AIR-CONDITIONED**
> **ROOM**...STAY IN THE SHADE IF POSSIBLE...**<u>AND CHECK UP ON RELATIVES</u>**
> **<u>AND NEIGHBORS</u>.**
> TAKE EXTRA PRECAUTIONS IF YOU WORK OR SPEND TIME OUTSIDE. WHEN
> POSSIBLE...RESCHEDULE STRENUOUS ACTIVITIES TO EARLY MORNING OR
> EVENING. **<u>KNOW THE SIGNS AND SYMPTOMS OF HEAT EXHAUSTION AND HEAT</u>**
> **<u>STROKE</u>. WEAR LIGHT WEIGHT AND LOOSE FITTING CLOTHING WHEN**
> **POSSIBLE AND <u>DRINK PLENTY OF WATER</u>.**
> TO REDUCE RISK DURING OUTDOOR WORK...THE OCCUPATIONAL SAFETY AND
> HEALTH ADMINISTRATION RECOMMENDS SCHEDULING FREQUENT REST BREAKS
> IN SHADED OR AIR CONDITIONED ENVIRONMENTS. **ANYONE OVERCOME BY**
> **HEAT SHOULD BE MOVED TO A COOL AND SHADED LOCATION. <u>HEAT STROKE</u>**
> **<u>IS AN EMERGENCY - CALL 9 1 1.</u>**

26.     The National Weather Service issued an **excessive heat *watch*** on July 6,

2012 for the following day, Saturday, July 7, 2012.  The National Weather Service's

public announcement issued with the excessive heat watch stated as follows:

> AN EXCESSIVE HEAT WATCH REMAINS IN EFFECT FROM SATURDAY
> AFTERNOON THROUGH SATURDAY EVENING.
> * AREAS AFFECTED: CENTRAL AND SOUTHEAST VIRGINIA...NORTHEAST
> NORTH
>   CAROLINA.
> * MAXIMUM FORECAST HEAT INDEX VALUES: BETWEEN 105 AND 108 THIS
>   AFTERNOON...AND AROUND 110 SATURDAY AFTERNOON.
> * TIMING: THE HOTTEST TEMPERATURES AND HEAT INDICES WILL OCCUR
>   BETWEEN 1 PM AND 6 PM TODAY AND SATURDAY.
> * IMPACTS: **PROLONGED EXPOSURE TO THE HEAT OR ANY STRENUOUS**
>   **ACTIVITY OUTDOORS MAY LEAD TO HEAT RELATED ILLNESSES THAT**
>   **REQUIRE IMMEDIATE MEDICAL ATTENTION.**
> PRECAUTIONARY/PREPAREDNESS ACTIONS...
> AN EXCESSIVE HEAT WATCH MEANS THAT A PROLONGED PERIOD OF HOT
> TEMPERATURES IS EXPECTED. **THE COMBINATION OF HOT TEMPERATURES AND**
> **HIGH HUMIDITY WILL COMBINE TO CREATE A DANGEROUS SITUATION IN**
> **WHICH HEAT ILLNESSES ARE POSSIBLE.** DRINK PLENTY OF FLUIDS...STAY
> IN AN AIR-CONDITIONED ROOM...STAY IN THE SHADE IF POSSIBLE...**AND**
> **CHECK UP ON RELATIVES AND NEIGHBORS.**

27.     The National Weather Service issued an **excessive heat *warning*** on July

7, 2012, (accompanied by an additional *excessive heat watch* for the following day, July

8, 2012) the National Weather Service's public announcement issued with the excessive

heat warning stated as follows:

```
THE NATIONAL WEATHER SERVICE IN WAKEFIELD HAS ISSUED AN EXCESSIVE
HEAT WARNING...WHICH IS IN EFFECT FROM NOON TODAY TO 8 PM EDT
THIS EVENING. AN EXCESSIVE HEAT WATCH HAS ALSO BEEN ISSUED. THIS
EXCESSIVE HEAT WATCH IS IN EFFECT FROM SUNDAY AFTERNOON THROUGH
SUNDAY EVENING. THE EXCESSIVE HEAT WATCH IS NO LONGER IN EFFECT.
* AREAS AFFECTED: CENTRAL AND SOUTHEAST VIRGINIA...LOWER EASTERN
  SHORE...AND NORTHEAST NORTH CAROLINA.
* MAXIMUM FORECAST HEAT INDEX VALUES: BETWEEN 110 AND 115 DEGREES
  THIS AFTERNOON AND SUNDAY AFTERNOON.
* TIMING: THE HOTTEST TEMPERATURES AND HEAT INDICES WILL OCCUR
  BETWEEN 1 PM AND 6 PM TODAY AND SUNDAY.
* IMPACTS: PROLONGED EXPOSURE TO THE HEAT OR ANY STRENUOUS
  ACTIVITY OUTDOORS WILL LIKELY LEAD TO HEAT RELATED ILLNESSES
  THAT REQUIRE IMMEDIATE MEDICAL ATTENTION.
PRECAUTIONARY/PREPAREDNESS ACTIONS...
AN EXCESSIVE HEAT WARNING MEANS THAT A PROLONGED PERIOD OF
DANGEROUSLY HOT TEMPERATURES WILL OCCUR. THE COMBINATION OF HOT
TEMPERATURES AND HIGH HUMIDITY WILL COMBINE TO CREATE A DANGEROUS
SITUATION IN WHICH HEAT ILLNESSES ARE LIKELY. DRINK PLENTY OF
FLUIDS...STAY IN AN AIR-CONDITIONED ROOM...STAY IN THE SHADE IF
POSSIBLE...AND CHECK UP ON RELATIVES AND NEIGHBORS.
TAKE EXTRA PRECAUTIONS IF YOU WORK OR SPEND TIME OUTSIDE. WHEN
POSSIBLE...RESCHEDULE STRENUOUS ACTIVITIES TO EARLY MORNING OR
EVENING. KNOW THE SIGNS AND SYMPTOMS OF HEAT EXHAUSTION AND HEAT
STROKE. WEAR LIGHT WEIGHT AND LOOSE FITTING CLOTHING WHEN
POSSIBLE AND DRINK PLENTY OF WATER.
TO REDUCE RISK DURING OUTDOOR WORK...THE OCCUPATIONAL SAFETY AND
HEALTH ADMINISTRATION RECOMMENDS SCHEDULING FREQUENT REST BREAKS
IN SHADED OR AIR CONDITIONED ENVIRONMENTS. ANYONE OVERCOME BY
HEAT SHOULD BE MOVED TO A COOL AND SHADED LOCATION. HEAT STROKE
IS AN EMERGENCY - CALL 9 1 1.
AN EXCESSIVE HEAT WATCH MEANS THAT A PROLONGED PERIOD OF HOT
TEMPERATURES IS EXPECTED. THE COMBINATION OF HOT TEMPERATURES AND
HIGH HUMIDITY WILL COMBINE TO CREATE A DANGEROUS SITUATION IN
WHICH HEAT ILLNESSES ARE POSSIBLE. DRINK PLENTY OF FLUIDS...STAY
IN AN AIR-CONDITIONED ROOM...STAY IN THE SHADE IF POSSIBLE...AND
CHECK UP ON RELATIVES AND NEIGHBORS.
```

28.     Temperatures inside the Jail are consistently 15-30 degrees higher than

temperatures outside the Jail in summer months.

29.     The heat levels inside the Jail have been well known for years.  Shortly

after Mr. Sleeper's death, another Richmond Times Dispatch article stated:

> *Heat-exposure has become a concern at the Richmond City Jail, where a prisoner was hospitalized and later died of that cause last month. Another inmate died at the jail last month, but his cause of death is unknown.*
> **The men's tiers at the jail don't have air conditioning, and temperatures when it's 100 degrees outside can get up to 115 or 120 degrees inside the overcrowded jail, Richmond Sheriff C.T. Woody Jr. said last week.**
>
> *The American Civil Liberties Union of Virginia, reacting to last month's deaths, said yesterday it was asking the Department of Justice to investigate the conditions at the city jail.*

30.     During the Heat Wave, Mr. Woodson was confined on the top floor of the Jail without adequate ventilation.

31.     During the Heat Wave, Mr. Woodson was confined on the top floor of the Jail without adequate access to water and/or hydration.  Upon information and belief, Mr. Woodson had virtually no access to cold water.

32.     During the Heat Wave, Mr. Woodson was confined on the top floor of the Jail without air conditioning, adequate temperature control, or opportunity to cool his body temperature.

33.     Upon information and belief, Defendants were indifferent to Mr. Woodson's inability to properly breathe, hydrate, or cool himself.

34.     Upon information and belief, Defendants took no meaningful steps to provide Mr. Woodson with additional cooling devices, access to cold water, increased ventilation, or timely and appropriate medical care.

**II.     Mr. Woodson suffered a catastrophic heat stroke as a result of Defendants' omissions, gross negligence, and deliberate indifference to the dangerous heat levels in the jail and his resulting heat illness.**

35.     In the days leading up to July 9, 2012, Mr. Woodson, or someone on his behalf, complained to some or all of the following Defendants: Sheriff Woody, Deputy Bul, Deputy Palmer, Deputy Whitaker, the Deputies, Correct Care, Medical Staff, and

Dr. Moja that he was feeling unusually hot and otherwise physically distressed. In fact, Correct Care's records document that Mr. Woodson registered a temperature of 102.3 °F on July 5, 2012. Notwithstanding, no person or entity did anything to correct or prevent heat-related illness or to otherwise appropriately address Mr. Woodson's complaints and symptoms. In fact, other inmates were so concerned with Mr. Woodson's deteriorating condition that they pleaded with Deputy Bul, Deputy Palmer, Deputy Whitaker, and/or the Deputies to attend to Mr. Woodson, but were met with utter refusal and deliberate indifference. See Affidavit of Clifton Martin attached as Exhibit C.

36.     In the early morning hours of July 9, 2012, Mr. Woodson suffered a heat stroke as a result of the Defendants' failure to provide adequate ventilation, constitutionally appropriate housing, hydration, constitutionally appropriate medical care, and/or temperature control.

37.     In the early morning of July 9, 2012, staff at the Jail found Mr. Woodson unresponsive in his cell (which was, upon information and belief) in or near the medical tier of the Jail as a result of heat stroke.

38.     Richmond Ambulance Authority ("RAA") emergency responders arrived at Mr. Woodson's location at approximately 2:38 a.m., finding him unresponsive and seated in a chair on the medical tier of the Jail. RAA responders noted that Mr. Woodson had lost continence of his bladder and bowel and that he had vomited into his lap. Mr. Woodson's skin was extremely hot to the touch. Shockingly, Mr. Woodson registered an aural temperature of 106.1 degrees and his blood pressure registered 102/50. Mr. Woodson's breathing was shallow, short, and gasping. His pulse was weak. His pupils

were constricted and unreactive. His entire body was hot to the touch, and Mr. Woodson was or had been, upon information and belief, bleeding profusely from the nose.

39. Recognizing a heat-related emergency, RAA responders administered oxygen, applied ice packs to Mr. Woodson's groin, axillary and neck, and used IV tubing wrapped around ice packs to administer chilled fluids. They then transported Mr. Woodson via ambulance to MCV Hospital ("MCV"). On arrival at the hospital, Mr. Woodson was unresponsive and his emergency condition was unchanged in all respects.

40. When he arrived at MCV, Mr. Woodson was diagnosed with hyperthermia (elevated body temperature), registering 41°C (105.8°F). The doctors noted that Mr. Woodson was "in jail with no AC." The Emergency Department Visit Notes indicate that he arrived "hyperthermic, unresponsive, tachycardic, he soiled himself." Unbelievably, the note documents a "**Tmax core temp [of] 42.5 °C (108.5°F)**." The Progress Notes from Mr. Woodson's admission state that Mr. Woodson presented with

> hyperthermia due to overheating and dehydration. Jail apparently without air conditioning and temperatures have been >100 F for the past several days. Unlikely to be serotonin syndrome, NMS, etc. as patient not on known SSRI or antipsychotic medication.

41. Mr. Woodson's injuries were the direct result of the Defendants' omissions, negligence, and deliberate indifference to his constitutional rights.

42. Defendants Woody, Deputy Bul, Deputy Palmer, Deputy Whitaker, Deputies, Correct Care, Medical Staff, and Dr. Moja failed to provide appropriate access to care, adequate care, and timely care to Mr. Woodson in violation of his constitutional rights.

42. Defendants knew or should have known that Mr. Woodson was exposed to dangerous heat conditions and that he, in fact, demonstrated symptoms of heat-related

illness.  Notwithstanding this knowledge, Defendants took no appropriate steps to treat or prevent his injuries.

### III.   Defendants Have Known of the Life-Threatening and Inhumane Conditions at the Jail for Many Years, and Have Specific Knowledge of the Risk for Heat-Related Illness During Summer Months.

43.   The conditions at the Jail have been unsuited for the housing of human life for years.  The life-threatening heat levels, lack of water access, poor air quality, overcrowding, and inadequate medical care are well known to Defendants.  In fact, these conditions have been reported in the press, have been the subject of public debate, and have been analyzed in numerous unaddressed recommendations to upgrade the facility.

44.   Defendant Sheriff Woody has made repeated public comments concerning the Jail's dangerous heat problems.  In fact, in 2008, Sherriff Woody described the Jail as a "dumping ground," and referred to *daily* Jail conditions as "almost inhumane," further offering "**it is [inhumane], when it's hot**."

45.   On February 2, 2009, Mosely Architects, a firm under contract with the City of Richmond, produced a report acknowledging the horrible overcrowding at the facility.  Mosely Architects documented that the Jail was operating at 151% - 173% of its operating capacity.  This incredible degree of overcrowding further exacerbates the inhumane conditions at the jail, including exacerbation of the unconstitutional level of uncontrolled heat.

46.   On June 26, 2010, Mr. Sleeper died as a result of heat stroke while being held as a pre-trial detainee at the Richmond City Jail.  His death was previously the subject of litigation before this Court.  Significantly, Mr. Sleeper's action was filed on June 15, 2012, 24 days before Mr. Woodson's heat stroke in the Jail.

47.     Mr. Sleeper's action, alleging heat-related death as a result of conditions in the Jail, alone serves as notice that ongoing heat-related danger to inmates existed at the time of Mr. Woodson's injuries.

48.     Local NBC affiliate WWBT NBC12 documented the suffocating heat conditions in the Jail in an article published on July 22, 2010, entitled "Photos: Beating the heat in the Richmond City Jail."  This article contains independent, photographic confirmation of heat levels in the jail exceeding 100 degrees.

49.     As discussed above, Mr. Woodson's heat stroke occurred during the Heat Wave in the Richmond metropolitan area, when temperatures regularly exceeded 100 degrees.  It was well known by the Defendants that temperatures inside the men's tiers of the Jail were 15-20 degrees hotter than those outside the Jail. Supplementing Sheriff Woody's temperature findings, Lieutenant Colonel Walter Allman stated on September 11, 2010 that "when you have an average temperature of about 105 degrees that's on the outside, it's not unusual to find the temperature within the Jail to be up to about 110 degrees—that's the truth of the matter."

50.     Dangerous and potentially unconstitutional conditions at the Jail have been known by the City of Richmond for many years.   These problems were acknowledged as a result of the litigation in Brown v. Mitchell, 308 F. Supp. 2d 682 (E.D. Va. 2004).

51.     Brown documents the City of Richmond's knowledge of dangerous and potentially unconstitutional conditions at the Jail, beginning at least as early as 1988. Since then, the City has long failed to take any meaningful action to adequately address the problems despite litigation, requests by the office of the Sheriff of the City of

Richmond, several proposals by outside consulting firms recommending changes to the facility, and having documented issues with heating, poor ventilation, lack of water access, and overcrowding.

52.     In 2004, former Richmond City Sheriff Michelle B. Mitchell gave the following deposition testimony in the <u>Brown</u> case:

> *...you're dealing with the extreme heat that's in the back of the jail... we have to be really very careful with heat exhaustion in the summertime.*
>
> *In the summertime, what we would find is, [inmates] would go outside and play basketball and then they come back into their cell area where sometimes it can be ninety to a hundred degrees. There are no water fountains in the back of the jail. So, again, if you want water, you have to go drink, you know, from the tap.*
>
> *...we have to be very, very careful on how we recreate the inmates and also what we feed them, simply because it is terribly, terribly hot in the back of the jail.*
>
> *And, again, I have to tell you, it does affect the cleanliness. Because, in the back of the jail, you know, even though the water temperature may not be what it's supposes to be, it's still relatively hot. And, in the summertime, if you're back there taking a lot of showers, you now have the humidity that hangs in the air from the showers which makes the heat even that more unbearable in the back of the jail.*

<u>See</u> <u>Exhibit D</u>.

53.     Sheriff Mitchell went on to describe the City of Richmond's policy and custom of deliberate indifference to the conditions at the Jail and the constitutional rights of the inmates and detainees housed therein:

> *Q      Okay. But, how did you expect the City to resolve your request for addressing the overcrowded conditions and deteriorating conditions of the Richmond City Jail?*
>
> *A      I basically told Calvin [Jamison, Richmond City Manager] at that particular point in time, the jail is falling down. You have to seriously begin to address the issues, because something is going to happen and I don't want to have to be responsible for it...*

*We had conversations back and forth about whether or not City Council had the political will or the muster to really champion the cause of people who were behind bars. And, he felt at that particular point in time they did not. They did not want to expend his term there – Political capital, you know, pushing a new jail. He subsequently told me that if that's something that had to be done, that it was a ball that I was going to have to carry, I think was his little metaphor for that.*

*And, I said well, Calvin, I understand what you're saying, but the City has to understand that it's not just –* ***It's not my jail. I occupy a building. This is your facility, and you bear responsibility for it.***

*And he basically told me that it was my ball, I needed to carry it.*

Exhibit D.

54.     In July 2005, then Mayor of the City of Richmond, Douglas L. Wilder, created a commission to review various aspects of the current Jail.

55.     On September 29, 2006, the Mayor's Commission on City Jail Issues presented its Final Report (the "Final Report") to then Mayor Wilder. The Final Report states:

*The City Jail, because of* ***years of benign neglect preceding*** *the current Jail Administration, has suffered* ***significant consequences*** *resulting from a* ***stagnant budget and under funding.***

The Final Report strongly recommends a new Jail facility:

*A new facility will allow for greater efficiency and effective use of tax dollars. A new facility will provide for a better quality of life for inmates as well as a healthy, safe work environment for employees…* ***Overcrowding and antiquated physical conditions support this recommendation***.

Significantly, the Final Report emphasized that a new facility was required in order to meet "constitutional standards."

56.     On February 2, 2009, Mosely Architects notified the City of unconstitutional conditions at the Jail in producing a report that documented the extreme overcrowding at the  facility.  *See supra* ¶ 45.

57.     On July 6, 2010, ACLU Executive Director Kent Willis sent a letter to the U.S. Department of Justice chronicling the ongoing heat crisis at the Jail and requesting action.  He stated in conjunction with this request:

> *One of the most important measures of a civilized society is how it treats institutionalized persons. The Constitution flatly forbids cruel and unusual punishment because it has no place in our criminal justice system.* **By any measure, the punishing conditions at the Richmond City Jail are cruel and unusual. We should not be waiting for more deaths before taking action.**

https://acluva.org/5543/aclu-seeks-doj-investigation-into-conditions-at-richmond-city-jail/.

58.     The City of Richmond was constructively notified of the conditions at the Jail as a result of the report of local NBC affiliate WWBT NBC12.  *See supra* ¶ 48.

59.     Lieutenant Allman admitted in September 2010 that temperatures often eclipse 100 degrees in the Richmond City Jail, and that high temperatures have been an ongoing, widely-known, and largely unaddressed health and safety crisis for the facility for years.

60.     On December 13, 2010, and in subsequent correspondence following the heat-related death of Mr. Sleeper, counsel for Mr. Sleeper put the City of Richmond on notice that its failure to remedy the deplorable conditions at the Jail constituted actionable constitutional deprivations.

61.     In July 2011, Sheriff Woody publicly addressed Richmond City Council regarding the Jail's heat problem, "deplorable conditions," and imparted knowledge that

the current facility had "long outlasted its intended purpose." He indicated that ongoing use of the Jail was a known safety concern.

62. On June 15, 2012, the City of Richmond (along with Sheriff Woody and certain deputies) were sued by the Estate of Grant Rollins Sleeper following Mr. Sleeper's heat-related death while detained at the Jail. This suit served as additional notice to the City of Richmond of the sub-human conditions at the Jail, resulting in daily, ongoing, and future constitutional deprivations to those housed at the Jail, including Mr. Woodson, who was an inmate at that time.

63. Despite notice of the constitutionally inadequate facilities and services at the Jail, no action was taken by the City of Richmond, or the other Defendants, to remedy the known constitutional deprivations at the Jail, resulting in the ongoing indifference by the City of Richmond and the other Defendants to human life and to the constitutionally afforded rights of the inmates and detainees at the Jail.

64. Consequently, the knowing and deliberate inaction of Defendants allowed such conditions to persist, resulting in the danger of cruel and unusual harm to the lives of the inmates and detainees housed in the Jail, including Mr. Woodson, and resulting, tragically, in the real and otherwise preventable harm suffered by Mr. Woodson as described herein.

65. Despite years of knowledge demonstrating the need for a new facility, indifference to the human and constitutional rights of the inmates and detainees housed at the Jail, the City of Richmond delayed the ground breaking of a new facility until 2012. This new facility is not slated to be completed until 2014. Meanwhile, no efforts are

being taken to remedy the daily constitutional deprivations of the current Jail's inmates and detainees.  Consequently, future harm to these inmates and detainees is likely.

**IV.     *The May 12, 2011 Request for Proposal # B11801-1: Medical Services & Resident Care for the Richmond City Jail, and the May 23, 2011 Addendum No. 1 to RFP # B11180-1.***

66.     On May 12, 2011, The City of Richmond issued Request for Proposal # B11801-1 (the "RFP") for the contracting of medical services for inmates and detainees at the Jail.  A copy of the RFP is attached as <u>Exhibit E</u>.

67.     The RFP documents the extreme overcrowding at the Jail, showing a daily average population of 1214 inmates and detainees.

68.     The RFP defines the "Community Standard" for medical services as:

>*...diagnostic testing, preventive services and after care considered appropriate, in terms of type, amount, frequency, level, setting and duration appropriate to the patient's diagnosis or condition.  The Care must be consistent with generally accepted practice parameters in the Commonwealth of Virginia as recognized by health care providers in the same or similar general specialty as typically **treat or manage the diagnosis or condition, help restore or maintain the patient's health, prevent the deterioration or palliate the patient's condition, prevent the reasonably likely onset of a health problem, or detect an incipient problem***.

<u>Exhibit E</u> at 7.

69.     On May 23, 2011, the City of Richmond issued Addendum No. 1 to the RFP (the "Addendum").  A copy of the Addendum is attached as <u>Exhibit F</u>.

70.     The Addendum documents higher density of inmate population than suggested in the RFP, reflecting an average daily population of 1,463 in 2009 and 1,402 in 2010.  <u>Exhibit F</u> at 4.

71.     The Addendum indicates that the Jail is not accredited by either the American Correctional Association ("ACA") or the National Commission on Correctional Health Care ("NCCHC").  <u>Exhibit F</u> at 4.

72.     As of the date of the Addendum, five matters were currently in litigation pertaining to inmate health care at the Jail.  Exhibit F at 4.

73.     The Addendum confirms that the Jail is not air conditioned.  Exhibit F at 14.

74.     The Addendum states that the expectation for the hired medical contractor is to provide a licensed physician "onsite a minimum of 40 hours per week."  Exhibit F at 17.

**V.     *The Medical Services and Resident Care Contract is Awarded to Correct Care.***

75.     The contract stemming from the RFP was awarded to Correct Care on July 19, 2011, at an initial award rate of $4,039,883.00.     See http://richmondvaprocurementawards.blogspot.com/2011/07/rfp-b11180-1-medical-services-resident.html.

76.     The City of Richmond Professional Services Contract – Contract No. 11180-1 (the "Contract") was entered into on August 1, 2011, between Sheriff Woody and Correct Care.  A copy of the Contract is attached as Exhibit G.

77.     The Contract incorporates by reference the RFP, the Addendum, and the Original Plan proposed by Correct Care.

78.     Notwithstanding the foregoing, Correct Care has, upon information and belief, failed to meet the standards set forth in the Eighth Amendment, the RFP, and the Addendum.  Plaintiff does not, at the time of filing, have access to the Original Plan.

79.     Dr. Marc Stern, a former medical director for prisons in Washington State, said the data suggest either that the people being jailed in Richmond are sicker than their counterparts in other American cities or that Richmond's prisoners are getting inferior

medical    care.    See    http://www.timesdispatch.com/news/local/new-jail-old-roblem/article_4970827e-bec9-5d17-8c38-b7cd1a1f941d.html

**VI.     Correct Care, Medical Staff, and Dr. Moja Failed to Provide Constitutionally Adequate Care to Mr. Woodson.**

80.     Defendants Correct Care, Medical Staff, and Dr. Moja did not provide Mr. Woodson with access to care, adequate care, or timely care as required by the Eighth Amendment.

81.     Defendants Medical Staff and Dr. Moja observed Mr. Woodson demonstrating symptoms of heat-related illness, yet took no steps to properly treat these symptoms or prevent future harm.

82.     Mr. Woodson's heat-related illness and subsequent heat stroke constitutes a serious medical condition that was so obvious that even a lay person would have recognized the potential for serious harm.

83.     Defendants Correct Care, Medical Staff, and Dr. Moja failed to adequately treat Mr. Woodson's serious medical condition, and were otherwise grossly and recklessly indifferent to his health and safety.

84.     Upon information and belief, Defendant Correct Care promised to furnish a licensed M.D. on site at the Jail a minimum of 40 hours per week, but failed to furnish an M.D. to treat physical symptoms on-site at the Jail a minimum of 40 hours per week.

85.     Upon information and belief, Defendants Correct Care, Medical Staff, and/or Dr. Moja forged, tampered with, destroyed and/or otherwise caused unlawful spoliation to occur with respect to Mr. Woodson's medical records in an effort to cover up their grossly negligent, recklessly indifferent, and unconstitutional treatment (or lack of treatment) of Mr. Woodson.

86.     Upon information and belief, Defendant Correct Care and/or Dr. Moja failed to develop adequate, appropriate, and practical medical guidelines for use by the nurses and other medical personnel at the Jail, resulting in the inability or failure to provide Mr. Woodson constitutionally adequate diagnosis and treatment, and leading to the injuries suffered by Mr. Woodson as described herein.

87.     Upon information and belief, to the extent Defendant Correct Care and/or Dr. Moja did develop medical guidelines for use by the nurses and other medical personnel at the Jail, there was insufficient training to ensure that the guidelines would be properly followed by these nurses and medical personnel.  This failure to train resulted in the inability or failure to provide Mr. Woodson constitutionally adequate diagnosis and treatment, and led to the injuries suffered by Mr. Woodson as described herein.

88.     Upon information and belief, Defendants Medical Staff failed to follow medical guidelines, if any, provided for use in treating patients at the Jail.  This failure resulted in the inability or failure to provide Mr. Woodson constitutionally adequate diagnosis and treatment, and led to the injuries suffered by Mr. Woodson as described herein.

89.     Upon information and belief, Defendants Correct Care, Medical Staff, and/or Dr. Moja failed to develop or properly conduct adequate chronic care clinics for patients with chronic conditions.

90.     Hypertension is a chronic condition that, if not properly treated, can lead to serious health consequences.

91.     Persons with hypertension are more susceptible to heat-related illness.

92.     Upon information and belief, the failure to provide adequate medical care for individuals with chronic hypertension greatly exacerbates the impact of any heat-related illness.

93.     Upon information and belief, at all times relevant to this lawsuit, Mr. Woodson had been diagnosed with, suffered from, and had been prescribed medication for, chronic hypertension.  This chronic condition is well documented in Mr. Woodson's medical records maintained by Correct Care.  These records further indicate that Correct Care at various times failed to provide Mr. Woodson with his prescribed blood pressure medication, resulting in dangerously high and uncontrolled blood pressure levels in Mr. Woodson.

94.     Unbelievably, Defendants were so indifferent to Mr. Woodson's known chronic health problem that they did not give him his prescribed medication.  In fact, Mr. Woodson had to **call his mother and have her bring his hypertension medicine to the Jail**.  Specifically, on June 6, 2012, Mr. Woodson's progress note from Correct Care indicates:

> *Inmate requesting refills of… Lisinopril [high blood pressure medication] … states he has been out of them for 2wks now.  Has not been able to contact outside physicians to get renewal so that **mother could bring into Jail <u>as before</u>**.*

95.     Upon information and belief, in the period leading up to his heat stroke, Mr. Woodson made numerous requests for medical care, but did not receive a timely and adequate response to these requests.

96.     Upon information and belief, Mr. Woodson's blood oxygen levels were not checked, even after presenting with symptoms of high fever, shortness of breath, headache, fatigue, and other indicia of potential heat-related illness..

97.     Upon information and belief, an appropriate patient history was not taken.

98.     On July 5, 2012, Mr. Woodson was examined by Dr. Moja and member(s) of the Medical Staff.  Mr. Woodson complained of shortness of breath, headache, fatigue and chest pain.  His skin was noted as abnormal.  His temperature was an alarming 102.3° Fahrenheit.  Dr. Moja recommended that the nurse check his temperature that night and again the next morning.  He was advised to follow up **next week** and given Motrin 800 mg.

99.     Dr. Moja's and the Medical Staff's responses to Mr. Woodson's symptoms are inexplicable.  Any doctor, health professional, and even certain lay persons would identify that a patient with Mr. Woodson's specific health conditions presenting with these symptoms in a hot, humid, overcrowded, and poorly ventilated facility in the midst of a record breaking heat wave was likely suffering a heat-related illness and had a substantial risk of suffering heat stroke.

100.     Upon information and belief, no additional temperature checks were taken by the nurse, Dr. Moja, the Medical Staff, or any other Correct Care employee between the July 5, 2012 exam and the time of Mr. Woodson's heat stroke.

101.     Upon information and belief, absolutely no further care was given to Mr. Woodson to cure, palliate, mitigate, prevent, or otherwise treat his symptoms of heat-related illness.

102.     Upon information and belief, Mr. Woodson was not provided with adequate water or temperature control following his presentation with heat-related symptoms.

103.    Defendants Correct Care, Medical Staff, and Dr. Moja failed to provide constitutionally adequate medical care to Mr. Woodson, failed to respond to and prevent further symptoms of heat-related illness, ignored a plain and identifiable, serious medical condition, and were otherwise grossly negligent in care provided to Mr. Woodson and deliberately indifferent to his serious medical condition. As such, Defendants Correct Care, Medical Staff, and Dr. Moja violated Mr. Woodson's constitutional right to adequate medical care.

104.  Upon information and belief, absolutely no quality assurance or monitoring protocol is in place for ensuring the adequacy of medical care provided at the Jail.

## DEFENDANTS' DUTIES

105.    At all times relevant to this action, all Defendants had duties to Mr. Woodson, an inmate, pursuant to the Eighth Amendment of the U.S. Constitution.

106.    Defendants City of Richmond, Sheriff Woody, Deputy McRae, and John Doe Deputies were, among other things, required to provide Mr. Woodson and all other inmates and detainees, with adequate food, water, clothing, shelter and access to medical care.

107.    Defendants City of Richmond, Sheriff Woody, Deputy McRae, and John Doe Deputies were obligated to provide humane conditions of detention, which included a minimally adequate living space with reasonably adequate ventilation, and inside cell temperatures that did not endanger detainee health. Defendants also were obligated to take reasonable measures to provide for the safety of Mr. Woodson.

108.    Defendants City of Richmond, Sheriff Woody, Deputy McRae, and John Doe Deputies also owed statutory and common law duties of care to Mr. Woodson,

including affirmative duties to provide adequate and safe conditions of detention, including access to medical care.

### Specific Duties of Correct Care, Medical Staff, and Dr. Moja

109.   By virtue of the Contract to provide medical services at the Jail, Defendants Correct Care, Medical Staff, and Dr. Moja were, among other things, required to provide Mr. Woodson and all other inmates and detainees with constitutionally appropriate access to medical care, constitutionally adequate medical care, and constitutionally timely medical care.  Defendant Correct Care also assumed the duty to provide a standard of care as outlined in the RFP, the Addendum, and the Original Proposal.

### Specific Duties of Defendant City of Richmond

110.   Pursuant to state statute, the City of Richmond was obligated to provide for the physical maintenance and structural upkeep of the Jail building.  Va. Code Ann. § 15.2-1638; Cf. Va. Code Ann. § 53.1-71.

111.   The Richmond City Council is, and during the relevant time period, was, the policy maker for the City of Richmond.  Section 4-02 of the Richmond City Charter (the "City Charter") states that all powers vested generally in the City, unless otherwise specified, shall be exercised by the City Council, Richmond's local legislative body.

112.   Under Section 6-19 of the City Charter, the final authority to adopt a budget for any capital improvements, including the building of a new jail or structural improvements to an existing jail facility, also resides with the City Council.

### Specific Duties of Defendant Woody

113.    Defendant Sheriff Woody is responsible for the day-to-day operations and maintenance at the Richmond City Jail.  Va. Code Ann. §53.1-116 et seq.

114.    The final policymaking decision maker for the City of Richmond in the daily operation of the Jail is Sheriff Woody.  In a deposition in connection with another case, Defendant Woody acknowledged that he is the "chief administrator of the office who has overall authority in all matters of policy, operation, and discipline," as described in Sheriff's Office SOP 106.

115.    Sheriff Woody had the ability and the duty to report overcrowding and other inadequacies of the Jail that would warrant the circuit court's adopting another jail for the city.  See Va. Code Ann. § 53.1-71 and 52.1-74.

116.    Sheriff Woody had the duty of care and custody for Mr. Woodson.  While he was confined in the Richmond City Jail, Mr. Woodson was in the custody and under the care of Defendant Sheriff Woody and his deputies, employees and agents, including Defendant Deputy McRae and Defendant Deputies.

117.    In connection with Mr. Woodson's state law claim, Defendant Sheriff Woody is accountable, under the doctrine of *respondeat superior* liability, for the actions and inactions of his deputies, agents, and employees.

118.    Defendant Sheriff Woody, by and through his deputies (including Deputy McRae and Deputies) and medical staff (including Correct Care, Medical Staff, and Dr. Moja), had specific statutory duties to provide medical treatment to Mr. Woodson under Virginia Code § 53.1-126.  Under that statute, the Sheriff and jail personnel have a specific responsibility to inmates, in that "medical treatment shall not be withheld for any communicable diseases, serious medical needs, or life threatening conditions."  Id.

119.    Virginia legislative authority also enacted various regulations noted herein, including those that set standards for the heat exposure to which jail inmates can be subjected.    According to the Virginia Administrative Code's Department of Corrections Minimum Standards for Jails and Lockups. "[a]ir conditioning or mechanical ventilation systems, such as electric fans, shall be provided when the temperature exceeds 85[degrees] F."    (See 6 VAC 15-40-1160, "Appropriate lighting and heating"). Furthermore, Virginia Administrative Code provision 6 VAC 15-40-1170, "Water utilities," mandates the provision of, among other things, "**drinking water** and washbasins with hot and **cold running water accessible to inmates**." (Emphasis added).

120.    Upon information and belief, the Jail's Inmate Handbook makes inmates aware of and subject to the Jail's rules, including the policies of 24-hour emergency medical care, availability of "licensed health care providers" on all jail shifts, and access to a medical doctor upon request.

## COUNT I
### § 1983 Claim Against the City of Richmond
### (Official Policy or Custom)

121.    Mr. Woodson incorporates paragraphs 1 through 120 and 127 through 163 of this Complaint, as if fully set forth herein.

122.    At all times relevant to this action, through its actions and inactions as set forth above, Defendant City of Richmond, Virginia, acting under color of state law, by and through its City Council, pursuant to an official policy or custom, constructed and maintained the physical structure of the Jail in a manner that was in ill-repair, posed a risk to the health and safety of the inmates/detainees, including Mr. Woodson, and was otherwise inadequate to meet the needs of inmates/detainees such as Mr. Woodson,

including being overly crowded, poorly ventilated, and during the summer months, excessively overheated, with inadequate water supplies. Design, construction, and maintenance of the Richmond City Jail is the responsibility of the City of Richmond. Va. Code 15.2-1638.

123.    As set forth in detail herein, the policy and custom was manifest in certain affirmative decisions and omissions by the policy makers for the City of Richmond, as well as by a persistent and widespread practice of deliberate indifference to the needs of the inmates/detainees sufficient to constitute an official custom. The policy or custom may also be inferred from, among other acts, Defendant the City of Richmond's failure to act, despite a known pattern of constitutional deprivations that had occurred within the Jail because of the overcrowding, poor ventilation, inadequate medical care, inadequate water supply, and excessive heat in the summer, and/or the City of Richmond's failure to remedy these or related conditions that, left unaddressed, were patently likely to cause (and in the case of Mr. Woodson did cause) constitutional deprivations to the inmates/detainees who were confined in the Jail, and to whom the City owed affirmative duties of care.

124.    The Richmond City Council, itself, had knowledge of the constitutionally inadequate physical structure and conditions at the Jail, and engaged in an official policy or custom of representing a deliberate indifference towards the inmates/detainees at the Jail, in the period prior to, and at the time of Mr. Woodson's injuries.

125.    This official policy and/or custom reflected a deliberate indifference to, and had resulted in a deprivation of, Mr. Woodson's constitutional rights and/or other statutory rights, and such policy or custom has caused, or has contributed to cause, Mr.

Woodson's injuries. As stated herein, Defendant the City of Richmond's policy and custom was directly related to, and the moving force behind, the violation of Mr. Woodson's constitutional rights by, among other acts, those of Defendant Sheriff Woody, and his deputies, employees and agents, including the Defendant Deputies, Deputy McRae, Correct Care, Medical Staff and Dr. Moja. As a result, Mr. Woodson suffered a denial of his constitutional rights, physical pain, suffering and permanent mental and physical disability. Defendants' unconstitutional, deliberate indifference to Mr. Woodson's constitutional rights directly and proximately caused his injuries as described herein.

126. WHEREFORE, Defendant City of Richmond's violations of the Eighth Amendment to the United States Constitution establish a cause of action pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages in the amount to be established at trial, and attorneys fees and costs.

## <u>COUNT II</u>
### § 1983 Defendant Woody
### (Official policy or custom concerning operation of the Jail, including training)

127. Mr. Woodson incorporates paragraphs 1 through 126 and 134 through 163 of this Complaint, as if fully set forth herein.

128. This claim against Defendant Sheriff Woody is brought in his individual capacity.

129. According to state law, regulations, and practices, Sheriff Woody was the decision and policy maker for the operations and general inmate care at the City of Richmond's Jail prior to and at the time of Mr. Woodson's injuries. Sheriff Woody

knowingly and deliberately accepted additional prisoners into the Jail even though he knew the Jail already housed approximately two-and-a-half times its inmate capacity.

130.    Through his actions and inactions, Sheriff Woody, acting under color of state law, pursuant to an official policy or custom, operated and maintained the Jail and trained his deputies, employees, and agents in a manner that posed a risk to the health and safety of the inmates/detainees, including failing to operate the facility and train the staff to care for and protect the inmates/detainees from the severe heat inside the Jail in the summer months, and failing to provide adequate medical care to the inmates/detainees and training the staff, including for heat-related illnesses.

131.    Defendant Sheriff Woody had direct, personal, and specific knowledge of the constitutionally inadequate physical conditions, operations, medical care and training at the Jail, and engaged in an official policy or custom representing a deliberate indifference towards the Jail's inmates/detainees in the period leading up to Mr. Woodson's injuries.

132.    The policy or custom was manifest in certain affirmative decisions and omissions by Defendant Sheriff Woody, as well as by a persistent and widespread practice of deliberate indifference to the needs of the inmates/detainees sufficient to constitute an official custom.  The policy or custom may be inferred from, among other acts, Defendant Sheriff Woody's failure to act despite a known pattern of constitutional deprivations that have occurred within the Jail because of the overcrowding, poor ventilation, inadequate medical care, excessive heat in the summer, and lack of proper operations and training to deal with these conditions; or, the policy or custom may be inferred from Sheriff Woody's failure to remedy these or related conditions that, left

unaddressed, were patently likely to cause (and in the case of Mr. Woodson, did cause) constitutional deprivations to the inmates/detainees to whom Sheriff Woody owed affirmative duties of care.  Further, Sheriff Woody's failure to use available statutory mechanisms to remedy the overcrowding issue at the jail constitutes deliberate indifference to the inmates' Eighth Amendment rights, including Mr. Woodson.

133.   WHEREFORE, Defendant Woody's violations of the Eighth Amendment to the United States Constitution establish a cause of action pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages in the amount to be established at trial, and attorneys fees and costs.

## COUNT III
**§ 1983 Claim Against Defendants Sheriff Woody, Deputy Bul, Deputy Palmer, Deputy Whitaker, and Deputies**
**(Deliberate Indifference to the Conditions of Confinement and/or Supervisory Liability)**

134.   Plaintiff incorporates paragraphs 1 through 133 and 144 through 163 of this Complaint, as if fully set forth herein.

135.   Through their actions set forth herein, Defendants Sheriff Woody, Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies, in their individual capacities, while acting under color of state law, were through action and inaction deliberately indifferent to the constitutional rights of inmates/detainees, including Mr. Woodson.  Defendants Sheriff Woody, Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies knew of, but disregarded, the inhumane nature of the conditions to which Mr. Woodson was subjected in the Jail and the potential for heat-related illness that was unaddressed while Mr. Woodson was in the Jail.

136.     Defendants Sheriff Woody, Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies confined Mr. Woodson in a Jail facility they knew was likely to cause, and did cause, a serious deprivation of Mr. Woodson's constitutionally protected need for safe and adequate shelter and medical care.  Specifically, Mr. Woodson was placed in and maintained in an environment that was a patent and actual danger to his health as a result of overcrowding, inadequate ventilation and water access, inadequate medical care, and which encouraged suffocating temperatures and humidity in summer months.

137.     Defendants Sheriff Woody, Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies were aware of the inhumane conditions at the Jail, but did nothing to remedy or ameliorate the problems to bring conditions in the Jail within constitutionally acceptable standards.

138.     Defendants Sheriff Woody's, Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies' actions and inactions evidenced their deliberate indifference to the conditions of Mr. Woodson's confinement, which caused and/or contributed to Mr. Woodson's heat stroke and preceding heat illness.

139.     Defendants Sheriff Woody, Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies failed to properly manage and/or audit the medical care provided at the Jail.

140.     Defendants Sheriff Woody, Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies failed to properly notice and/or respond to the symptoms of heat illness exhibited by Mr. Woodson and otherwise failed to properly manage those personnel who could have appropriately responded to Mr. Woodson's symptoms and prevent his heat stroke.  On July 8, 2012, some or all of these Defendants willfully, deliberately and with

reckless indifference to the serious medical condition of Mr. Woodson, ignored requests from other inmates to come to his aid.

141.    Defendants Sheriff Woody, Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies failed to take any steps to palliate or mitigate Mr. Woodson's condition by providing relief from the deplorable conditions in the Jail during the Heat Wave.

142.    Defendants Sheriff Woody's, Deputy Bul's, Deputy Palmer's, Deputy Whitaker's and Deputies' aforesaid actions and omissions constitute willful, wanton, reckless, conscious, and deliberate indifference and disregard of Mr. Woodson's constitutional rights, by reason of which Mr. Woodson is entitled to recover punitive damages.

143.    WHEREFORE, Defendants Sheriff Woody's, Deputy Bul's, Deputy Palmer's, Deputy Whitaker's and Deputies' violations of the Eighth Amendment to the United States Constitution establish a cause of action pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages in the amount to be established at trial, and attorneys fees and costs.

### COUNT IV
### § 1983 Claim Against Defendants Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies
### (Official policy or custom concerning operation of the Jail, including training)

144.    Mr. Woodson incorporates paragraphs 1 through 143 and 151 through 163 of this Complaint, as if fully set forth herein.

145.    Through their actions set forth above, Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies, in their individual capacities, while acting under color of state law, acted in a manner that was deliberately indifferent to Mr. Woodson's basic human

needs during his confinement, including his need for medical care, amounting to a violation of Mr. Woodson's Eighth Amendment Rights.

146.   Upon information and belief, Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies knew that, with the combination of extremely high temperatures in the Jail, Mr. Woodson's documented chronic medical needs, Mr. Woodson's physical complaints, and Mr. Woodson's alarmingly high body temperature, that Mr. Woodson's basic needs were not being met, and that he was in need of additional water, cool air, or other aid to prevent heat stroke, or other heat-related-illness, and, when such illness manifested, adequate medical care.   Upon information and belief, the following facts were or should have been known to Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies:

i.      The Heat Wave lead to temperatures over one hundred degrees outside the Jail;

ii.     Local news outlets warned that the National Weather Service had issued an excessive heat warning for the Richmond area;

iii.    The National Weather Service issued heat advisories, excessive heat watches, and excessive heat warnings during the Heat Wave for the Richmond area;

iv.     Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies were aware that temperatures inside the Jail became excessively hot as outdoor temperatures increased;

v.      Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies knew or should have know about the heat advisories and/or heat watches and/or heat warnings during the Heat Wave.

vi.     The interior of the Jail was in fact excessively hot during the Heat Wave;

vii.    It was well known that the Jail was extremely hot in the summer, with indoor temperatures ranging from 15-30 degrees hotter than outdoor temperatures;

viii.   Numerous other detainees have previously suffered heat-related distress and illness;

ix.     It was well known that the third floor of the Jail, where Mr. Woodson was housed, was the hottest area of the jail;

x.      Mr. Woodson was kept in a medical observation unit in the Jail;

xi.     Mr. Woodson had symptoms indicative of heat-related illness, including an alarmingly high fever, which caused his skin to be noticeably hot to the touch;

xii.    Mr. Woodson requested medical care during the Heat Wave;

xiii.   Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies should have physically observed Mr. Woodson during the Heat Wave during inmate/detainee movement, scheduled count, security checks, and pill pass; and

xiv.    Given the seriousness of Mr. Woodson's condition, it should have been obvious that he was in physical distress.

xv.     Other inmates actually begged some or all of the herein named defendants to respond to Mr. Woodson's deteriorating conditions, but some or all of the

herein named defendants ignored or otherwise deliberately failed to respond to such requests.

147.    Upon information and belief, Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies failed to take action to aid Mr. Woodson, including:

i.    Failing to take any preventative measures (such as making sure he had regular access to cold water, removing him periodically to a cooler area, and providing some and/or increased ventilation) to help Mr. Woodson cope with the extreme temperatures in the Jail during the Heat Wave;

ii.    Once Mr. Woodson was in distress from the heat, either because of lack of training and/or their own indifference, the Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies failed to provide basic First Aid (or any response whatsovever) such as: removing Mr. Woodson to a cooler place, laying him down, providing cold towels/compresses, administering cold water, providing fans, providing air conditioning, and/or otherwise monitoring him closely so that his condition would not escalate, and/or providing appropriate access to medical care before his heat illness became acute and/or life threatening.

iii.    Some or all of Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies actively refused to respond to requests from other inmates to respond to Mr. Woodson's serious condition.

148.    Defendants' failures identified herein amounted to deliberate indifference to Mr. Woodson's serious medical needs, and a deprivation of a basic human need that caused, or contributed to cause, Mr. Woodson's heat stroke.

149.    Deputy Bul's, Deputy Palmer's, Deputy Whitaker's and Deputies's actions and omissions constitute willful, wanton, reckless, conscious, and deliberate indifference and disregard of Mr. Woodson's constitutional rights, by reason of which Plaintiff is entitled to recover punitive damages.

150.    WHEREFORE, Defendant Deputies' violations of the Eighth Amendment to the United States Constitution establish a cause of action pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages in the amount to be established at trial, and attorneys fees and costs.

## <u>COUNT V</u>
### § 1983 Claim Against Defendants Correct Care, Medical Staff, and Dr. Moja (Deliberate Indifference to the Serious Medical Needs of Mr. Woodson)

151.    Plaintiff incorporates paragraphs 1 through 150 and 158 through 163 of this Complaint, as if fully set forth herein.

152.    Through their actions set forth above, Correct Care, Medical Staff, and Dr. Moja, in their individual capacities, while acting under color of state law, acted in a manner that was deliberately indifferent to Mr. Woodson's basic human needs during his confinement, including his need for medical care, amounting to a violation of Mr. Woodson's Eighth Amendment Rights.  The denial of Mr. Woodson's medical needs by these defendants is so serious as to implicate the Eighth Amendment's explicit ban on cruel and unusual punishment.

153.    Upon information and belief, Defendants Correct Care, Medical Staff, and Dr. Moja knew about the dangerous combination of extremely high temperatures in the Jail, Mr. Woodson's documented chronic medical needs (including chronic hypertension), Mr. Woodson's physical complaints, and Mr. Woodson's alarmingly high

body temperature; that Mr. Woodson's basic needs were not being met; and that he was in need of additional water, cool air, or other aid in order to prevent heat stroke or other heat-related illness. They were further aware that when such illness manifested, Mr. Woodson required adequate medical care. Upon information and belief, the following facts were or should have been known to Defendants Correct Care, Medical Staff, and Dr. Moja:

    i.    Mr. Woodson had a history of hypertension, a condition that renders affected people especially susceptible to extreme heat conditions;

    ii.    Defendants Correct Care, Medical Staff, and Dr. Moja did not timely supply Mr. Woodson with prescription medication prescribed by his primary care physician that was necessary to effectively combat the effects of hypertension;

    iii.    The Heat Wave lead to recorded temperatures over one hundred degrees outside the Jail;

    iv.    The National Weather Service issued heat advisories, excessive heat watches, and excessive heat warnings for the Richmond area during the Heat Wave;

    v.    Local news outlets warned the public, including Defendants, that the National Weather Service had issued an excessive heat warning for the Richmond area;

    vi.    Defendants Correct Care, Medical Staff, and Dr. Moja were aware that temperatures inside the Jail became excessively hot as outdoor temperatures increased;

vii.    Defendants Correct Care, Medical Staff, and Dr. Moja knew or should have know about the heat advisories and/or heat watches and/or heat warnings during the Heat Wave.

viii.    The interior of the Jail was in fact excessively hot during the Heat Wave;

ix.    It was well known that the Jail was extremely hot in the summer, with indoor temperatures ranging from 15-30 degrees hotter than outdoor temperatures;

x.    Numerous other detainees have previously suffered heat-related distress and illness;

xi.    It was well known, and otherwise should be known, that the third floor of the Jail, where Mr. Woodson was housed, was the hottest area of the jail;

xii.    Mr. Woodson was kept in a medical observation unit in the Jail;

xiii.    Mr. Woodson had symptoms indicative of heat-related illness, including an alarmingly high fever, which caused his skin to be noticeably hot to the touch;

xiv.    Mr. Woodson requested medical care during the Heat Wave;

xv.    Dr. Moja and Medical Staff personally observed Mr. Woodson during the Heat Wave and documented symptoms that should have been recognized as symptoms of heat-related illness, especially given their presentation during a period of excessive heat, including: an alarmingly high temperature, headache, fatigue, and observation of skin abnormalities.

xvi.    Notwithstanding these symptoms, Dr. Moja and Medical Staff were grossly negligent in their treatment of Mr. Woodson and deliberately indifferent to his serious medical condition.

xvii.    Notwithstanding the heat advisory in place on July 5, 2012, which placed Defendants on specific notice to be alert for heat-related illness, Defendants Correct Care, Medical Staff, and Dr. Moja were deliberately indifferent to this advisory and to Mr. Woodson's symptoms of heat-related illness when he presented for treatment on July 5, 2012, as evidenced by their own medical records from that date.

xviii.    Given the seriousness of Mr. Woodson's condition, it was or should have been obvious (even to a lay person) that he was in physical distress due to heat-related illness.

154.    Upon information and belief, Defendants Correct Care, Medical Staff and Dr. Moja were deliberately, recklessly and wantonly indifferent to Mr. Woodson's health and grossly negligent in the care (or lack thereof) provided to Mr. Woodson as demonstrated by:

i.    Recklessly disregarding Mr. Woodson's vital signs and symptoms of heat-related illness.

ii.    Recklessly disregarding appropriate and customary guidelines for dealing with patients who present with heat-related symptoms, such as taking  full vital signs (including blood oxygen levels), failing to provide appropriate treatment for fever, allowing nurses to diagnose and practice outside the scope of their license (including relying on under qualified nurses or staff to diagnose (or fail to diagnose) heat-related illness), recklessly disregarding the need for adequate access to a physician, failing to provide timely access to care, recklessly disregarding the orders of a physician to follow up on serious symptoms;

recklessly disregarding public warnings regarding heat-related dangers; recklessly disregarding the likely danger to patients with chronic hypertension, including Mr. Woodson, during periods of extreme heat stress, deliberately, and recklessly ignoring Mr. Woodson during the Heat Wave – notwithstanding his symptoms of heat illness and history of chronic hypertension, failing to send Mr. Woodson for emergency care at an adequate and appropriate time;

iii.     Failing to take any palliative or preventative measures (such as making sure he had regular access to cold water, removing him periodically to a cooler area, and providing some and/or increased ventilation) to help Mr. Woodson cope with the extreme temperatures in the Jail during the Heat Wave;

iv.     Once Mr. Woodson was in distress from the heat, either because of lack of training, guidelines and/or their own indifference, Defendant Correct Care, Medical Staff, and Dr. Moja failed to even provide basic first aid for Mr. Woodson such as removing him to a cooler place, laying him down, providing cold towels/compresses, administering cold water, providing fans, providing air conditioning, and/or otherwise monitoring him closely so that his condition would not escalate, and/or providing appropriate access to medical care before his heat-related illness became acute and/or life threatening.

v.     The fact that Mr. Woodson's Correct Care-maintained medical records were, upon information and belief, altered, destroyed, and/or otherwise tampered with, supports the inference that Defendants recognized Mr. Woodson's heat-related illness and/or symptoms of heat-related illness, yet deliberately did nothing to address those symptoms and/or illness.

155.    The failures identified herein amount to deliberate indifference to Mr. Woodson's serious medical needs, and a deprivation of a basic human need that caused, or contributed to cause, Mr. Woodson's heat stroke. Specifically, Mr. Woodson's injuries resulted from the deliberate inaction of the Defendants nominated in this Count, in the face of a subjectively known risk for heat-related illness.

156.    Defendants Correct Care's, Medical Staff's, and Dr. Moja's actions and omissions constitute willful, wanton, reckless, conscious, and deliberate indifference and disregard of Mr. Woodson's constitutional rights, by reason of which Plaintiff is entitled to recover punitive damages.

157.    WHEREFORE, Defendants Correct Care's, Medical Staff's, and Dr. Moja's violations of the Eighth Amendment to the United States Constitution establish a cause of action pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages and punitive damages in the amount to be established at trial, and attorneys fees and costs.

## <u>COUNT VI</u>
**(State law Claims Against Defendant Sheriff Woody, Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies)**
**(Gross Negligence)**

158.    Plaintiff incorporates paragraphs 1 through 157 as if fully set forth herein.

159.    While he was detained at the Jail, Mr. Woodson was entrusted to the care of Defendant Sheriff Woody and his deputies, including Deputy Bul, Deputy Palmer, Deputy Whitaker and Deputies.   Each of these Defendants had a duty to exercise reasonable care with regard to Mr. Woodson and the other persons detained or confined at the Jail.   Among other things, Defendants each had duties to provide humane conditions of confinement, including a cell where the temperature and ventilation did not

pose a health risk (or relief from such risk when danger for, symptoms of, or signs of heat-related illness or other environmental health risk(s) were present), and access to timely and adequate medical care for serious medical needs. In addition to his own direct liability, Defendant Sheriff Woody is responsible under the doctrine of *respondeat superior* for the act of his deputies, agents, and employees.

160. These Defendants acted with indifference to Mr. Woodson's health and safety so as to constitute an utter disregard of prudence and common sense. This disregard and indifference amounted to a complete neglect for Mr. Woodson's safety, as well as violated applicable standards of care. These Defendants breached the foregoing duties by, among other things, disregarding the life-threatening conditions to which Mr. Woodson was subjected, responding or failing to respond in such a manner as to evidence the total and reckless indifference of these Defendants to Mr. Woodson's obvious medical condition(s), and generally disregarding the basic human and constitutional rights of Mr. Woodson.

161. The conduct of these Defendants demonstrates a level of indifference to Mr. Woodson which constitutes an utter disregard of prudence, and amounts to a complete neglect for Mr. Woodson's safety. Additionally, the several acts of negligence, when combined, had the cumulative effect of showing a reckless and total disregard for Mr. Woodson.

162. As a direct and proximate result of the grossly negligent and indifferent actions and omissions of these Defendants, Mr. Woodson suffered a severe heat stroke and continues to suffer both physically, mentally, and otherwise.

163.    As a direct and proximate result of the grossly negligent and indifferent actions and omissions of these Defendants, which were the cause of the injuries set forth herein, Mr. Woodson suffered and continues to suffer great physical pain, mental anguish, and ongoing bills and expenses.

WHEREFORE, based upon the foregoing, Plaintiff Stefan Woodson, demands judgment against all Defendants, jointly and severally, in an amount in excess of FIFTY MILLION DOLLARS ($50,000,000.00), for compensatory damages, together with costs incurred in the pursuit of just resolution to this matter, prejudgment and post-judgment interest, and attorneys' fees.

WHEREFORE, the Defendants' conduct having been so willful, wanton, and/or reckless as to evince a conscious disregard for the rights of others, Plaintiff Stefan Woodson demands the award of punitive damages against all Defendants, except Defendant City of Richmond, jointly and severally, in a just amount to be established at trial, together with prejudgment and post-judgment interest, and allowable costs incurred.

WHEREFORE, Plaintiff Stefan Woodson seeks such further and additional relief as this Court deems just and proper.

**TRIAL BY JURY IS DEMANDED.**

STEFAN WOODSON

By:   _____/s/_____
      Counsel

Seth R. Carroll (VSB No. 74745)
Benjamin M. Andrews (VSB No. 77824)
Lauren B. Carroll (VSB No. 70832)
Elyse H. Stiner (VSB No. 84501)
Geoff McDonald & Associates, P.C.
8905 Fargo Road
Richmond, Virginia 23229
804-888-8888 (t)
804-359-5426 (f)
scarroll@mcdonaldinjurylaw.com
bandrews@mcdonaldinjurylaw.com
lcarroll@mcdonaldinjurylaw.com
estiner@mcdonaldinjurylaw.com
**Counsel of Plaintiff Stefan Woodson**