

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

STEFAN WOODSON,

    Plaintiff,

v.                           Civil Action No. 3:13cv134

CITY OF RICHMOND, VIRGINIA,
et. al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on THE CITY OF RICHMOND'S MOTION TO DISMISS CROSS-CLAIM (Docket No. 30). For the reasons set forth below, the motion will be granted.

### FACTUAL ALLEGATIONS AND LEGAL CLAIMS AGAINST DEFENDANTS

At this stage, the Court, as it must, "accept[s] all well-pleaded allegations in the plaintiff's complaint as true and draw[s] all reasonable factual inferences from those facts in the plaintiff's favor." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999). With that in mind, the facts, which are derived from the First Amended Complaint (Docket No. 3) (the "Amended Complaint"), are alleged to be as set forth below.

During the first nine days of July 2012, the City of Richmond (hereinafter "City" or "Richmond") experienced a severe heat wave. During this period, several daily high temperatures

in excess of 100 degrees Fahrenheit were recorded within Richmond.   (Amend. Compl. ¶¶ 18-24).   The National Weather Service issued numerous heat-related advisories, forecasting daily index readings in excess of 110 degrees.  (Id. at ¶¶ 25-27).

During that period in July 2012, the Plaintiff, Stefan Woodson, was detained in the Richmond City Jail. He was housed on the top floor.   The jail was overcrowded and lacked air-conditioning.  (Id. at ¶¶ 29, 52-59).  The internal temperatures ranged from 15 to 20 degrees higher than the exterior of the facility.   (Id. at ¶ 49).   Over the preceding years, news reports, consultants, and previous cases within this district have addressed or alluded to the inadequate conditions at the facility.  (Id. at ¶¶ 43-62).   See also Sleeper v. City of Richmond, No. 3:12cv441, 2012 WL 3555412 (E.D. Va. Aug. 16, 2012); Brown v. Mitchell, 308 F. Supp. 2d 682 (E.D. Va. 2004).

Woodson suffers chronic hypertension, which makes him more susceptible to heat-related illnesses.   (Id. at ¶¶ 90-93). Woodson had a prescription for blood pressure medication to manage his hypertension, but Correct Care Solutions, LLC, which had contracted with the City Jail to provide medical services, did not provide Woodson with reliable access to his medication. (Id. at ¶ 93).   On at least one occasion, Woodson was able to

obtain his medication only by having his mother bring it to the Jail. (Id. at ¶ 94).

In the days leading up to July 9, 2012, Woodson complained to some or all of Defendants John Doe Deputies, Correct Care Solutions, LLC, John Doe Medical Staff, and Dr. Motsumi Moja about heat-related distress.  (Id. at ¶ 35).  On July 5, Woodson was examined, by Dr. Moja and members of the Jail Medical Staff, who recorded a temperature of 102.3 degrees (Id. at ¶ 98).  Dr. Moja recommended that Woodson have his temperature checked again that night and in the morning and prescribed the use of Motrin and advised Woodson to follow up next week.  (Id.)  The doctor's recommendations notwithstanding, Woodson's temperature was not checked again before July 9, and no other care or treatment was offered to him before that date.  (Id. at ¶¶ 100-102).

On the morning of July 9, Woodson suffered a heat stroke. Jailhouse staff found Woodson unresponsive in his cell.  (Id. at ¶¶ 36-37).  The Richmond Ambulance Authority ("RAA") was called to the jail.  The responders noted that Woodson had lost control of his bladder and bowel and had vomited into his own lap.  His breathing was shallow, short, and gasping, his pulse was weak, and he was generally nonresponsive.  An aural reading of Woodson's temperature produced a reading of 106.1 degrees.  (Id. at ¶ 38).

The RAA treated Woodson onsite before transporting him to MCV hospital, where he was formally diagnosed with hyperthermia and an elevated body temperature of 105.8 degrees. (Id. at ¶ 40). An Emergency Department record estimated that Woodson's core body temperature reached a maximum of 108.5 degrees. (Id.) The nature and extent of Woodson's injuries are not outlined in the Complaint, except to say that he was injured.

On March 13, 2013, Woodson filed an Amended Complaint against Sheriff C.T. Woody, Jr., several unknown deputies of the Richmond Sheriff's Office, the City of Richmond, Correct Care Solutions, LLC, and Dr. Motsumi Moja, alleging six claims.[1] Count I, a § 1983 claim, alleges that Richmond, acting under color of state law,

> pursuant to an official policy or custom, constructed and maintained the physical structure of the Jail in a manner that was in ill-repair, posed a risk to the health and safety of the inmates/detainees, including Mr. Woodson, and was otherwise inadequate to meet the needs of inmates/detainees such as Mr. Woodson, including being overly crowded, poorly ventilated, and during the summer months, excessively overheated, with inadequate water supplies.

Count II, a § 1983 claim, alleges that the Sheriff, while acting under color of state law, "operated and maintained the

---

[1]  Deputy Ken McRae was named as a defendant in the Amended Complaint, but has since been dismissed as a party pursuant to a Consent Order. (Docket No. 53).

4

Jail and trained his deputies, employees, and agents in a manner that posed a risk to the health and safety of the inmates/detainees." This count is captioned in the Amended Complaint as pertaining to "official policy or custom concerning operation of the Jail, including training."[2]

Count III, a § 1983 claim, alleges that the Sheriff and the Deputies, while acting under color of state law, were "through action and inaction deliberately indifferent" to "the unhuman nature of the conditions to which Mr. Woodson was subjected . . . and the potential for heat-related illness."

Count IV, a § 1983 claim, alleges that the Deputies, while acting under color of state law, "acted in a manner that was deliberately indifferent to Mr. Woodson's basic human needs during his confinement, including his need for medical care." This count is captioned in the Amended Complaint as pertaining to the "Official policy or custom concerning operation of the Jail, including training."

Count V, a § 1983 claim, alleges that the third parties responsible for medical care at the Richmond City Jail, while acting under color of state law, were "deliberately indifferent to Mr. Woodson's basic human needs during his confinement, including his need for medical care."

---

[2] At one point, this count also asserted a claim against the City. That claim has since been voluntarily dismissed. See Docket No. 35 and discussion infra.

Count VI, a state law claim, alleges that the Sheriff and his deputies were grossly negligent in their failure to provide humane conditions of confinement.

On April 15, 2013, Sheriff Woody filed against the City a Cross-Claim for indemnification or contribution, claiming that the City was the sole proximate cause of any injuries to Woodson and that the City breached its duties and obligations to Sheriff Woody by failing to provide adequate jailhouse facilities at the Richmond City Jail. (Docket No. 20).

On May 1, 2013, the City filed a Motion to Dismiss Cross-Claim (Docket No. 30), arguing that the City "cannot be held liable to Sheriff Woody under the claims sets forth in the Cross-Claim." The parties have been afforded several rounds of briefing. (See Docket Nos. 31, 33, 34, 50, 51). This matter is now ripe for resolution.

## LEGAL STANDARDS

The purpose of a motion made pursuant to Fed. R. Civ. P. 12(b)(6) is "to test the legal sufficiency of the complaint." Randall v. United States, 30 F.3d 518, 523 (4th Cir. 1994). A 12(b)(6) motion to dismiss will be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002). To survive a motion

6

to dismiss, a cross-claim must contain enough allegations of fact "to state a claim for relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). All factual allegations are accepted as true and the cross-claim is viewed in the light most favorable to the cross-claim plaintiff. Mylan Laboratories, Inc. v. Raj Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). The Court is not bound to respect any legal conclusions stated in a cross-claim. See Schatz v. Rosenberg, 943 F.2d 485, 489 (4th Cir. 1991); Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949-1950 (2009).

To establish liability under § 1983, a plaintiff must show that the defendant, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused injury. Brown v. Mitchell, 308 F. Supp. 2d 682, 692 (E.D. Va. 2004). Section 1983 is a vehicle for the vindication of pre-existing federal rights rather than an independent source of substantive rights. Id.

While municipalities can be proper defendants under § 1983, liability attaches to a municipality only if the deprivation of constitutional rights was caused by an official policy or custom. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690–91 (1978). That official policy can take the form of written ordinances and regulations, affirmative decisions made by individual policymakers, or omissions that are attributable to

7

individual policymakers. Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999) (citing Monell, 436 U.S. at 690); Pembauer v. City of Cincinnati, 475 U.S. 469, 483-84 (1986); City of Canton v. Harris, 489 U.S. 578, 388-89 (1989)). The policy must manifest deliberate indifference to the rights of citizens. Id.

In Virginia, "there can be no actionable negligence unless there is a legal duty, a violation of the duty, and a consequent injury." Gray v. INOVA Health Care Services, 257 Va. 597, 599, 514 S.E.2d 355, 356 (Va. 1999) (quoting Chesapeake and Potomac Telephone v. Dowdy, 235 Va. 55, 61, 365 S.E.2d 751, 754 (Va. 1988). Gross negligence is defined as:

> a "degree of negligence" which shows "such indifference to others" as to "constitute an utter disregard of prudence amounting to the complete neglect of the safety of another. Ferguson v. Ferguson, 212 Va. 86, 181 S.E.2d 648, 653 (1971). It must be such a degree of negligence as would shock fair minded people, although it need not constitute willful recklessness. Koffman v. Garnett, 265 Va. 12, 574 S.E.3d 258, 260 (2003).

Brown v. Mitchell, 308 F. Supp. 2d 682, 696 n.15 (E.D. Va. 2004).

Virginia common law does not include a right of contribution. North River Ins. Co. v. Davis, 274 F.Supp. 146, 149 (W.D. Va. 1967), aff'd 392 F.2d 571. Virginia does have a statutory right codified at VA Code Ann § 8.01-34: "Contribution among wrongdoers may be enforced when the wrong results from

8

negligence and involves no moral turpitude." This statutory right is subject to several important qualifications. First, a party forfeits his right to contribution when the act giving rise to joint liability involves "moral turpitude" or a voluntary tort. Hudgins v. Jones, 205 Va. 495, 501, 138 S.E.2d 16, 21 (Va. 1964). Second, "a contribution plaintiff cannot recover from a contribution defendant unless the injured party could have recovered against the contribution defendant." Pierce v. Martin for Benefit of Comm. Union Ins. Co., 230 Va. 94, 96, 334 S.E.2d 576, 577 (Va. 1985).

The Supreme Court of Virginia recognizes a right of equitable indemnification. See Williams ex rel. Estate of Williams v. U.S., 469 F.Supp.2d 339, 342 (E.D. Va. 2007) (citing Carr. v. Home Ins. Co., 250 Va. 427, 429, 463 S.E.2d 457, 458 (Va. 1995). "Equitable indemnification arises when a party without personal fault, is nevertheless legally liable for damages cause by the negligence of another. Equitable principles allow the innocent party to recover from the negligent actor for the amounts paid to discharge the liability." Carr. v. Home Ins. Co., 250 Va. 427, 429, 463 S.E.2d 457, 458 (Va. 1995).

These guiding principles inform the analysis of the motion.

## DISCUSSION

**1. Claims for Contribution in 1983 Actions (Counts I-V)**

### A. Express and Implied Rights of Contribution

42 U.S.C. § 1983 does not expressly provide a right of contribution. The framework for finding an implied right of contribution in a federal statute was outlined in <u>Northwest Airlines, Inc. v. Transport Workers Union of America</u>, 451 U.S. 77 (1981) and <u>Texas Industries, Inc. v. Radcliff Materials, Inc.</u>, 451 U.S. 630 (1981), which both sought to avoid "reading in" contribution rights for the benefit of persons who were not meant to be the primary beneficiaries of the statutory scheme. See <u>Northwest</u>, 451 U.S. at 91-92 ("Congress intended for these statutes to regulate [employers'] conduct for the benefit of employees. In light of these facts, petitioner can scarcely lay claim to the status of beneficiary whom Congress considered in need of protection.") (internal quotation omitted); <u>Texas Industries</u>, 451 U.S. at 630 ("Moreover, it is equally clear that the Sherman Act and the provision for treble-damages actions under the Clayton Act were not adopted for the benefit of the participants in a conspiracy to restrain trade. On the contrary, petitioner is a member of the class whose activities Congress intended to regulate for the protection and benefit of <u>an entirely distinct class</u>.") (emphasis in original) (internal quotation omitted).

Neither the Supreme Court nor the Fourth Circuit has decided whether the logic in Northwest and Texas Industries applies with equal force in actions brought under the auspices of § 1983. However, a leading district court decision within the circuit, Hepburn v. Athelas Institutes, Inc., 324 F. Supp. 2d 752 (D. Md. 2004), has found that those cases do have controlling force, and the Court agrees with Hepburn's analysis. See id. at 755-57. Section 1983 was enacted to benefit the victims, rather than the perpetrators, of Constitutional torts and it would be inconsistent with the goals of § 1983 to infer additional rights on behalf of those who perpetrate civil rights violations.

Therefore, this Court will follow the leading district court decision within the circuit and rule that there is no implied right to contribution in § 1983 actions. See Hepburn, 324 F. Supp. 2d 752 (D. Md. 2004).

## B.   Federal Common Law and Importation of State Contribution Rights

The Supreme Court has held that, if existing federal law does not cover an issue that arises within the context of a federal civil rights action, it is necessary to look to 42 U.S.C. § 1988, which "authorize[s] federal courts, where federal law is unsuited or insufficient to furnish suitable remedies, to look to principles of the common law, as altered by state law,

so long as such principles are not inconsistent with the Constitution and the laws of the United States." Moor v. Alameda County, 411 U.S. 693, 702-03 (1973) (internal quotation omitted). Section 1988 does not authorize courts to import "entire causes of action from state law," id., but since a claim for contribution is a derivative action, see Horton v. United States, 622 F.2d 80, 83 (4th Cir. 1980), that limitation on § 1988 poses no obstacle here. The main question for purposes of § 1988 is whether a principle of federal common law can be found that is consistent with the laws of the United States and permits a claim for contribution in a § 1983 suit.

The Third Circuit, relying on the authority that addresses suitable remedies under § 1988, has strongly implied a federal common law right to contribution that can be applied to § 1983 claims. See Miller v. Apartments and Homes of New Jersey, Inc., 646 F.2d 101 (3d Cir. 1981). But the reasoning of Miller has been drawn into serious question by Northwest, wherein the Supreme Court held that there was no statutory or federal common law right to contribution under the Equal Pay Act and Title VII; and by Texas Industries wherein the Supreme Court held that there was no statutory or common law right to contribution under federal antitrust statutes. Since then, most district court decisions outside the Third Circuit, including the leading decision within this circuit, have declined to find a right of

12

contribution in § 1983 actions. See Hepburn v. Athelas Institute, Inc., 324 F. Supp. 2d 752 (D. Md. 2004); Firestone v. Berrios, No.12-cv-0356, 2013 WL 297780 (E.D.N.Y. Jan. 22, 2013); Katka v. Mills, 422 F. Supp. 2d 1304 (N.D. Ga. 2004); Rosado v. New York City Housing Authority, 827 F. Supp. 179 (S.D.N.Y. 1989), Wright v. Reynolds, 703 F. Supp. 583 (N.D. Tex. 1988); Gray v. City of Kansas City, 603 F. Supp. 872 (D. Kan. 1985); TCI Cablevision, Inc. v. City of Jefferson, 604 F. Supp. 845 (W.D. Mo. 1984). Cf. Fishman v. De Meo, 604 F. Supp. 873 (E.D. Pa. 1985) (finding a right of contribution).

Moreover, the Supreme Court has bluntly stated that "contribution does not implicate 'uniquely federal interests' of the kind that oblige courts to formulate federal common law." Texas Industries, 451 U.S. at 641. That seems clearly to foreclose any possibility of using the combination of federal common law and § 1988 to import a contribution right into § 1983, as Hepburn and the foregoing district court decisions have held.

Nonetheless, some district courts have entertained the possibility of using § 1988 to import state statutes on contribution, even if they ultimately ruled that those state statutes did not apply to the particular claim at issue. See Katka, 422 F. Supp. 2d at 1304; Rosado, 827 F. Supp. at 184. But Hepburn, the leading case within this circuit, held that a

13

contribution right was inconsistent with § 1983 and therefore ruled that the applicability of the Maryland contribution statute was immaterial. See 324 F. Supp. 2d at 759-60. According to Hepburn, "Section 1983's twin goals of compensation and deterrence are not furthered by reducing the defendants' cost of violations while placing the risk of an insolvent defendant on the plaintiff." Id. at 759. Furthermore, "the level of culpability necessary for § 1983 liability reduces the need to equitably distribute damages among tortfeasors." Id. The logic of Hepburn is persuasive and, for the same reasons, the Court holds that the principles of contribution are inconsistent with the goals of § 1983. Therefore, § 1988 cannot be used to import state statutes on contribution into a § 1983 action.

## 2. Claims for Indemnification in 1983 Actions (Counts I-V)

Neither the Supreme Court nor the Fourth Circuit have decided whether there is a federal right to indemnity under § 1983. However, the Ninth Circuit has held clearly that: "[t]here is no federal right to indemnification provided in 42 U.S.C. § 1983." Allen v. City of Los Angeles, 92 F.3d 842, 845 n.1 (9th Cir. 1996) (overruled on other grounds). Several district courts also have rejected the proposition. See Firestone v. Berrios, No.12-cv-0356, 2013 WL 297780 (E.D.N.Y. Jan. 22, 2013); Taifer v. Catherines Stores Corp., No. 06 Civ. 2976, 2008 WL 7728651, at *3 (S.D.N.Y. May 28, 2008); Hayden v.

14

Hevesi, No. 05 CIv. 0294, 2007 WL 496369, at *4 (W.D.N.Y. Feb. 12, 2007); Frantz v. City of Pontiac, 432 F. Supp. 2d 717, 721-22 (E.D. Mich. 2006) (relying on the reasoning of Northwest Airlines in denying a claim for indemnification); Hart. v. City of Williamsburg, No. Civ.A. 6:04-321, 2005 WL 1676894, at *2 (E.D. Ky. July 16, 2005) (same); Wright v. Reynolds, 703 F. Supp. 583, 590-92 (N.D. Tex. 1988) (same). District courts have often analyzed claims for contribution and indemnification together. See Hart, 2005 WL 1676894 at *2; Wright, 703 F. Supp. at 590-92. In this case, both the logic of Northwest Airlines and the policy considerations of Hepburn have as much force in a discussion of indemnification as they do in a discussion of contribution. The Court therefore concludes that there is no express or implied right to indemnification in § 1983, no federal common law right to indemnification under § 1983, and no means of importing a right to indemnification through § 1988.

## 3.    Count VI (State Law Claim)

Count VI is a state law claim based on the alleged gross negligence of the Sheriff and the Deputy Sheriffs.  The alleged predicate acts of gross negligence are that the Sheriff and the Deputies disregarded "life-threatening conditions to which Mr. Woodson was subjected," were utterly indifferent to his known medical condition, and evinced a general disregard for his basic human and constitutional rights.  (Amended Compl. ¶ 160).  Given

these allegations there could be no recovery from the City for indemnity because any finding of liability against the Sheriff under Count VI would be based on his conduct or that of his Deputies, not on some conduct of the City for which the Sheriff would be held technically liable.  Thus, there would be no basis upon which the Sheriff would be entitled to indemnity from the City.

As the Supreme Court of Virginia has noted, a cause of action for contribution is available only when a "joint tortfeasor [seeks] relief from an inequitable burden placed upon him by reason of the refusal of another to perform such other's duty by paying his honest share of the common obligation." Shiflet v. Eller, 228 Va. 115, 121, 319 S.E.2d 750, 754 (Va. 1984) (quoting Distefano v. Lamborn, 46 Del. 195, 203-04, 81 A.2d 675, 679 (Del. Super. Ct. 1951).  Thus, a cross-claim for contribution as to Count VI presupposes that both the City and the Sheriff could be held liable.  But, Count VI makes no charge against the City that would make it a joint tortfeasor.  Thus, a putative claim for contribution based on the claim asserted in Court VI is not available.[3]

---

[3]  Given this resolution of the cross-claim under Count VI, there is no need to address the City's sovereign immunity theory.

## CONCLUSION

For the reasons set forth above, THE CITY OF RICHMOND'S MOTION TO DISMISS CROSS-CLAIM (Docket No. 30) will be granted.

It is so ORDERED.

_____ /s/ _____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  January 17, 2014