IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

STEFAN WOODSON,

    Plaintiff,

v.    Civil Action No. 3:13cv134

CITY OF RICHMOND,
VIRGINIA, et al.,

    Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on DEFENDANT DONALD PALMER'S MOTION FOR SUMMARY JUDGMENT (Docket No. 319). For the reasons set forth below, this motion will be granted.

**BACKGROUND**

**I.   Circumstances On July 9, 2012**

Stefan Woodson ("Woodson") was incarcerated in the Richmond City Jail (the "Jail") on March 27, 2012 for service of sentence. In the early morning hours of July 9, 2012 Woodson was transported to the emergency room after being found unresponsive in his cell at the Jail. MCV Emergency Room Records. The circumstances surrounding Woodson's illness and injury are the subject of this action.

During the first nine days of July 2012, the city of Richmond experienced a severe heat wave. Affidavit of

Kalkstein, at ¶¶ 12-14, 17. During that period, the National Weather Service issued many heat-related advisories. Id. at ¶¶ 11-14. These high temperatures were further exacerbated by high humidity levels. Id. at ¶25. Inmates on the Medical Tier at the Jail were subjected to very high temperatures, mitigated only by fans and limited access to ice water.

In the days leading up to July 9, 2012, Woodson complained to Jail employees and medical personnel that he was not feeling well. On July 5, Woodson was examined by Dr. Motsumi Moja and employees of Correct Care Systems, LLC[1], who recorded a temperature of 102.3 degrees. Chronic Care Periodic Exam Record. Dr. Moja ordered that Woodson have his temperature checked again that night and in the morning and prescribed the use of Motrin and advised Woodson to follow up next week. Id. The doctor's orders notwithstanding, Woodson's temperature was not checked again before he collapsed on July 9, and no other care or treatment was offered to him before that date.

During the course of the day on July 8, Woodson interacted with several jail employees and informed them that he was feeling ill. Donald Palmer ("Palmer"), a Deputy Sheriff, was on duty in the Medical Tier of the jail from 0800 until 1600. Palmer Affidavit. He testified that, Woodson informed him "that

---

[1] Correct Care Systems, LLC ("CCS") had contracted with the City of Richmond to provide medical services to inmates at the Jail.

2

he was hot and not feeling well" in "the morning hours at some time" before lunch. Palmer Dep. at 34:1-7. In response, Palmer gave Woodson two Styrofoam cups of water and told the CCS nurse performing afternoon pill pass that Woodson was hot and not feeling well. Id. at 30:17-21; 35. Palmer testified that he did not normally tell the medical department when an inmate complained about the heat but that he told "medical" in this instance because Woodson also complained about not feeling well. Palmer Dep. at 41:1-6. Further, he felt that it was important to tell the medical department about Woodson's complaint because Woodson was housed in the medical tier rather than general population. Id. at 41:7010.

Palmer also testified that later he observed Woodson during the day interacting "normally" with other inmates. Id. at 36:3-5. At some point after lunch, Woodson drug his mattress out of his cell, laid in front of the fan where he slept until the dinner hour. Caballero Dep. at 46-47. Later in the afternoon, Palmer gave Woodson a second cup of water. Palmer Dep. 30:17-31:1.

During his shift, Palmer did not observe Woodson in any physical distress such as a loss of consciousness, slurred speech, muscle cramps, confusion, dizziness, fainting or fatigue, nausea, or vomiting. Palmer Affidavit, Docket No. 320-6. Further, Palmer was never informed by medical employees that

3

Woodson was susceptible to heat or that he required special observation in addition to security checks. Id.

Several inmates testified to Woodson's condition during Palmer's shift. Clifton Martin testified that he was interacting regularly with Woodson during the day on July 8, 2012. Martin Dep. at 11:7-13. On July 8, Woodson "was up and about...normal stuff. He would sit in his cell reading his book or...listening to his radio or he...he would come out to the party and communicate with everybody else." Id. at 11:14-20. The only thing Woodson complained about during the day, according to Martin, was "not having his medication." Id. at 11:19-21. However, Martin started to notice that Woodson was having difficulties "between 6:30 or 7" on the evening of July 8. Id. at 13:22-14:5. Martin does state that he encouraged Woodson to take a shower to cool off "before" 6:30 p.m. "because it was so hot on the tier, everybody was jumping in and out of the shower just to stay cool." Id. at 50:13-20. Martin did not state, however, that he was concerned about Woodson's health prior to 6:30 p.m.; he only stated that he encouraged him to "stay cool." Id. at 50:19.

Inmate Michael Caballero testified that during the day of July 8, 2012 that "everyone was groggy and sluggish...[because i]t was hot" but that, other than that, Woodson was "fine [and] normal." Caballero Dep. 15:9-12; 31:1-9. He stated that

4

Woodson "was laying in front of the fan...[and] took his mat" out in front of it." Id. When Woodson moved his mattress back into his cell just before dinnertime (which is typically before 4:00 p.m.), Caballero testified that he did not notice Woodson having any medical problems. Id. at 46:18-25. However, Caballero did hear that Woodson was experiencing problems when "the sun had already been setting...[and] it was starting to get dark." Id. at 47:19-25.

Inmate Ronald Pinkston testified that he went to check on Woodson "at dinnertime...[and Woodson] just looked sleep [sic]." Pinkston Dep. at 24:1-4. However, "before lockdown time...[around] 9:00", Pinkston stated that he checked on Woodson again and "said something to the guys on the tier...like, 'Man, Stef [Woodson] don't look too good.'" Id. at 24:5-15. At this time, Woodson "was laying on his mattress in a ball of sweat." Id. at 23:13-24:8. Pinkston recalls that two inmates spoke with a deputy about Woodson during "the 4:00 shift", but Pinkston could not remember who the deputy was. Id. at 24:17-22.[2]

---

[2] Woodson states that "Kenneth Smith stated that Plaintiff could not stand up by himself and needed help." Docket No 459 at 8, ¶41. However, the testimony to which he refers does not discuss Woodson's health on July 8, 2012, but rather discussed Woodson's overall health. Specifically, Smith states only that "the only thing [he could] vaguely remember is that [Woodson] couldn't stand up that good by hisself [sic]. Like, we would always have to help him because he used to shake, until he sit down and he

5

Palmer's shift ended at 4:00 p.m. John Whitaker, the Deputy who took over for Palmer, has testified that Woodson's complaints were not mentioned during the formation meeting which is held at the beginning of the following shift. Whitaker Dep. at 86:16-18.

At 2:17 AM on July 9, a Jail employee conducted a security check an "observed [Woodson] lying across his bunk, in an awkward position, and appearing to be unresponsive." Moody Dep. at 32: 6-33:23, 48:7-11. A medical alert was called and Woodson was taken first to the medical clinic area. Id. Woodson was then transferred to MCV, where he was formally diagnosed with hyperthermia and an elevated body temperature of 105.8 degrees. MCV Records. An Emergency Department record estimated that Woodson's core body temperature reached a maximum of 108.5 degrees. Id.

**II. Section 1983 Claim**

On July 2, 2014, Woodson filed the Fourth Amended Complaint in this case. Docket No. 187. In the FAC, Woodson presents three claims against Palmer. However, two of those claims have been the subject of voluntary dismissals; thus, only Count IV remains. Count III and Count VI were dismissed as to Palmer by

---

be all right, but he couldn't stand up, like by himself. We always had to help him." Smith Dep. at 13:16-20. He characterized this as a "general" issue and not specific to the events on July 8 and 9. Id. at 13:21-23.

6

agreement of all parties during a conference call conducted by the Count on December 15, 2014. Docket No. 519. Count IV, which is brought pursuant to 42 U.S.C. §1983, alleges that Palmer violated Woodson's Eighth Amendment rights through by being deliberately indifferent to Woodson's serious medical needs. Id. at 41. Palmer has moved for summary judgment on Count V. Docket No. 319. Woodson has responded. Docket No. 459. Palmer has replied. Docket No. 483. A hearing on the matter was held on January 9, 2015. The motion is now ripe.

## LEGAL STANDARDS

### I. Summary Judgment Standard

Under Fed. R. Civ. P. 56, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. f6(c). In Celtotex Corp. v. Caltrett[3], the Supreme Court stated that Rule 56(c) requires the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party

---

[3] 417 U.S. 317 (1986)

7

will bear the burden of proof at trial." Id. at 322. In order to enter summary judgment "there can be no genuine issue as to any material fact, since a complete failure to proof concerning an essential elements of the nonmoving party's case renders all other facts immaterial." Id. at 323.

When reviewing a motion for summary judgment, a court must interpret the facts and any inferences drawn therefrom in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Seabulk Offshore, Ltd. V. Am. Home. Assurance Co., 377 F.3d 408, 418 (4th Cir. 2004). In order to successfully oppose a motion for summary judgment, the nonmoving party must demonstrate to the court that there are specific facts that would create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). "Where...the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

## II. 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code (§1983) provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia,

8

> subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

"§ 1983 is not itself a source of substantive rights; rather, it provides a method for vindicating federal rights elsewhere conferred." Brown v. Mitchell, 327 F. Supp. 2d. 615, 628 (E.D. Va. 2004). In order to succeed on a § 1983 claim, a plaintiff must establish that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999).

**DISCUSSION**

**I.  Legal Standard**

In Count IV, Woodson alleges that Palmer violated his Eighth Amendment right to adequate medical care. Under the Eighth Amendment to the United States Constitution, inmates have a right to be free from cruel and unusual punishment as a result of officials' deliberate indifference to serious medical needs. Wilson v. Seiter, 501 U.S. 294 (1991). Patients who allege an Eighth Amendment violation for a failure to provide such treatment must present triable issues of fact as to two elements

9

in order to survive summary judgment. First, the plaintiff must establish that the alleged deprivation is objectively sufficiently serious so as to violate the Eighth Amendment. Id. 298. This element is established by showing that the plaintiff was suffering from a serious medical need at the time he interacted with the defendant. A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008)

Second, the plaintiff must establish that the defendant acted with "deliberate indifference" to the right. Estelle v. Gamble, 429 U.S. 97 (1976). Deliberate indifference requires both that the defendant "subjectively recognized a substantial risk of harm" and "that his actions were 'inappropriate in light of the risk.'" Parrish ex rel. Lee v. Cleveland, 371 F.3d 294, 303 (4th Cir. 2004) (citation omitted). "A prison official shows deliberate indifference if he knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the

10

risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure reasonable safety." Odom v. S.C. Dep't of Corr., 349 F.3d 765, 770 (4th Cir. 2003) (internal citations omitted). Further, a mere "error of judgment [or] inadvertent failure to provide adequate medical care...[does] not constitute a constitutional deprivation redressable under § 1983." Boyce v. Alizaduh, 595 F.2d 948, 953 (4th Cir. 1979). In other words, negligence is not deliberate indifference. Farmer, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence.")

### A. Analysis

Palmer's motion for summary judgment is predicated for the most part on the assertion that the undisputed record is that Palmer was not deliberately indifferent, "had no knowledge of Mr. Woodson's serious condition", and reacted reasonably to Woodson's complaint that he was hot and not feeling well. MEMORANDUM IN SUPPORT OF DEFENDANT DONALD PALMER's MOTION FOR SUMMARY JUDGMENT (Docket No. 320) at 16-20. In arguing that he had no knowledge of Woodson's condition during his shift, Palmer states that "[a]ccording to other inmates, Mr. Woodson was not experiencing any issues or problems during B Shift." Id. at 17. Further, he points out that Woodson was acting normally during B shift, that he carried his mattress out of his cell during the

afternoon, and that the only complaint Palmer received during the course of the day was from Woodson who stated that he was "hot" and "not feeling well." Id. at 18-19. These arguments virtually presuppose the existence of a "serious medical need." And, Woodson's response argues that it is undisputed that there was a serious medical need. Woodson's assertion is that Woodson had a serious medical need because of "the heat in the medical tier...and [the fact that] Plaintiff himself told Palmer that he was not feeling well." PLAINTIFF'S SECOND OPPOSITION TO DEFENDANT DONALD PALMER'S MOTION FOR SUMMARY JUDGMENT (Docket No. 652) at 15. He further asserts that this serious medical issue was present "prior to 10:30 a.m...when Deputy Palmer was informed" that Woodson was hot and not feeling well. Id. at 16.

In response, Palmer argues that "the material facts that are not in dispute establish that Mr. Woodson was not suffering from an objectively serious medical need during Deputy Palmer's shift." REBUTTAL MEMORANDUM IN SUPPORT OF DONALD PALMER'S MOTION FOR SUMMARY JUDGMENT (Docket No. 676) at 4. He supports this argument with the evidence that, during Palmer's shift, Woodson was not exhibiting any symptoms of physical distress, other inmates did not notice any signs of medical distress, Woodson did not request medical attention, and that the only complaint anyone received from Woodson during the B shift of

12

July 8, 2012 was the pre-10:30 a.m. statement that Woodson was "hot" and "not feeling well." Id. at 4-5.

Whether Woodson presented with a serious medical need during B shift on July 8, 2012 was also raised and discussed in depth by counsel for both parties on January 9, 2015. Counsel for Palmer introduced the issue and presented the same evidence discussed above that was contained in his Rebuttal Memorandum. Oral Argument Transcript at 78-81 (January 9, 2015). Counsel for Woodson responded. Id. at 82. He argued that Woodson had a serious condition because "he reported he was hot, [Palmer] knew the temperature, [Woodson] said he was ill, and [Palmer] called the nurse or reported [Woodson's complaint] to the nurse." Id. at 90:14-19.

Thus, although the parties had not extensively briefed whether Woodson had a "serious medical need" when he interacted with Palmer on July 8, 2012, the issue is nonetheless raised. On the point, Palmer shows that the undisputed record is that Woodson was not suffering from a "serious medical need" on July 8, 2012 before 4:00 p.m. The Jail was hot and Woodson complained to Palmer that he was "hot and not feeling well". After this interaction, Palmer passed the complaint onto a medical staff member conducing pill pass, gave Woodson a glass of water, and did not observe any other unusual behavior for the rest of his shift. Woodson, according to all sources, was

13

acting normally during the course of the day and, while he was "hot and sluggish" just like everyone else in the jail, he did not complain of feeling ill again, nor did he exhibit signs and symptoms of a condition needing medical attention. A complaint from an inmate that he is "hot and not feeling well" in a hot environment does not establish that the inmate is suffering from a serious medical need at that time, especially when all other evidence available establishes that the inmate was behaving normally in all other respects.

Woodson has not presented a triable issue of fact that could support a reasonable jury's finding that he had a "serious medical need" on July 8, 2012 before 4:00 p.m., which is the only time relevant to this case that Palmer interacted with Woodson.

Even if there was a triable issue of fact respecting whether Woodson presented with a serious medical need before 4:00 p.m. on July 8, 2012, the record rather clearly establishes that Palmer was not indifferent to it both because he did not recognize it as a serious medical need and because he responded appropriately to it. Woodson complained about being hot and not feeling well during Palmer's shift but, by all accounts, behaved normally during the course of the day. In response, Palmer notified medical personnel that they might want to check on Woodson and brought Woodson a glass of water. Further, Palmer

responded reasonably to Woodson's need and, as such, did not act with deliberate indifference.

## CONCLUSION

For the reasons set forth above, DEFENDANT PALMER'S MOTION FOR SUMMARY JUDGMENT (Docket No. 319) will be granted.

It is so ORDERED.

/s/ *REP*
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: February 10, 2015