IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



STEFAN WOODSON,

    Plaintiff,

v.                                    Civil Action No. 3:13cv134

CITY OF RICHMOND,
VIRGINIA, <u>et al.</u>,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on Marian Williams'
("Williams") MOTION FOR SUMMARY JUDGMENT (Docket No. 374).   For
the reasons set forth below, this motion was granted by ORDER
(Docket No. 686).

## BACKGROUND

### I.   Background Facts

On March 27, 2012 Stefan Woodson ("Woodson") was
incarcerated at the Richmond City Jail (the "Jail").   In a
Chronic Care Initial Visit with the CCS staff on April 4, 2012,
it was noted that Woodson was suffering from several chronic
medical conditions such as hyperlipidemia, hypertension, cardiac
dysrhythmia, and gout.   Chronic Care Initial Visit Sheet at 75-
78.   Because of these conditions, Woodson was enrolled in the

was monitored in periodic visits.  Id.  At the initial visit on April 4, 2012, Woodson was evaluated by Dr. Moja, who ordered that Woodson receive an EKG, blood pressure monitoring, and a follow-up visit in 90 days on July 5, 2012.  Physician's Order from April 4, 2012.  However, there is no record that these orders were followed or that an EKG occurred.  Stewart Expert Report at 13.

At the time of Woodson's incarceration at the Jail, Williams was employed as a Licensed Practical Nurse ("LPN") at the jail and was an employee of Correct Care Solutions, Inc. ("CCS") who had contracted with the City of Richmond to provide medical services to inmates at the Jail.  Williams Dep. at 6:6-7, 8:3-7.  Williams had one interaction with Woodson that is relevant to these proceedings.  That interaction occurred on July 5, 2012 and is discussed below.

## II.  July 5, 2012 Visit with Dr. Moja and Nurse Williams

On July 5, 2012, Woodson returned to the medical offices at the Jail to meet with Moja for the previously pre-scheduled 90-day periodic Chronic Care visit.  Chronic Care Periodic Exam Record at 79.  At this visit, Williams checked Woodson's vital signs and recorded a temperature of 102.3, a blood pressure level of 114/76, a pulse rate of 70, and a respiratory rate of 18.  Id. at A-56.  When Williams saw that Woodson had an elevated temperature, she alerted Moja because she believed that

2

the temperature was "abnormal" and she wanted the doctor "to note that [Woodson] had a temp of a hundred and two." Williams Dep. at 19:18-21:14. Having learned of Woodson's elevated temperature, Moja examined Woodson and asked whether he had been experiencing other symptoms. Woodson reported that he had been experiencing fatigue and anorexia (not eating) for the past several weeks. Chronic Care Periodic Exam Record at 79. Moja considered that the fever might have been attributable to a lingering infection, to a current medication, or to environmental factors. Moja Dep. at 6:12-20. After the examination, Moja noted that Woodson "had an isolated temperature without any other . . . symptoms or clinical signs to specifically tie the elevated temperature to one diagnosis." Moja Dep. at 6:6-12. Additionally, he determined that Woodson was "stable." Chronic Care Periodic Exam Record at 80.

At the appointment, Moja issued an order with several instructions which Williams was responsible for "taking off." "Taking off" or "noting" an order "means that the nurse given the order completes all of the paperwork needed to alert the other medical staff of what the order requires so the treatment is actually carried out." Docket No. 414 at 6-7. First, Moja instructed Williams to give Woodson cold water to drink and instructed Woodson to drink "plenty of cold fluids." He instructed that Woodson was to remain in the air-conditioned

clinic and drink the cold water.  Moja Dep. at 17:23-18:7.  Moja estimated that the amount of water given to Woodson in the clinic to be "a liter or two."  Id. at 8:8-11.  Second, Moja directed Williams to prepare a medication administration record (a "MAR") which stated that Woodson was to be provided 800 mgs of Motrin twice a day for three days.  Physician's Order from July 5, 2012; Medication Administration Record for Stephan Woodson.  Williams prepared the MAR.  Id.  Third, Moja directed, at Woodson's request, that Woodson be weaned off of the medication Topamax, id., because Topamax regularly causes fatigue and anorexia and can cause elevated body temperatures in rare instances.  Moja Declaration at ¶13.  Finally, Moja directed that a CCS nurse was to follow up with Woodson on the evening of July 5 and the morning of July 6 for temperature checks.  Physician's Order from July 5, 2012.[1]  After drinking the water and being told what treatment was being ordered for him, Woodson was returned to his cell.  It is undisputed that Woodson's temperature was not taken on the evening of July 5 or the morning of July 6.

---

[1] There is a dispute between the parties as to whether Williams properly "took off" Moja's order directing the temperature checks.  CCS asserts that Williams did not "take off" Moja's order telling staff to check Woodson's temperature.  Williams disputes this and has testified that she did create such a treatment sheet.  See Williams Dep. at 11:5-13:5.  No such sheet was in the medical records.  For purposes of this motion, it must be assumed that Williams did not "take off" the temperature check directive issued by Moja.

In the early morning hours of July 9, 2012 (four days after Moja saw Woodson), Woodson was found unresponsive in his cell. After being taken by ambulance to MCV, it was determined that Woodson had suffered a heat stroke.

## III. Williams' Disciplinary Record

In his response to Williams' motion for summary judgment, Woodson points out that Williams' "personnel record is full of reprimands, including warnings about the consequences to patients if she did not follow doctor's orders." Docket No. 451 at 3, 10 (citing Marian Williams' Personnel Record at 1554, 1557, 1558, 1559, 1602, 1613, 1615, 1616, 1618, 1625). Because of the arguments the parties make, it is beneficial to identify just what types of reprimands Williams received during her time as a CCS nurse. It should be noted that the list of reprimands cited by Woodson on page 10 of his memorandum lists many duplicate reprimands. To be specific, page 1557 is identical to 1615, 1554 is identical to 1616, and 1558 is identical to 1625, thus reducing the total number of reprimands by three.

Williams received three reprimands for attendance-related issues (1554, 1557, 1558), one for poor job performance after Williams transcribed an order for medication incorrectly and an inmate suffered a seizure (1559), one for an unspecified type of performance action in which an inmate did not have his medication ordered or verified upon intake (1618), and one for

another unspecified type of performance action in which Williams
failed to give an inmate his medication (1635).

## IV.  Section 1983 Claim

On July 2, 2014, Woodson filed the Fourth Amended Complaint
in this action.  Docket No. 187.  In the FAC, Woodson presents
one claim against Williams.  Specifically, in Count V, which is
brought pursuant to 42 U.S.C. § 1983, it is alleged that
Williams violated Woodson's Eighth Amendment rights by being
deliberately indifferent to his serious medical needs.  Id. at
45-51.  Williams has moved for summary judgment on Count V.
Docket No. 374.  Woodson has responded.  Docket No. 451.
Williams has replied. Docket No. 487.  A hearing on the matter
was held on January 7, 2015.  The motion is now ripe.

## LEGAL STANDARDS

## I.  Summary Judgment Standard

Under Fed. R. Civ. P. 56, summary judgment "shall be
rendered forthwith if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to
judgment as a matter of law."  Fed. R. Civ. P. f6(c).  In
Celtotex Corp. v. Caltrett[2], the Supreme Court stated that Rule

---

[2] 417 U.S. 317 (1986)

56(c) requires the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. In order to enter summary judgment "there can be no genuine issue as to any material fact, since a complete failure to proof concerning an essential elements of the nonmoving party's case renders all other facts immaterial." Id. at 323.

When reviewing a motion for summary judgment, a court must interpret the facts and any inferences drawn therefrom in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Seabulk Offshore, Ltd. V. Am. Home. Assurance Co., 377 F.3d 408, 418 (4th Cir. 2004). In order to successfully oppose a motion for summary judgment, the nonmoving party must demonstrate to the court that there are specific facts that would create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). "Where...the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

## II.  42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code (§1983) provides that:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any
> State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any
> citizen of the United States or other person
> within the jurisdiction thereof to the
> deprivation of any rights, privileges, or
> immunities secured by the Constitution and
> laws, shall be liable to the party injured in
> an action at law, suit in equity, or other
> proper proceeding for redress.

"§ 1983 is not itself a source of substantive rights; rather, it provides a method for vindicating federal rights elsewhere conferred." Brown v. Mitchell, 327 F. Supp. 2d. 615, 628 (E.D. Va. 2004).  In order to succeed on a § 1983 claim, a plaintiff must establish that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999).

### DISCUSSION

## I.  Legal Standard

In Count V, Woodson alleges that Williams violated his Eighth Amendment right to adequate medical care.  Under the Eighth Amendment to the United States Constitution, inmates have a right to be free from cruel and unusual punishment as a result

of officials' deliberate indifference to serious medical needs. Wilson v. Seiter, 501 U.S. 294 (1991). Plaintiffs who allege an Eighth Amendment violation for a failure to provide such treatment must present triable issues of fact as to two elements in order to survive summary judgment. First, the plaintiff must establish that the alleged deprivation is objectively sufficiently serious so as to violate the Eighth Amendment. Id. 298. This element is established by showing that the plaintiff was suffering from a serious medical need at the time he interacted with the defendant. A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008)

Second, the plaintiff must establish that the defendant acted with "deliberate indifference" to the right. Estelle v. Gamble, 429 U.S. 97 (1976). Deliberate indifference requires both that the defendant "subjectively recognized a substantial risk of harm" and "that his actions were 'inappropriate in light of the risk.'" Parrish ex rel. Lee v. Cleveland, 371 F.3d 294, 303 (4th Cir. 2004) (citation omitted). "A prison official shows deliberate indifference if he knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn

that a substantial risk of serious harm exists, and he must also draw the inference. In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure reasonable safety." Odom v. S.C. Dep't of Corr., 349 F.3d 765, 770 (4th Cir. 2003) (internal citations omitted). Further, a mere "error of judgment [or] inadvertent failure to provide adequate medical care...[does] not constitute a constitutional deprivation redressable under § 1983." Boyce v. Alizaduh, 595 F.2d 948, 953 (4th Cir. 1979). In other words, negligence is not deliberate indifference. Farmer, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence.")

## II. Analysis

Williams argues that Woodson was not suffering from a serious medical need at the time of their encounter because "a mild illness or elevated temperature in a hot environment is insufficient to meet the objective requirement that Mr. Woodson had a serious medical need." Docket No. 377 at 10. This view is supported by the record.

First, at the time Moja examined Woodson, Moja did not believe that Woodson was suffering from a serious medical

10

condition.   Moja Dep. at 128:13-25.   Further, Moja believed that he had ruled out the possibility of Woodson suffering from a heat related illness during the July 5 visit.   Id. at 13:4-19. Moja did not believe that, at the time, there was anything "clinically that showed that [Woodson] was about to have an emergent situation."   Id. at 22:19-22.   Second, Woodson's own medical experts do not believe that Woodson was suffering from a serious medical need on July 5.   Dr. Marc Stern testified in a deposition, and stated in a supplemental report, that, in his opinion, Woodson was only "mildly ill" when he was seen by Moja and Williams on July 5.   Stern Dep. at 27:10-25.   Also, in the deposition, Stern is asked whether he "would agree that on July 5, 2012, when Mr. Woodson was seen by Dr. Moja that his illness was mild."   He answered "yes."   Id.   Further, Woodson's own nursing standard of care expert Deidra Stewart stated that, although Woodson was "definitely" ill on July 5, she agreed with Dr. Stern's opinion that Woodson was "mildly ill."   Stewart Dep. at 136:34-137:19.   She also stated that Woodson "was not seriously ill at the time" that he was seen by Williams.   Id. at 137:13-14.   Third, Williams argues that the inmates who were housed with Woodson on the medical tier did not notice that Woodson was ill until after dinner on July 8, 2012.   Martin Dep. at 13:15;14:4; Caballaro Dep. at 16:20-17:14; Pinkston Dep. at 21:15-23:17.

Woodson responds that there is a triable issue of fact as to whether his condition on July 5, 2012 was a "serious medical condition." He bases this assertion solely on the fact that he had a temperature of 102.3 degrees. Docket No. 451 at 5 ("Plaintiff had a serious medical condition based on his temperature of 102.3 degrees...Dr. Moja's testimony, along with common sense, demonstrates that Plaintiff's significantly elevated temperature of 102.3 degrees was a serious medical condition.") First, Woodson points out that, when describing Woodson's condition on the 5th, Moja stated that he "had a significantly elevated temperature" and ordered that Woodson be given cold water and Motrin. Moja Dep. at 134:25-135:1. Woodson alleges that "these are not the types of statements and treatment that a doctor would make if he did not think the Plaintiff was suffering from a serious medical condition."[3] Docket No. 451 at 6. Second, Woodson argues that the Iko standard which defines "serious medical condition" as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize

---

[3] In response, Williams notes that, in this same part of the deposition, Moja explains that, despite the "significant temperature elevation", he did not believe that Woodson was suffering from a serious medical issue because "he had a significantly elevated temperature without any clinical findings such as a definitive diagnosis." (emphasis added) Moja Dep. at 134:25-135:2, Docket No. 451-2. Thus, Woodson's assertion that Moja was stating that his Woodson's condition was serious on July 5 is misguided.

the necessity for a doctor's attention" fits this case. Iko, 535 F.3d at 241. He states that the treatment ordered by Moja that mandated that Woodson receive Motrin for three days and drink cold water is sufficient to satisfy the Iko test. Further, he argues that a lay person would recognize the danger of a 102.3 degree fever and cites to this Court's statement that 102.3 is an "extremely high fever". Docket No. 451 at 6. Finally, he attempts to explain his experts' testimony by stating that it only means that "plaintiff was less ill as compared to the catastrophic injury that he suffered a few days later" and not that he was only mildly ill, as the testimony stated. Id.

Woodson has not presented a triable issue of fact that could support a reasonable jury's finding that he had a "serious medical need" on July 5, 2012. Woodson presented to Dr. Moja and Williams on July 5 for a regularly-scheduled continuing care visit. After taking Woodson's vitals, Williams found that he had a 102.3 degree fever and reported such to Dr. Moja. Based on this fact alone, Woodson argues that there is enough evidence to establish that Woodson was suffering from a "serious medical condition." This disregards the fact that Moja did not think Woodson's condition was serious when dealing with Woodson in person and that Woodson's own medical experts, upon review, did not think that his condition was serious on July 5, but only

that Woodson was "mildly ill."  It further disregards the fact that, because of the heat wave, it was likely that most of the inmates were running a higher than normal body temperature.

Further, Woodson's argument that his case fits the Iko test is not well-taken.  It is true that Moja did prescribe 800 mgs of Motrin to be given twice a day for three days.  However, it is shaky logic to equate prescribing the equivalent of two "super strength" Motrin to a physician's decision to "mandate treatment" for a serious need.  Were that to be the case, every headache, cold or fever for which Motrin or the like is prescribed would become a serious medical need.  Iko does not require such a result.  And Woodson has cited no authority that would so define a serious medical need.[4]

There is no doubt that 102.3 degrees is a high temperature for an adult.  However, there is no evidence that would permit a reasonable jury to find that a patient who has a temperature of 102.3 degrees in an extremely warm environment has a "serious medical need," where, as here, the undisputed evidence is that Woodson was mildly ill on July 5.

---

[4] Woodson's contention that it would be clear to a lay person that he needed medical attention is rebutted by the fact that the inmates with whom he interacted extensively every day did not seek out medical attention for him until three days after his interaction with Williams.

## CONCLUSION

For the reasons set forth above, Marian Williams' MOTION FOR SUMMARY JUDGMENT (Docket No. 374) will be GRANTED.

It is so ORDERED.

_____ /s/   *R E P*

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  February /0, 2015
        *REP*

15