IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

STEFAN WOODSON,

    Plaintiff,

v.                                    Civil Action No. 3:13cv134

CITY OF RICHMOND,
VIRGINIA, et al.,

    Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on LOLITA PADGETT, R.N.'S MOTION FOR SUMMARY JUDGMENT (Docket No. 366). For the reasons stated below, this motion was granted by ORDER (Docket No. 685).

**BACKGROUND**

**I. Background Facts**

On March 27, 2012, Stefan Woodson ("Woodson") was incarcerated for service of sentence at the Richmond City Jail (the "Jail"). At the time of Woodson's incarceration, Lolita Padgett ("Padgett") was the Director of Nursing ("DON") in the medical department at the Jail and was employed by Correct Care Solutions LLC ("CCS"). Padgett Declaration at ¶3. She began that job on May 28, 2012. Id. For the period between May 28, 2012 and July 9, 2012, however, Padgett split her working time

between the Jail, where she was DON, and the Riverside Regional Jail, where CCS was also beginning operations. Id. at ¶5.

The duties of the DON include planning and developing procedures for the health care department that complied with contract requirements and with various standards, training staff, recruiting and retaining nurses, scheduling nursing staff, and reviewing discrepancies in equipment and medications. Id. at 4. For a new DON in the CCS system, the job description can entail learning the site-specific procedures and the professional backgrounds of staff at that specific cite. At the Richmond City Jail, these site-specific procedures included the provision of urgent care and the process of "noting" a physician's order for treatment. Padgett Declaration at ¶8-14

## II. The July 5 Visit With Dr. Moja And Nurse Williams

On July 5, 2012, Woodson came to the clinic for a previously scheduled 90-day Chronic Care visit. Chronic Care Periodic Exam Record at 79. At this visit, Nurse Marian Williams ("Williams") checked Woodson's vital signs and recorded a temperature of 102.3, a blood pressure level of 114/76, a pulse rate of 70, and a respiratory rate of 18. Id. at 56. Williams reported the elevated temperature to Dr. Motsumi Moja ("Moja"), who thereafter examined Woodson.

As part of a physician's order ensuing that examination, Moja ordered that the nursing staff perform temperature checks

2

on Woodson on the evening of July 5 and the morning of July 6. Id. at 48, 82. That order was handed to Williams to be "taken off" or "noted" so as to alert the on-duty nurses of the doctor's orders.[1] The temperature checks that had been ordered by Moja were not conducted. There is a dispute between the parties as to why those temperature checks did not occur. CCS states that Williams "either did not complete the Treatment Record needed to alert the Clinic Nurses that they were to conduct temperature checks or she completed that form and it was not placed in the Treatment Book." Docket No. 413 at 6, fn 1. Williams, however stated that "she completed the Treatment Record and placed it in the Treatment Book and the reason eh Clinic Nurse did not perform the temperature checks is unknown." Id. However, it is undisputed that there was no such Treatment Record in the Treatment Book.

In the early morning hours of July 9, 2012, Woodson was found unresponsive in his cell, and was taken by ambulance to the Medical College of Virginia where it was determined that Woodson had suffered a heat stroke and sustained serious injury.

---

[1] "Taking off" or "noting" an order "means that the nurse given the order completes all of the paperwork needed to alert the other medical staff of what the order requires so the treatment is actually carried out." Docket No. 414 at 6-7.

### III. Williams' Subpar Performance And Padgett's Knowledge Thereof

Williams had been reprimanded three times for failing properly to perform her duties while employed by CCS at the Jail. On December 8, 2011, Williams was reprimanded for her failure to properly process an inmate's paperwork after he returned from the hospital and a failure to provide the inmate with IV antibiotics as directed. Williams Personnel Record at 1635. On March 2, 2012, Williams was reprimanded for a February 24, 2012 failure to properly confirm an incoming inmates' medications when processing the inmate in the Annex of the Jail. As a result, it appears that the inmate in question did not receive his medication until the mistake was noticed and corrected. Williams Personnel Record at 1618. Finally, on April 3, 2012, Williams failed to follow proper procedure when she placed an inmate's Medication Administration Record in the inmate's chart instead of the prescription book; as a result, the inmate did not receive his medication. Additionally, Williams' transcription of the physician's order was incorrect in that she recorded that the medication was to be given two times a day rather than three as the doctor had ordered. Williams Personnel File at 1568.

Padgett states that she did not have the opportunity to examine staff personnel files before July 9, 2012 and thus was not aware of their contents. Padgett Declaration at ¶6.

4

Specifically, she denies having any knowledge of "any performance deficiencies by Williams" before July 9, 2012. Id. at ¶7; Stanford Declaration at ¶¶ 7,9 (stating that she reprimanded Williams on April 10, 2012 - before Padgett assumed the DON position - for performance deficiencies and "personally retrained Nurse Williams on . . . [the] site procedure of 'taking off' physician orders and [Correct Care's] no miss meds policy"; additionally stating that no additional performance issues were observed from Williams between April 10 and July 9, 2012).

Padgett's contention, however, is contradicted by her deposition testimony taken on July 11, 2014.

> Question: Do you recall ever talking to Nurse Williams about taking off orders, not just Mr. Woodson's order, but taking off any order?
>
> Answer: I recall it because I looked at her reprimands, so yes.

Padgett Dep. at 76: 15-19. At oral argument, Padgett's counsel contended that her review of Williams' reprimands and her conversation with Williams came after July 9, 2012 when Padgett was reviewing documents in order to serve as a Fed. R. Civ. P. 30(b)(6) witness in this case. However, the deposition testimony was unclear about when Padgett's review of Williams' record occurred and when Padgett talked to Williams about it.

5

Thus, says Woodson, he should be entitled to the inference that the review occurred before July 9, 2012.

Padgett's testimony is indeed unclear about the date on which she reviewed Williams' personnel file, gained knowledge of Williams' reprimands, and spoke with Williams about her failure to take off orders.

> Question: Do you remember when that was?
>
> Answer: No, I don't remember the date itself.

Padgett Dep. at 77: 6-7. Because of this testimony and requirement that all reasonable inferences are to be made in favor of the non-moving party at the summary judgment stage, Woodson is entitled to the reasonable inference that Padgett was aware of Williams' performance issues and had spoken with her regarding such prior to July 9, 2012.

**IV. Section 1983 Claim**

On July 2, 2014, Woodson filed the Fourth Amended Complaint ("FAC") in this case. Docket No. 187. In that Complaint, Woodson raised one claim against Padgett. In Count V, brought pursuant to 42 U.S.C. § 1983, Woodson alleges that Padgett violated Woodson's Eighth Amendment rights by being deliberately indifferent to his serious medical needs under a theory of supervisory liability. Id. at 45-51. Specifically, Woodson alleges that "to the extent [that]...adequate, appropriate, and

6

practical medical guidelines and/or policies, and/or procedures for us by the nurses and other medical personnel at the Jail [were developed]...Padgett failed to implement or oversee adherence to such guidelines and/or policies and/or procedures." FAC ¶92. Woodson contends that "[t]his failure resulted in the inability or failure to provide [him] constitutionally adequate diagnosis and treatment, and led to the injuries" he suffered. Id.

Padgett has moved for summary judgment. Woodson has responded, and Padgett has replied. A hearing on the matter was held on January 7, 2015 and the motion is now ripe for decision.

**LEGAL STANDARDS**

I. **Summary Judgment Standard**

Under Fed. R. Civ. P. 56, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. f6(c). In Celtotex Corp. v. Caltrett[2], the Supreme Court stated that Rule 56(c) requires the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an

---

[2] 417 U.S. 317 (1986)

essential element to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. For summary judgment to be proper "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." Id. at 323.

When reviewing a motion for summary judgment, a court must interpret the facts and any inferences to be drawn therefrom in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Seabulk Offshore, Ltd. V. Am. Home. Assurance Co., 377 F.3d 408, 418 (4th Cir. 2004). In order to successfully oppose a motion for summary judgment, the nonmoving party must demonstrate to the court that there are specific facts that would create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). "Where...the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

II. **42 U.S.C. 1983 Standard**

Section 1983 of Title 42 of the United States Code (§1983) provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or

8

>      usage, of any State or Territory or the
>      District of Columbia, subjects, or causes to
>      be subjected, any citizen of the United
>      States or other person within the
>      jurisdiction thereof to the deprivation of
>      any rights, privileges, or immunities
>      secured by the Constitution and laws, shall
>      be liable to the party injured in an action
>      at law, suit in equity, or other proper
>      proceeding for redress.

"§ 1983 is not itself a source of substantive rights; rather, it provides a method for vindicating federal rights elsewhere conferred." Brown v. Mitchell, 327 F. Supp. 2d. 615, 628 (E.D. Va. 2004). In order to prove a § 1983 claim, Woodson must establish that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999).

## DISCUSSION

### I. Count V: Supervisory Liability For Deliberate Indifference To A Prisoner's Medical Needs

In Count V, Woodson has alleged that Padgett should be held liable for her subordinates' failure to provide constitutionally adequate medical care as required by the Eighth Amendment. Docket No. 187 at 45-52.

#### A. Legal Standard

"The principal is firmly entrenched that supervisory officials may be held liable in certain circumstances for the

9

constitutional injuries inflicted by their subordinates." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotations omitted). To survive summary judgment on the issue of supervisory liability, Woodson must present a triable issue of fact as to three elements: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Shaw, 13 F.3d at 799 (internal quotations omitted).

    **B.  Analysis**

        **(i) Actual Or Constructive Knowledge That A Subordinate Was Engaged In Conduct That Posed A Pervasive And Unreasonable Risk Of Constitutional Injury**

"Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions." Shaw 13 F.3d at 799 (citing Slakan v. Porter, 737 F.2d 368, 373-74 (4th Cir. 1984)). "Ordinarily, [a plaintiff] cannot satisfy his burden of proof by pointing to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and

10

procedures covering every conceivable occurrence within the area of his responsibilities." Slakan, 737 at 373.

Padgett argues that Woodson cannot present a triable issue of fact as to whether her subordinates were engaged in conduct that posed a risk of constitutional violations. In particular, she argues that Williams' reprimands do not rise to the level of a "pervasive and unreasonable risk of constitutional harm." Woodson argues that he has established a triable issue of fact as to Padgett's subordinates' conduct, relying on the documented deficient performance of duties by Williams, and he asserts that those three instances provide enough support to satisfy the constitutional standards for summary judgment purposes.

Woodson cannot establish that Padgett's subordinates were engaged in "conduct that posed a pervasive and unreasonable risk of constitutional injury" based on the evidence provided. As stated above, the Shaw test requires that the conduct engaged in by the defendant's subordinates "is widespread" and not merely "isolated incidents".

As explained above, Williams received three performance-related reprimands stemming from three incidents that occurred between December 8, 2011 and April 3, 2012. One incident involved a failure to process hospital paperwork and a subsequent failure to provide an inmate with medication. The second involved a failure to properly verify an incoming

11

inmate's medication at the Jail Annex. The last incident involved William's failure to properly take off a doctor's order and her misplacement of the medication administration record containing the order that was incorrectly taken off.

As explained previously for purposes of this motion, it is assumed that Padgett was aware of all three incidents. However, that does not establish that Padgett was aware of a pervasive and unreasonable risk of constitutional injury. Woodson relies on evidence of three reprimands spanning a five month period, only one of which stemmed from Williams' failure to properly take off a doctor's order, which is the type of behavior that Williams is alleged to have engaged in here. Based on this evidence, a reasonable jury could not find that Woodson has met the Shaw requirement that the conduct in question be "widespread". Therefore, Padgett is entitled to summary judgment in her favor.

## CONCLUSION

For the reasons set forth above, LOLITA PADGETT, R.N.'S MOTION FOR SUMMARY JUDGMENT (Docket No. 366) will be granted.

It is so ORDERED.

/s/ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: February 10, 2015

REP

12