```
         IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF VIRGINIA
                   Richmond Division
```

STEFAN WOODSON,

    Plaintiff,

v.                            Civil Action No. 3:13cv134

CITY OF RICHMOND,
VIRGINIA, et al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on CORRECT CARE SOLUTIONS, LLC'S MOTION FOR SUMMARY JUDGMENT (Docket No. 382). For the reasons set forth below, the motion will be granted.

## BACKGROUND

### I. Background Facts

Correct Care Solutions, LLC ("CCS") and the City of Richmond entered into a contract whereby CCS would fully staff the medical department at the Richmond City Jail (the "Jail") beginning August 1, 2011. See Contract between CCS and the City of Richmond at 2-113. This contract required, among other things, that CCS would "comply with standards established by the American Correctional Association (ACA), the National Commission on Correctional Health Care (NCCHC) for health services in

jails, the Virginia Department of Corrections Standards, and all applicable federal and Virginia statutes and regulations pertaining to the delivery of health care at Community Standards." Id. at 2-10.

On March 27, 2012, Stefan Woodson ("Woodson") was committed to the Jail for service of sentence. In the notes of a Chronic Care Initial Visit with the CCS staff on April 4, 2012, it was recorded that Woodson was suffering from several chronic medical conditions such as hyperlipidemia, hypertension, cardiac dysrhythmia, and gout. Chronic Care Initial Visit Sheet at 75-78. Because of these conditions, Woodson was enrolled in the "Chronic Care" program at the Jail in which an inmate's health was monitored in periodic visits. Id.; Moja Declaration at ¶17. At the initial Chronic Care visit on April 4, 2012, Woodson was evaluated by Dr. Moja, who ordered that Woodson receive an EKG, blood pressure monitoring, and a follow-up visit in 90 days on July 5, 2012. Physician's Order from April 4, 2012 at 52. However, there is no record that these orders were followed or that an EKG occurred. Stewart Expert Report at 13.

On July 5, 2012, Woodson returned to the medical offices at the Jail to meet with Moja for the previously scheduled 90-day periodic Chronic Care visit. Chronic Care Periodic Exam Record at 79. At this visit, Nurse Marian Williams ("Williams") checked Woodson's vital signs and recorded a temperature of

102.3, a blood pressure level of 114/76, a pulse rate of 70, and a respiratory rate of 18. Id. at 56. When Williams saw that Woodson had an elevated temperature, she alerted Moja because she believed that the temperature was "abnormal" and she wanted the doctor "to note that the man had a temp of a hundred and two." Williams Dep. at 19:18-20:5 and 20:18-21:14. Having learned of Woodson's elevated temperatures, Moja examined Woodson and asked whether he had been experiencing other symptoms. Woodson reported that he had been experiencing fatigue and anorexia (not eating) for the past several weeks. Chronic Care Periodic Exam Record at 79. Moja considered that the fever might have been attributable to a lingering infection, to a current medication, or to environmental factors. Moja Dep. at 6:12-20. After the examination, Moja noted that Woodson "had an isolated temperature without any other . . . symptoms or clinical signs to specifically tie the elevated temperature to one diagnosis." Moja Dep. at 6:6-12. Additionally, he determined that Woodson was "stable." Chronic Care Periodic Exam Record at 80.

At the appointment, Moja issued an order with several instructions that Williams was responsible for "taking off." "Taking off" or "noting" an order "means that the nurse given the order completes all of the paperwork needed to alert the other medical staff of what the order requires so the treatment

3

is actually carried out." Docket No. 414 at 6-7. First, Moja instructed Williams to give Woodson cold water to drink and instructed Woodson to drink "plenty of cold fluids." He instructed that Woodson was to remain in the air-conditioned clinic and drink the cold water. Moja Dep. at 17:23-18:7. Moja estimated that the amount of water given to Woodson in the clinic to be "a liter or two." Id. at 8:8-11. Second, Moja directed Williams to prepare a medication administration record (a "MAR") which stated that Woodson was to be provided 800 mgs of Motrin twice a day for three days. Physician's Order from July 5, 2012; Medication Administration Record for Stephan Woodson. Williams prepared the MAR. Id. Third, Moja directed, at Woodson's request, that Woodson be weaned off of the medication Topamax, id., because Topamax regularly causes fatigue and anorexia and can cause elevated body temperatures in rare instances. Moja Declaration at ¶13. Finally, Moja directed that a CCS nurse was to follow up with Woodson on the evening of July 5 and the morning of July 6 for temperature checks. Physician's Order from July 5, 2012.[1] After drinking

---

[1] There is a dispute between the parties as to whether Williams properly "took off" Moja's order directing the temperature checks. CCS asserts that Williams did not "take off" Moja's order telling staff to check Woodson's temperature. Williams disputes this and has testified that she did create such a treatment sheet. See Williams Dep. at 11:5-13:5. No such sheet was in the medical records. For purposes of this motion, it

4

the water and being told what treatment was being ordered for him, Woodson returned to his cell. It is undisputed that Woodson's temperature was not taken on the evening of July 5 or the morning of July 6.

In the early morning hours of July 9, 2012 (four days after Moja saw Woodson), Woodson was found unresponsive in his cell. After being taken by ambulance to MCV, it was determined that Woodson had suffered a heat stroke.

## II. CCS's Critical Clinical Event Reporting System

CCS maintains a Critical Clinical Event Reporting System that is called "CCE" for short. Ducote Declaration at ¶14; CCS Clinical Procedures: Critical Clinical Event. This system compiles reports of "sentinel events,"[2] clinical events with significant implications for clients, and clinical events that Correct Care deemed high risk and therefore monitors. CCS Clinical Procedures: Critical Clinical Event at 805. The CCE system serves both a data collecting role and a role in preserving patient safety.

In the CCE system, "site representatives . . . would email notices of important events to [Correct Care]'s corporate

---

must be assumed that Williams did not "take off" the temperature check directive issued by Moja.

[2] A sentinel event is "an occurrence involving death or serious physical or psychological injury or risk thereof".

5

headquarters to be reviewed by various members of [Correct Care]'s corporate leadership." Ducote Declaration at ¶16. Senior personnel from several departments would review the CCE notifications and discuss them with each other. Id. at ¶18. If the CCE Committee deemed it appropriate, a Root Cause Analysis ("RCA") would be conducted to determine what caused the critical clinical event and what should be done to minimize the risk of a similar event in the future. Id. at ¶19. However, if the Committee believed that an RCA was not necessary, one would not be performed. Id. at ¶21.

If the RCA identified that a change needed to be made, a CCS investigator would create an improvement plan. Id. at ¶20. If a CCE was not submitted to an RCA, the CCE was supposed to be discussed by facility leadership at a quarterly meeting held as part of a program called "Continuous Quality Improvement" ("CQI"). Id. at ¶22.

The CCE generated by Woodson's heat stroke was never the subject of an RCA or an improvement plan. Helfand Dep. at 188:1-189:25. In addition, there was never an in-depth discussion of Woodson's injuries during the quarterly CQI meeting at the Jail. Id.

6

### III. CCS's History Regarding Heat Related Illnesses

#### A. Incidents of Heat-Related Illness

In 2009, no CCS facility reported any incidents of heat-related illnesses. Ducote Declaration at ¶27. In 2010, one heat related illness was reported in a CCS facility (not the Jail). Id. at 29. An RCA was performed and it was determined that medication given by a mental health provider in that facility had created "a susceptibility to heat injury." Id. Following the incident, the inmate was moved to a temperature controlled environment and monitored following the RCA. Id. ¶31.

In 2011, CCS facilities reported three different heat-related events involving different inmates at different facilities served by CCS. Id. at ¶33. First, an inmate in Kansas was hospitalized because of meningitis and possible complications secondary to heat injury. He later died. Id. at ¶34. A Mortality Review found that the inmate had died from sepsis.[3] Id. at ¶35. Second, three inmates at the Jail were reported to have suffered heat-related illness. Id. at ¶36; CCE

---

[3] Woodson states that "the accuracy of [CCS's] own data is seriously called into question...the failures to investigate [three heat-related CCE's in 2011 at the Richmond City Jail...and Woodson's heat stroke] are consistent with an attempt to cover up and preclude liability." Docket No. 478 at 9 ¶33. However, there is no proof that Correct Care fabricated the report referred to here.

7

Report from Kim Palmer on July 23, 2011.[4] Two of those inmates were treated at the Jail[5] and one was sent to the emergency room at MCV for further care. Id. Third, several inmates were being transported in an un-air-conditioned vehicle in Tennessee and began to show signs of heat distress. Id. at ¶38. When a distress call went out from the van, CCS employees responded. Id. at ¶39. The inmates were not housed in a CCS facility at the time.

CCS argues that this illustrates that it has experienced "only 2 instances in which a patient inmate required any form of hospitalization for heat-related illness." Docket No. 415 at 11. Further, CCS states that its employees at the Jail "encouraged Sheriff Woody to institute several heat injury mitigation approaches, including the use of industrial fans to circulate air, active provision of cool fluids to inmates in the housing areas, and encouraging inmates to hydrate as a part of daily operations" after the incident in 2011. Ducote Declaration at ¶37.

---

[4] The Report states: "What: 3 heat related illnesses. Where: Richmond City Jail. 2 treated on site; 1 sent to ER via EMS."

[5] CCS argues that this allows the inference that the illnesses were "detected by medical staff sufficiently early to allow the RCJ medical staff to adequately treat the patients without complications." Docket No. 415 at 10, ¶41. Woodson, however, argues that there is no evidence as to who detected the illness. Docket No. 478 at 9, ¶36.

### B. Policy Concerning Heat-Related Illness

CCS did not have a formal policy addressing heat-related illness. Interrogatory Responses, Docket No. 415-25 at Interrogatory 6. However, CCS also explains that it did not have policies specific to most individual medical conditions. Docket No. 415 at 11. Instead, the company "promulgat[ed] general operating policies and requir[ing] each site's medical department leadership to develop and maintain site specific procedures to account for the nuanced aspects of providing medical care at any given site." Docket No. 415 at 12, ¶50; Correct Care Policy: Policies and Procedures at N-1. Woodson points out that CCS does have a specific policy addressed to fevers and alleges that there are formal clinical policies for "many specific medical conditions", but does not cite to them. CCS Fever Pathway; Docket No. 478 at 10.

Staff at individual sites were to be trained on site-specific procedures. Correct Care Policy: Policies and Procedures at N-1. At the Jail, there was a site procedure requiring that an inmate who complained or exhibited signs of several urgent conditions be assessed immediately. Padgett Declaration at 2, ¶9. Urgent conditions included chest pain, shortness of breath, skin rashes, open wounds, nausea and/or vomiting, loss or alteration of consciousness, severe muscle cramps or headaches,

9

or anything medical staff believed could lead to acute complications. Id. at 2, ¶10.

## IV. Section 1983 Claim

In the Fourth Amended Complaint ("FAC"), Woodson presents one claim against CCS. Specifically, in Count V, which is brought pursuant to 42 U.S.C. §1983, it is alleged that CCS violated Woodson's Eighth Amendment rights by maintaining an unconstitutional policy or custom at the Jail and its medical operations therein. Id. at 45-51. This count alleges that CCS "acted in a manner that was deliberately indifferent to Mr. Woodson's basic human needs during his confinement, including his need for medical care, amounting to a violation of Mr. Woodson's Eighth Amendment Rights." Id. at 46, ¶168. Specifically, in Count V of the FAC, Woodson alleges that CCS "failed to establish any meaningful policy or procedure to prevent or ameliorate foreseeable harm to inmates...as a result of dangerously high temperatures in the Jail." FAC ¶38.

However, in briefing and at oral argument on this motion, counsel for Woodson attempted to rephrase the claim against CCS as an allegation that CCS had "an unwritten policy of not following a written policy", namely, the sentinel and critical care event policy discussed above. Woodson's argument is that CCS failed to follow its own policy when reviewing CCEs, particularly with respect to the incident in 2011 involving

three heat-related illnesses at the Jail and Woodson's heat stroke. Woodson makes the related argument that CCS failed to follow the National Commission on Correctional Health Care's Standards for Health Services in Jails in addressing adverse inmate events. Docket No 478 at 12, ¶7. Particularly, he alleged that the Patient Safety Policy (J-B-02) was violated. Helfand Dep. at 200:10-201:25; Docket No 478 at 12, ¶7.[6] Lastly, Woodson argues that, had an appropriate investigation of the three heat-related illnesses in 2011 been conducted and a Corrective Action Plan instituted, Woodson's harm might have been avoided. Docket No. 478 at 13, ¶¶12-14.

It became clear during the course of oral arguments that this claim had not been presented in the FAC. Woodson thereafter moved for leave to amend the FAC by interlineation. That motion was denied.

Thus, the claim facing CCS in Count V of the FAC remains that the allegation that it failed to establish any meaningful policy or procedure dealing with heat related illness at the Jail. That is the claim that is the subject of CCS's motion for summary judgment.

---

[6] The parties have not provided the full text of the Patient Safety Policy. However, a portion of the policy is read on the record in the Helfand deposition and consists, in part, of the statement that "The RHS should analyze each adverse or near-miss clinical event." Helfand Dep. at 200:10-17.

11

## LEGAL STANDARDS

### I. Summary Judgment Standard

Under Fed. R. Civ. P. 56, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. f6(c). In Celtotex Corp. v. Caltrett[7], the Supreme Court stated that Rule 56(c) requires the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. In order to enter summary judgment "there can be no genuine issue as to any material fact, since a complete failure to proof concerning an essential elements of the nonmoving party's case renders all other facts immaterial." Id. at 323.

When reviewing a motion for summary judgment, a court must interpret the facts and any inferences drawn therefrom in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Seabulk Offshore, Ltd. V. Am. Home. Assurance Co., 377

---

[7] 417 U.S. 317 (1986)

F.3d 408, 418 (4th Cir. 2004). In order to successfully oppose a motion for summary judgment, the nonmoving party must demonstrate to the court that there are specific facts that would create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). "Where...the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

## II. 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code (§1983) provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

"§ 1983 is not itself a source of substantive rights; rather, it provides a method for vindicating federal rights elsewhere conferred." Brown v. Mitchell, 327 F. Supp. 2d. 615, 628 (E.D. Va. 2004). In order to succeed on a § 1983 claim, a plaintiff must establish that he was "deprived of a right

13

secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999).

## DISCUSSION

### I. Legal Standard: Official Policy or Custom

Liability against CCS may not be predicated upon a theory of vicarious liability or respondeat superior. Monell v. Dep't of Soc. Serv. Of City of N.Y., 436 U.S. 658, 694 (1978). "Rather, under Monell, municipal liability arises only where the municipality, qua municipality, has undertaken an official policy or custom which causes a deprivation of the plaintiff's constitutional or statutory rights." Brown, 327 F. Supp.2d at 629. This holding is "equally applicable to the liability of private corporations." Powell v. Shopco Laurel Co., 678 F.2d 504, 506 (4th Cir. 1982). In order to establish a claim under §1983 for an unconstitutional official policy or custom, Woodson must raise a triable issue of fact that: "(1) [CCS] had a policy or custom of deliberate indifference to the deprivation of constitutional rights; and (2) this policy or custom caused the complained of injury." Brown, 327 F. Supp. 2d at 629. (citing Westmoreland v. Brown, 883 F. Supp. 67, 76 (E.D. Va. 1995)); see also Owens v. City of Independence, 445 U.S. 662 (1980).

### A. Analysis

An official policy or custom "can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'" Lytle v. Doyle, 326 F.3d 463, 472 (4th Cir. 2003) (internal citations omitted).

In Carter v. Morris[8] the Fourth Circuit examined a case in which the plaintiff could point to only one other incident that was similar to her own in attempting to establish municipal liability under a policy or custom approach. In rejecting her argument, the Court of Appeals stated that, "even assuming that the [other] incident states a federal violation, Carter's evidence falls far short of proof of an unconstitutional municipal policy. At best Carter...offers only one other uninvestigated complaint of unlawful arrest in the City of Danville-and that resulting from apparently reasonable error. This evidence fails to show that the City of Danville is deliberately indifferent to the relevant rights of its citizens." Id. at 220.

---

[8] 164 F.3d 215 (4th Cir. 1999).

15

The evidence on which Woodson relies to show that CCS had a policy of deliberate indifference is the failure of CCS to investigate the three heat-related illnesses at the Jail in 2001 that are identified briefly in a CCE email.[9] Two of those inmates were treated on-site and one was sent to the emergency room for a suspected heat-related illness. There was no internal investigation into any of those incidents and nothing else is known about their circumstances. Just as a lack of evidence doomed the plaintiff's case in Carter, so too is the evidence insufficient to support Woodson's claim against CCS. Woodson has presented, at best, evidence that CCS did not investigate one hospitalization and two illnesses that were successfully treated on-site. That is, he has shown only one incident in which CCS did not investigate a potential heat-related illness that was not successfully treated by CCS employees. One instance in which a company fails or declines to investigate an incident is not sufficient to establish that the company operates under a policy of deliberate indifference to constitutional deprivations.

Even if there was a triable issue respecting whether CCS had a policy of deliberate indifference to constitutional deprivations at the Jail, the record clearly establishes that

---

[9] The Report states: "What: 3 heat related illnesses. Where: Richmond City Jail. 2 treated on site; 1 sent to ER via EMS." CCE Report from Kim Palmer on July 23, 2011.

there is no triable issue of fact respecting whether said policy caused Woodson's injuries. Woodson has presented no evidence that an internal review of the two successfully-treated potential heat-related illness and the one hospitalized inmate with a potential heat related illness would have prevented his later sickness and related injuries. Further, CCS has presented evidence that it did, in fact, improve the medical service at the Jail after it began full-scale operations there on August 1, 2011. After August 1, CCS instituted an urgent care procedure meant to ensure prompt medical attention for inmates potentially suffering from serious health issues, recommended to the Sheriff's office that more fans and ice be provided in the building, and instituted a procedure by which inmates on the medical tier were permitted to express medical complaints to nurses during pill pass rather than being required to follow procedures requiring written documentation of complaints. Transcript of January 7, 2015 Oral Argument at 72:7-73:16. These actions were taken after the un-investigated incidents discussed above. Woodson has presented no evidence which would support the inference that, even had CCS conducted an investigation into the July 2011 incidents, it would have implemented any additional measures and that the failure to do so is causally linked to his injury.

## CONCLUSION

For the reasons set forth above, CORRECT CARE COLUTIONS, LLC'S MOTION FOR SUMMARY JUDGMENT (Docket No. 382) will be granted.

It is so ORDERED.

/s/ *REP*
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: February 10, 2015