IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

STEFAN WOODSON,

    Plaintiff,

v.                                    Civil Action No. 3:13cv134

CITY OF RICHMOND,
VIRGINIA, et al.,

    Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on DR. MOTSUMI MOJA'S MOTION FOR SUMMARY JUDGMENT (Docket No. 394). For the reasons set forth below, the motion was granted by ORDER (Docket No. 522).

**BACKGROUND**

**I. Background Facts**

On March 27, 2012, Stefan Woodson ("Woodson") was incarcerated for service of sentence at the Richmond City Jail (the "Jail"). Moja Declaration at ¶5. At the time of Woodson's incarceration, Moja was a physician and the medical director at the Richmond County Jail medical department. Moja Declaration at ¶3. He was, at all relevant times, an employee of Correct Care Solutions LLC ("CCS"). Id.

In a Chronic Care Initial Visit with the CCS staff on April 4, 2012, it was noted that Woodson was suffering from several chronic medical conditions such as hyperlipidemia, hypertension, cardiac dysrhythmia, and gout. Chronic Care Initial Visit Sheet at 75-78. Because of these conditions, Woodson was enrolled in the "Chronic Care" program at the jail in which an inmate's health was monitored in periodic visits. Id.; Moja Declaration at ¶17. At the initial Chronic Care visit on April 4, 2012, Woodson was evaluated by Moja, who ordered that Woodson receive an EKG, blood pressure monitoring, and a follow-up visit in 90 days on July 5, 2012. Physician's Order from April 4, 2012, Docket No. 414-1 at 52. However, there is no record that these orders were followed or that an EKG occurred. Stewart Expert Report at 13.

**II. July 5, 2012 Visit With Dr. Moja And Nurse Williams**

On July 5, 2012, Woodson returned to the medical offices at the Jail to meet with Moja for the previously pre-scheduled 90-day periodic Chronic Care visit. Chronic Care Periodic Exam Record at 79. At this visit, Nurse Marian Williams ("Williams") checked Woodson's vital signs and recorded a temperature of 102.3, a blood pressure level of 114/76, a pulse rate of 70, and a respiratory rate of 18. Id. at 56. When Williams saw that Woodson had an elevated temperature, she alerted Moja because

2

she believed that the temperature was "abnormal" and she wanted the doctor "to note that the man had a temp of a hundred and two." Williams Dep. at 19:18-20:5 and 20:18-21:14. Having learned of Woodson's elevated temperatures, Moja examined Woodson and asked whether he had been experiencing other symptoms. Woodson reported that he had been experiencing fatigue and anorexia (not eating) for the past several weeks. Chronic Care Periodic Exam Record at 79. Moja considered that the fever might have been attributable to a lingering infection, to a current medication, or to environmental factors. Moja Dep. at 6:12-20. After the examination, Moja noted that Woodson "had an isolated temperature without any other . . . symptoms or clinical signs to specifically tie the elevated temperature to one diagnosis." Moja Dep. at 6:6-12. Additionally, he determined that Woodson was "stable." Chronic Care Periodic Exam Record at 80.

At the appointment, Moja issued an order with several instructions that Williams was responsible for "taking off." "Taking off" or "noting" an order "means that the nurse given the order completes all of the paperwork needed to alert the other medical staff of what the order requires so the treatment is actually carried out." Docket No. 414 at 6-7. First, Moja instructed Williams to give Woodson cold water to drink and instructed Woodson to drink "plenty of cold fluids." He

3

instructed that Woodson was to remain in the air-conditioned clinic and drink the cold water. Moja Dep. at 17:23-18:7. Moja estimated that the amount of water given to Woodson in the clinic to be "a liter or two." Id. at 8:8-11. Second, Moja directed Williams to prepare a medication administration record (a "MAR") which stated that Woodson was to be provided 800 mgs of Motrin twice a day for three days. Physician's Order from July 5, 2012; Medication Administration Record for Stephan Woodson. Williams prepared the MAR. Id. Third, Moja directed, at Woodson's request, that Woodson be weaned off of the medication Topamax, id., because Topamax regularly causes fatigue and anorexia and can cause elevated body temperatures in rare instances. Moja Declaration at ¶13. Finally, Moja directed that a CCS nurse was to follow up with Woodson on the evening of July 5 and the morning of July 6 for temperature checks. Physician's Order from July 5, 2012.[1] After drinking the water and being told what treatment was being ordered for him, Woodson returned to his cell. It is undisputed that

---

[1] There is a dispute between the parties as to whether Williams properly "took off" Moja's order directing the temperature checks. CCS asserts that Williams did not "take off" Moja's order telling staff to check Woodson's temperature. Williams disputes this and has testified that she did create such a treatment sheet. See Williams Dep. at 11:5-13:5. No such sheet was in the medical records. For purposes of this motion, it must be assumed that Williams did not "take off" the temperature check directive issued by Moja.

4

Woodson's temperature was not taken on the evening of July 5 or the morning of July 6.

In the early morning hours of July 9, 2012 (four days after Moja saw Woodson), Woodson was found unresponsive in his cell. After being taken by ambulance to MCV, it was determined that Woodson had suffered a heat stroke. Shortly thereafter, Moja was informed of this development.

### III. Section 1983 Claim

On July 2, 2014, Woodson filed the Fourth Amended Complaint ("FAC") in this action. Docket No. 187. In the FAC, Woodson presents one claim against Moja. Specifically, in Count V, which is brought pursuant to 42 U.S.C. § 1983, it is alleged that Moja violated Woodson's Eighth Amendment rights by being deliberately indifferent to his serious medical needs. Id. at 45-51. Moja has moved for summary judgment on Count V. Docket No. 394. Woodson has responded. Docket No. 437. Moja has replied. Docket No. 508. A hearing on the matter was held on January 7, 2015. The motion is now ripe.

## LEGAL STANDARDS

### I. Summary Judgment Standard

Under Fed. R. Civ. P. 56, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

5

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. f6(c). In Celtotex Corp. v. Caltrett[2], the Supreme Court stated that Rule 56(c) requires the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. In order to enter summary judgment "there can be no genuine issue as to any material fact, since a complete failure to proof concerning an essential elements of the nonmoving party's case renders all other facts immaterial." Id. at 323.

When reviewing a motion for summary judgment, a court must interpret the facts and any inferences drawn therefrom in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Seabulk Offshore, Ltd. V. Am. Home. Assurance Co., 377 F.3d 408, 418 (4th Cir. 2004). In order to successfully oppose a motion for summary judgment, the nonmoving party must demonstrate to the court that there are specific facts that would create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). "Where...the record

---

[2] 417 U.S. 317 (1986)

taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

## II. 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code (§1983) provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

"§ 1983 is not itself a source of substantive rights; rather, it provides a method for vindicating federal rights elsewhere conferred." Brown v. Mitchell, 327 F. Supp. 2d. 615, 628 (E.D. Va. 2004). In order to succeed on a § 1983 claim, a plaintiff must establish that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999).

7

## DISCUSSION

### I. Legal Standard

In Count V, Woodson alleges that Moja violated his Eighth Amendment right to adequate medical care. Under the Eighth Amendment to the United States Constitution, inmates have a right to be free from cruel and unusual punishment as a result of officials' deliberate indifference to serious medical needs. Wilson v. Seiter, 501 U.S. 294 (1991). Patients who allege an Eighth Amendment violation for a failure to provide such treatment must present triable issues of fact as to two elements in order to survive summary judgment. First, the plaintiff must establish that the alleged deprivation is objectively sufficiently serious so as to violate the Eighth Amendment. Id. 298. This element is established by showing that the plaintiff was suffering from a serious medical need at the time he interacted with the defendant. A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008)

Second, the plaintiff must establish that the defendant acted with "deliberate indifference" to the right. Estelle v. Gamble, 429 U.S. 97 (1976). Deliberate indifference requires both that the defendant "subjectively recognized a substantial

8

risk of harm" and "that his actions were 'inappropriate in light of the risk.'" Parrish ex rel. Lee v. Cleveland, 371 F.3d 294, 303 (4th Cir. 2004) (citation omitted). "A prison official shows deliberate indifference if he knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure reasonable safety." Odom v. S.C. Dep't of Corr., 349 F.3d 765, 770 (4th Cir. 2003) (internal citations omitted). Further, a mere "error of judgment [or] inadvertent failure to provide adequate medical care...[does] not constitute a constitutional deprivation redressable under § 1983." Boyce v. Alizaduh, 595 F.2d 948, 953 (4th Cir. 1979). In other words, negligence is not deliberate indifference. Farmer, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence.")

**II. Analysis**

Moja's motion for summary judgment is predicated for the most part on the position that the undisputed record is that

9

Moja's "treatment plan for Mr. Woodson is the exact opposite of deliberate indifference to Mr. Woodson's serious medical need." DR. MOTSUMI MOJA'S AMENDED MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (Docket No. 414) pp. 16-19. That contention virtually presupposes the existence of a "serious medical need." And, Woodson's response argues that it is undisputed that there was a serious medical need. However, as to the existence of a "serious medical need," Woodson's assertion is that "Woodson had a serious medical need, as demonstrated by his debilitating heatstroke suffered on July 9, 2012, which left him wheelchair bound and unable to care for himself."[3] The predicate for that point is that the temperature of 102.3 degrees treated by Moja on July 5 was itself a serious medical need. Id. To support that contention Woodson cites Dr. Stern. Id. However, Dr. Stern actually testified that, on July 5, 2012, Woodson was "mildly ill." DEFENDANT MOTSUMI MOJA, M.D.'S REBUTTAL MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT (Docket No. 508), p. 19.

Thus, although the parties have not extensively briefed whether Woodson had a "serious medical need" when he interacted with Moja on July 5, 2012, the issue is nonetheless raised. The undisputed record is that Woodson did not come to the clinic on

---

[3] PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT MATSUMI [sic] MOJA'S MOTION FOR SUMMARY JUDGMENT (Docket No. 437), p. 14.

10

July 5 "with complaints of acute illness," but instead for a prescheduled Chronic Care visit;" that, after determining that Woodson had a fever, Moja examined him, but "could not reach a definitive diagnosis," and determined that Woodson's condition was "stable;" and that "Woodson was [not] facing any sort of emergency situation . . . [and] did not indicate that Mr. Woodson was suffering from dehydration or heat-related illness." Docket No. 508 at 17. Dr. Marc Stern, plaintiff's expert, testified in a deposition, and stated in a supplemental report, that, in his opinion, Woodson was only "mildly ill" when he was seen by Moja on July 5. Stern Dep. at 27:10-25, Docket No. 377-5; Stern Report at 2, Docket No 508-8. Specifically, in the deposition, Dr. Stern was asked whether he "would agree that on July 5, 2012, when Mr. Woodson was seen by Dr. Moja that his illness was mild." He answered "yes." Id. Further, Woodson's own nursing standard of care expert Deidra Stewart stated that, although Woodson was "definitely" ill on July 5, she agreed with Dr. Stern's opinion that Woodson was "mildly ill." Stewart Dep. at 136:34-137:19. She also stated that Woodson "was not seriously ill at the time" on July 5, 2012. Id. at 137:13-14.

On this record, Woodson has not presented a triable issue of fact that could support a reasonable jury's finding that he had a "serious medical need" on July 5, 2012, the only date on which Moja treated him. Woodson's basic argument admits as much

11

by asserting that the serious medical need was demonstrated by what happened on July 9, four days after he was treated by Moja. But, what happened on July 9 does not convert a mild illness on July 5 into a serious medical need on July 5.

To hold Moja responsible for what happened on July 9, there would have to be proof that he knew what was occurring after Moja saw Woodson on July 5. The undisputed record is that Moja had no such knowledge.

There is no doubt that 102.3 degrees is a high temperature for an adult. However, there is no evidence that would permit a reasonable jury to find that a patient who has a temperature of 102.3 degrees in an extremely warm environment has a "serious medical need," especially in light of the undisputed evidence showing that Woodson was mildly ill on July 5, the only date on which Moja treated him. For the foregoing reasons, Moja is entitled to summary judgment on Count V, the only count against him.

Even if there was a triable issue respecting whether a 102.3 degree fever was a serious medical need when Moja saw Woodson on July 5, the record rather clearly establishes that Moja was not deliberately indifferent to it. Moja took immediate action by having Woodson drink cool water and sit in a cool environment; by prescribing fever reducing medication; by ordering temperature checks later that day and the next morning;

12

by weaning Woodson off of a medication (Topamax) that was known to produce elevated temperatures; and by scheduling a follow-up appointment. That conduct is the antithesis of deliberate indifference. For that additional reason, Moja is entitled to summary judgment.

## CONCLUSION

For the reasons set forth above, DR. MOTSUMI MOJA'S MOTION FOR SUMMARY JUDGMENT (Docket No. 394) will be granted.

It is so ORDERED.

                                                   /s/             REP
                                     Robert E. Payne
                                     Senior United States District Judge

Richmond, Virginia
Date: February 10, 2015