

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

STEFAN WOODSON,

    Plaintiff,

v.                    Civil Action No. 3:13cv134

CITY OF RICHMOND,
VIRGINIA, et al.,

    Defendants.

### MEMORANDUM OPINION

This matter is before the Court on the CITY OF RICHMOND'S MOTION FOR SUMMARY JUDGMENT (Docket No. 342). For the reasons set forth below, this motion will be granted in part and denied in part.

### BACKGROUND

#### I.  History of the Richmond City Jail

In July 2012, Stefan Woodson ("Woodson") was serving a sentence in the Richmond City Jail (the "Jail") where he was housed in the so-called "Medical Tier" because of several conditions that warranted his placement there. The Jail opened its doors in 1964. It's previous history of inadequate conditions have been well documented by courts in the Eastern District of Virginia. See Sleeper v. City of Richmond, No.

3:12cv441, 2012 WL 3555412 (E.D. Va. Aug. 16, 2012); Brown v. Mitchell (Brown I), 308 F. Supp. 2d 682 (E.D. Va. 2004); Brown v. Mitchell (Brown II), 327 F. Supp. 2d 615, 635 (E.D. Va. 2004) (calling the conditions in the jail "deplorable").

The City of Richmond (the "City") is responsible for providing "suitable spaces and facilities to accommodate...a jail." Va. Code Ann. §15.2-1638. "[T]he design, the construction, and...the structural maintenance of local jails in Virginia are the responsibilities of local governments – in this case, the City." Brown I, 308 F. Supp. 2d at 698. Following the 2004 decisions in Brown I and Brown II, the mayor of the City created a Mayor's Commission on City Jail Issues. Mayor's Commission on City Jail Issues: Final Report at App'x #6. In its Final Report, the Mayor's Commission found that "because of years of benign neglect [the Jail had] suffered significant consequences resulting from a stagnant budget and under funding." Id. The Commission also "strongly recommended and advocated for the construction of a new state-of-the-art facility" in order to deal with "overcrowding and antiquated physical conditions." Id. at 19-20 When explaining why construction was preferable to renovation, the Commission stated that a new facility would "meet constitutional standards." Id. at 20. The City did not build a new jail at that time.

In 2008, Sheriff C.T. Woody was interviewed by the Richmond Times Dispatch and stated that the "Jail [had] never been a priority in this city." Further, he said that the conditions in the Jail were "almost inhumane,  and in some instances, [they are], when it's hot."  "Sheriff says Richmond Will Get a New Jail", Richmond Times Dispatch, June 12, 2008.  In 2008, the City installed approximately 100 drum fans in the Jail. Beschler Dep. 2 at 36:20-25.  A drum fan is a large portable fan used to move air around large spaces.

In 2009, a planning study for a new jail was conducted by Moseley Architects.  Planning Study for the Richmond City Jail at 1.  Moseley Architects reported that "the existing heating and ventilation units and exhaust fans [did] not adequately serve the Main Jail.  Temperatures in the Housing Units have reached upwards of 100 degrees Fahrenheit during the summer due to the lack of air conditioning.  Much of the equipment is original to the facility and is well beyond its serviceable lifetime.  None of the equipment [was] sized to meet current code requirements."  Id. at 81.  Further "insufficient ventilation and exhaust air...contribute[d] to the periods of poor indoor air quality [and t]he fact that the ventilation air is not conditioned result[ed] in high humidity levels during the summer and further contribute[d] to the poor indoor air quality."  Id.

3

Byron Marshall, who was then the Chief Administrative Officer for the City of Richmond, stated that the City was continuing to study building a new jail because the "old jail was neither heated nor cooled, for the most part." Byron Dep. at 11:23-12:3. The record shows that city officials knew that there were temperature and ventilation problems in the housing units of the Jail.

> Question: Temperatures in the housing unit have reached upwards of 100 degrees Fahrenheit during the summer months due to lack of air conditioning. The city also knew that; correct?
>
> Answer: Yes
>
> Question: There is insufficient ventilation and exhaust air in many of the housing units. The city knew that; correct?
>
> Answer: Yes

Beschler Dep. at 59:25-60:8.

In 2010, the City installed approximately 40 industrial fans, upgraded electrical system to accommodate the new fans, and installed and/or updated exhaust fans in the dining hall and rooftop. Beschler Dep. 2 at 36:22-25; Salomone Declaration. Throughout 2010 and 2011, the City looked into different ways to cool the jail. Marshall Dep. at 17:10-18:19. Several people, including Sheriff Woody, the Richmond City Attorney, the Sheriff's General Counsel, and the Acting Chief Administrative

Officer for the City met to discuss these possibilities.  Id. at 17:5-18:6.

In 2011, the City decided to install air conditioning in the kitchen, laundry, and dining area of the Jail.  City of Richmond Purchase Order Request; Woody Dep. 1 at 27:4-6; 38:25-39:7.  While the option of air conditioning the entire Jail was examined, no other measures were taken at that time.  The City says that the failure to act was because of security, operational, and expense factors.  Beschler Dep. 2 at 49:9-19; Salomone Dep. 2 at 40:14-21.  Woodson contests that any factor other than cost played a role in this decision making process. Marshall Dep. at 67:6-9.

On January 20, 2012, the City broke ground on a new jail facility.  Beschler Dep. 2 52:2-5.  The new facility opened on July 28, 2014.

## II.  The Medical Tier

During the first nine days of July, Woodson was housed on the Medical Tier at the Jail.  McRae Affidavit.  The Medical Tier consisted of 12 single occupancy cells that opened to a common area that ran the length of the cell block and that also contained a shower.  Id.  Inmates had access to this common area during non-locked down times.  Id.  Inmates are "locked down" in their cells for the night, typically beginning around 11:00 to

11:30 p.m.  Whitaker Aff. at ¶29.  Outside of this common area, there was a "catwalk" which had windows that, in theory, could open to the outside.  Id.  However, there is no evidence that the windows were ever opened during the first week of July or even that they were physically capable of being so opened at that time.

Woodson's cell had a bed, toilet and sink.  Id.  Whether the water from the sink in Woodson's cell was drinkable is a matter of factual dispute.  While the City contends that the sink supplied Woodson with running water that he was able to drink at all times, Woodson contends that the water from the sink was often undrinkable and that inmates often had to rely on deputies for access to drinkable water.  Id.; Whitaker Dep. at 37:7-10.

Each cell in the Medical Tier had a one foot by one foot metal vent above the bed that gave access to a "pipe chase" that, in turn, was connected to exhaust fans on the roof.  Salomon Declaration.  Further, on July 8 and 9, 2012, there was one large barrel fan operating on Woodson's tier.  McRae Affidavit; Evangelist Dep. at 48:20-49:23.  This fan appears to be one of the barrel fans purchased by the City in 2008.  The Medical Tier also had a shower in the common area with hot and cold running water.  Inmates on the Medical Tier were permitted

to shower as often as they wanted when they were not locked down.   Perry Dep. 55:7-15; Martin Dep. 57:13-58:17.

## III. Circumstances On July 9, 2012

In the early morning hours of July 9, 2012 Woodson was transported to the emergency room after being found unresponsive in his cell.   MCV Emergency Room Records.   The circumstances giving rise to Woodson's condition on July 9 are at the core of this action.

During the first nine days of July 2012, the City experienced a severe heat wave.   Affidavit of Kalkstein, at ¶¶ 12-14, 17.   During this period, the National Weather Service issued many heat-related advisories. Id. at ¶¶ 11-14.   Inmates on the Medical Tier at the Jail were subjected to very high temperatures.   The high temperatures during that period were further exacerbated by concomitant high humidity levels.   Id. at ¶25.

There was no air conditioning installed in the Medical Tier and Medical Tier inmates did not have access to those areas of the Jail that were air conditioned, such as the inmate dining room.   Allman Dep. 69:9-20.   Inmates housed on the Medical Tier took their meals in their cells.   Id.

In 2006, after C.T. Woody was elected the Sheriff of the City of Richmond, several measures were taken in an attempt to

7

alleviate the excessive heat conditions to which inmates were exposed. Those measures including opening windows, placing large floor fans within the housing tiers, providing three meals with liquid, providing "icebergs" to inmates[1], and placing coolers of cold water on housing tiers when outside temperatures rise to 95 degrees. Woody Aff.; Woody Dep. at 28. Woodson's cell did not open into the large common area where the fans were located, but instead had an opening "partially obstructed by the shower unit." Photograph of Stefan Woodson's cell. Woodson's cell was in an area where the windows were not opened. And, there was one barrel fan in the Medical Tier where Woodson was housed.

## IV.  Section 1983 Claim

On July 2, 2014, Woodson filed the Fourth Amended Complaint in this action and therein asserted one claim against the City of Richmond. Docket No. 187. Specifically, in Count I, which is brought pursuant to 42 U.S.C. § 1983, it is alleged that the City violated Woodson's Eighth Amendment rights by maintaining an unconstitutional policy or custom of not properly ventilating and cooling the Jail thereby exposing inmates to excessive heat. Says Woodson, "by and through its City Counsel [sic], pursuant

---

[1] Icebergs are "flavored ice in plastic bags". Docket No 296 at 9.

to an official policy or custom, [the City] constructed and maintained the physical structure of the Jail in a manner that was in ill-repair, posed a risk to the health and safety of the inmates/detainees . . . and was otherwise inadequate to meet the needs of inmates/detainees such as Mr. Woodson, including being overly crowded, poorly ventilated, and during the summer months, excessively overheated, with inadequate water supplies." Id. at 35, ¶138. The City has moved for summary judgment on Count I. Docket No. 343. Woodson has responded. Docket No. 456. The City has replied. Docket No. 500. A hearing on the matter was held on January 7, 2015. The motion is now ripe.

## LEGAL STANDARDS

### I.   Summary Judgment Standard

Under Fed. R. Civ. P. 56, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. f6(c). In Celtotex Corp. v. Caltrett[2], the Supreme Court stated that Rule 56(c) requires the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to

---

[2] 417 U.S. 317 (1986)

make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. In order to enter summary judgment "there can be no genuine issue as to any material fact, since a complete failure to proof concerning an essential elements of the nonmoving party's case renders all other facts immaterial." Id. at 323.

When reviewing a motion for summary judgment, a court must interpret the facts and any inferences drawn therefrom in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Seabulk Offshore, Ltd. V. Am. Home. Assurance Co., 377 F.3d 408, 418 (4th Cir. 2004). In order to successfully oppose a motion for summary judgment, the nonmoving party must demonstrate to the court that there are specific facts that would create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). "Where...the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

## II.   42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code (§1983) provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

"§ 1983 is not itself a source of substantive rights; rather, it provides a method for vindicating federal rights elsewhere conferred." Brown II, 327 F. Supp. 2d. at 628.   In order to succeed on a § 1983 claim, a plaintiff must establish that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999).

## DISCUSSION

## I.   Legal Standard: Official Policy Or Custom

In Count I, Woodson alleges that the City of Richmond violated his Eighth Amendment rights, which are made applicable

11

to state and municipal actors by operation of the Fourteenth Amendment. Estelle v. Gamble, 429 U.S. 91, 101 (1976).

Cities are "persons" amenable to suit under §1983. However, municipal liability may not be predicated upon a theory of vicarious liability or respondeat superior. Monell v. Dep't of Soc. Serv. Of City of N.Y., 436 U.S. 658, 694 (1978). "Rather, under Monell, municipal liability arises only where the municipality, qua municipality, has undertaken an official policy or custom which causes a deprivation of the plaintiff's constitutional or statutory rights." Brown II, 327 F. Supp. 2d at 629. In order to establish a claim under §1983 for an unconstitutional official policy or custom, Woodson must raise a triable issue of fact that: "(1) the City had a policy or custom of deliberate indifference to the deprivation of constitutional rights; and (2) this policy or custom caused the complained of injury." Id. (citing Westmoreland v. Brown, 883 F. Supp. 67, 76 (E.D. Va. 1995)); see also Owens v. City of Independence, 445 U.S. 662 (1980).

## 1. Analysis

### A. Custom Or Policy

Woodson alleges that the City had an official policy or custom of maintaining a structure that was in ill-repair, posed a risk to the health and safety needs of the inmates, and was otherwise inadequate to meet inmate needs. Docket No. 187 at

§138.  Particularly, Woodson alleges that the Jail was overly crowded, poorly ventilated, and excessively overheated during the summer months, and that it had inadequate water supplies. Id.  He alleges that this policy resulted from the City's action and inaction[3] in the face of relevant knowledge.  Thus, in order to survive summary judgment respecting the official policy or custom as to Count I, Woodson must show that the City had knowledge of unconstitutional conditions at the Jail and yet did not take appropriate action in response to them, thereby evincing a custom or policy of deliberate indifference to the unconstitutional conditions.  Williams v. Griffin, 952 F.2d 820, 826 (4th Cir. 1991).  Deliberate indifferences of this sort is cognizable:  "(1) when the city fails to act despite a known pattern of constitutional deprivations; or (2) when the city fails to remedy a situation that, unaddressed, is patently likely to cause constitutional deprivations to an identifiable group of persons who stand in a special relationship to the City."  Brown I, 308 F.Supp.2d at 693.

---

[3] Municipal inaction may qualify as an official policy or custom in certain circumstances for the purposes of Monell.  Brown II, 327 F. Supp. 2d at 629.

### (i)   City's Failure To Act Despite Known Pattern Of Constitutional Deprivations

#### (a)   Known Pattern Of Deprivations

The City has "adopted" Sheriff Woody's Motion for Summary Judgment and the deputies' motions for summary judgment on the issue of whether there is a known history of widespread heat related constitutional violations.   Docket No. 343 at 15, n.7. Its argument on this point consists only of a footnote pointing to those motions, stating that there "were multiple means available to address the concerns with the temperatures at the jail" and arguing that "[o]ther than pointing to the Sleeper case, Woodson does not have evidence of widespread known constitutional deprivations."   Id.   Woodson responds that the conditions in the Jail amounted to a constitutional violation because, armed with knowledge of the unconstitutional conditions, "[t]he City allocated no funds, employed no resources and otherwise took no action to ameliorate the conditions to which Mr. Woodson was subject on the Medical Tier of the Jail."   Docket No. 456 at 18.   This resulted in excessively high temperatures in the Jail in July 2012 and, subsequently, caused Woodson's heat stroke.

It has been established that the Eighth Amendment is violated when the conditions of confinement amount to cruel and unusual punishment.   Further, the Supreme Court has held that

14

the Eighth Amendment is violated when prisoners are exposed to extreme temperatures, absent reasonable efforts to ameliorate the effects thereof. Wilson v. Seiter, 501 U.S. 294, 304 (1991) (A "totality of the circumstances" violation of the Eighth Amendment was established by "a low cell temperature at night combined with a failure to issue blankets."). That precedent has been applied in the Eastern District of Virginia. Brown II, 327 F. Supp. 2d at 630 ("In addition, the basic human needs mandated by the Eighth Amendment include inmates' need for a reasonable amount of space and their need for reasonable temperatures.") (citing Williams v. Griffin, 952 F.2d 820, 826 (4th Cir. 1991)).

On this record, there is ample evidence that the Jail was extremely hot during the summer, and was even hotter during heat waves. And, it is beyond dispute that, in early July 2012, the outside temperatures in Richmond were incredibly hot. Further, a jury reasonably could find that the City did not take reasonable steps to ameliorate that heat during the summer generally, during heat waves, and during the heat wave of July 2012, specifically, especially with respect to those inmates who were confined in the Medical Tier of the Jail. Finally, a reasonable jury could find that a lack of access to adequate water supplies and inadequate ventilation on the Medical Tier further compounded the understood consequences of exposure to

the heat levels that occurred in the Medical Tier in July 2012. And, the record would permit a jury reasonably to find that the City engaged in a pattern and practice of permitting the well understood risks to prisoner health from heat exposure to exist without taking reasonable steps to ameliorate the known risks.

Second, a reasonable jury could find that the pattern was "known" to the city. In 2004, the City was informed that "the overcrowded, poorly ventilated, and dilapidated conditions at the Jail deprived inmates of one or more of" the basic needs "for reasonable safety...for a reasonable amount of space and [for] reasonable temperatures." Brown II, 327 F. Supp. 2d. at 631. That holding was based on extensive supporting evidence that need not be repeated here.

Since that time, there have been both internal and external communications showing that the City was on notice that the conditions in the Jail were dangerous to inmates. For example, in 2005, the Mayor's Commission recommended that a new jail be built based in part on the "overcrowding and antiquated physical conditions" at the Jail. Mayor's Commission Report at 19. In 2009, the Moseley Architect report stated that "the existing heating and ventilation units and exhaust fans to not adequately serve the Main Jail. Temperatures in the Housing Units have reached upwards of 100 degrees Fahrenheit during the summer due to the lack of air conditioning." Moseley Architect

16

Report at 81.   Further, Sheriff Woody gave several interviews in which he described the conditions of the Jail.   Most notably, he stated that the jail was "inhumane . . . when it's hot." "Sheriff says Richmond Will Get a New Jail", Richmond Times Dispatch, June 12, 2008.   He also stated that, when the temperatures reach "100 degrees outside . . . [the jail] can get up to 115 or 120 degrees inside the overcrowded jail." "Mortality rates decline in local jails nationwide", Richmond Times-Dispatch, July 7, 2010.   In lobbying for a new jail, Sheriff Woody stated that "the living conditions [in the City Jail were] inhumane for all of us not just the one [sic] who live here, but for the ones who work here."   "Beating the Heat in the Richmond City Jail," Rachel DePompa WWBT, July 22, 2010.

Finally, on June 26, 2010, Grant Sleeper died as a result of a fatal heat stroke while imprisoned in the Richmond City Jail.   Sleeper, 2012 WL 3555412 at *2.   While there are factual differences between the two cases (i.e. where in the Jail the inmates were imprisoned and their respective health conditions), this death, and the legal action following it, certainly placed the City on notice again just how hot and dangerous the Jail truly was.

Also, it is significant that, during the July 2012 heat wave, the City's Emergency Operations Center issued multiple communications to address anticipated health and safety issues

17

related to extreme high temperatures.   Beginning on June 30, 2012, the Emergency Operations Center distributed notices to other city departments warning of excessive heat and noting that "Governor McDonnell [had] declared a State of Emergency, which [would] help make resources available as needed."   City of Richmond Emergency Operations Center, June 30, 2012 Situation Report #2.   These reports indicated that the City was responding to the heat conditions by providing "cooling stations" for individuals without access to cooler areas, thousands of bags of ice to local fire stations, and "working a/c units and electrical power" to emergency shelters in the area.   City of Richmond Emergency Operations Center, June 30, 2012 Situation Report #5.

Further, as late as July 5, 2012, the Virginia Department of Emergency Management issued talking points to its local coordinators "for use in answering questions" about the heat wave.   Talking Points E-mail from Laura Southard, July 5, 2012. These talking points advised that "spending at least two hours per day in air conditioning significantly reduces the number of heat-related illnesses."   Id.   Additionally, it noted that "[d]uring extreme temperatures, fans by themselves are not enough to prevent heat related illnesses.   When temperatures are in the upper 90s or above, fans may not prevent heat-related illnesses."   Id.   Finally, the email noted that "[a] heat

18

advisory [was] in effect for areas of southwest and eastern Virginia until 8 p.m.  Heat index values may reach as high as 109 degrees F." Id.

All of the above reports, press, and incidents are enough to support a reasonable jury's findings that the City knew about the pattern of constitutional violations occurring in the Jail leading up to, and in, early July 2012.  Thus, Woodson has survived summary judgment on the first element of this claim.

### (b)  Failure To Act

Next, Woodson must present a triable issue of fact as to whether the City failed to act in the face of its knowledge of these constitutional deprivations.

The City argues that its approach to problems at the Jail following the Brown case illustrates that it promptly acted on the living conditions in the Jail.  Docket No. 343 at 15.  Brown was decided in 2004.  First, the City conducted a study in 2005 that recommended building a new jail facility.  Second, six years later in 2011, the City received four proposals to build a jail.  Third, the City began construction of the new jail in 2012.  Fourth, the City installed 100 drum fans in 2008, upgraded the electrical system in 2009 and installed 40 industrial fans and "improved the rooftop ventilation" in 2009. Id. at 17   Fifth, the City "designated funds in the City's capital budget to improve the City Jail's heating and cooling

19

systems." Id. Sixth, in 2011, the City installed air conditioning in the kitchen, laundry, and dining areas of the Jail. Id.

In response, Woodson argues that the reports supplied to the City by the Commission and the Architects weigh in favor of finding indifference on the part of the City because the City did not even begin construction of a new jail until 2012, and, even then, the commencement of construction did nothing to help inmates confined in the Jail in July 2012. Docket No. 456 at 11. Second, Woodson argues that the City's inaction was based only on cost, which is an impermissible excuse. Id. at 14. (citing Marshall Dep. at 67:6-9, 68:8-10, 61:25-62:3, 58L22-24, 42:17-20).

The City's position respecting whether it failed to act begins by acknowledging that it was on notice of the seriousness of the excessive heat conditions at the Jail and then cites six instances of responsive action that are said to demonstrate that adequate ameliorative actions were taken. The asserted ameliorative actions, says Woodson, amounted to naught.

First, Woodson correctly argues that the two studies that confirmed the severe inadequacies of the Jail did nothing to improve the circumstances at the Jail in general or the Medical Tier specifically in July 2012. Second, the construction of the new city jail which opened in 2014 similarly did nothing to

20

ameliorate the conditions faced by inmates imprisoned in the Jail while the new jail was being built, in particular in July 2012. Third, the installment of air conditioning in the kitchen, laundry, and dining areas had no substantive impact on the inmates housed in the Medical Tier where Woodson was held because, even though many inmates had access to air conditioning at least while eating, inmates in the Medical Tier ate in their cells.[4]

It is, of course, true that the City took four more actions after the decision in Brown that, according to the City, were intended to ameliorate the effect of exposure to excessive heat

---

[4] At oral argument, counsel for the City argued that the City air conditioned the dining hall with the expectation that it would be a "cooling center" for the inmates during times of high heat. See Oral Argument Transcript at 183:18-187:1 (January 7, 2015). Deposition testimony taken from Chris Beschler and Byron Marshall was cited as support for that proposition. Beschler stated that "the purpose of air-conditioning in the dining area was because the residents would move there generally three times a day for their meals, and it's a common area where they can go multiple times during the day to be cooled." Beschler Dep. at 29:16. Marshall stated that "[Woody] told [the City] the areas he thought needed to be cooled [and the City] cooled them." Marshall Dep. at 26. This testimony does not establish that the City air conditioned the dining hall with the expectation that all inmates would be taken to the area at times other than when meals were served, nor is there any evidence that inmates were ever moved there as a means of ameliorating exposure to excessive heat. Thus, at this stage, Woodson is entitled to the reasonable inference that, when deciding which areas to air conditioned, the City did not expect that all inmates would be "cycled" through the dining hall for the cooling purposes but instead chose to air condition the dining hall to be used by inmates only during meal times.

conditions:    (1)  the  City  supplied  100  drum  fans  and  40 industrial  fans  to  the  Jail  in  2008  and  2009;  (2)  it  upgraded electrical  systems  in  order  to  power  those  fans  in  2009;  (3)  it improved  ventilation  fans  located  on  the  roof  of  the  Jail  in 2009;  and  (4)  it  "dedicated  funds"  in  the  City's  Budget  to  be applied  to  heating  and  cooling  the  Jail.[5]   Marshall  Dep.  11:17-12:13.   Ultimately,  this  resulted  in  one  large  barrel  fan  being placed  on  the  Medical  Tier  during  the  heat  wave  in  July  2012  and allegedly  increased  ventilation  in  the  Medical  Tier  resulting from  the  repaired  rooftop  exhaust  fans.

The  fact  that  the  City  took  these  actions  is  not  in dispute.   The  issue  is  whether  the  installation  of  the  fans  and the  air  conditioning  of  the  dining  hall,  the  laundry,  and  the kitchen,  and  the  dedication  of  funds  to  be  spent  by  the  Sheriff at  the  Jail  ameliorated,  or  reasonably  could  have  been  expected to  ameliorate,  the  known  excessive  temperature  conditions  and the  consequences  of  exposure  to  those  conditions  in  July  2012. The  first  facet  of  the  analysis  is  whether  those  measures reduced  temperatures  in  the  Jail,  in  particular  on  the  Medical

---

[5]  The  record  is  undeveloped  respecting  whether  the  funds "dedicated"  were  in  addition  to  those  used  to  purchase  the  fans and  air  conditioning  or  whether  they  were  the  same  funds. Similarly,  it  is  unclear  from  the  record  how  much  of  the  funds were  actually  spent  cooling  the  jail  (i.e.  as  opposed  to heating).   Woodson  is  entitled  to  the  inferences  that  occur because  of  this  failure  of  proof.

Tier, or helped the inmates avoid the known adverse health risks associated with exposure to excessive heat.

The record permits a finding that the supposed ameliorative measures had no ameliorative effect.   In that regard, Woodson has offered lay and expert testimony, accompanied by test results, that the ameliorative measures on which the City relies neither reduced temperatures on the Medical Tier in July 2012 nor helped the inmates confined there then to cope with the consequences of exposure to excessive heat in July 2012.[6]   It thus is for the jury to decide the issue.

The second facet of the analysis is whether the City reasonably believed that the measures it took would ameliorate the excessive temperatures in the Medical Tier or help the inmates.   On this point, the City has offered no evidence other than that the City took the actions after the decision in Brown and the testimony of Marshall discussed in footnote four.   As explained there, Woodson is entitled to have the dispute on that point resolved in his favor at this stage of the proceedings. Moreover, Woodson has produced evidence from which a jury reasonably could conclude that the measures taken by the City could not have been thought to be sufficient to ameliorate the excessive heat conditions on the Medical Tier or to help the

---

[6] For that matter, there is evidence that the measures produced neither result in the Jail as a whole.

23

inmates there confined to deal with the consequences of those conditions.

> **(ii) City's Failure To Remedy A Situation That Is Patently Likely To Cause Constitutional Deprivations To An Identifiable Group Of Persons Who Stand In A Special Relationship To The City**

As an alternative to establishing inaction in the face of a known pattern of constitutional violations, Woodson can survive summary judgment by presenting a triable issue of fact whether the City failed to remedy a situation that was patently likely to cause constitutional deprivations and that the victims were identifiable and stood in a special relationship with the City.

> **(a) Identifiable Group In A Special Relationship With The City**

Inmates in the Jail are an identifiable group and are in a special relationship with the City of Richmond. See Brown I, 308 F. Supp.2d at 694 ("Stevenson, an inmate housed in the City's Jail, certainly stands in a special relationship with the City.")

> **(b) Situation Patently Likely To Cause Constitutional Deprivations**

The first nine days of July were extremely hot in Richmond. On July 1, 5, and 6, the City was under heat advisories; on July 7, the City was under an excessive heat warning; and on July 8, the City was under an excessive heat watch. Kalkstein Aff. at 2. Because of this forecast of extreme heat, Governor McDonnell

declared a State of Emergency on June 30, 2012. City of Richmond Emergency Operations Center Situation Reports I at 2. In Situation Reports sent to City officials, it was recognized that the heat wave posed an extreme danger to city residents and that additional steps should be taken in order to protect residents' health and safety. Id.; Richmond Emergency Operations Center Situation Reports II.

As noted above, it has been established that the Eighth Amendment is violated when the conditions of confinement amount to cruel and unusual punishment; and, the Supreme Court has found that exposure to extreme temperatures, in conjunction with a failure to ameliorate their effects on prisoners, violates the Eighth Amendment. Wilson, 501 U.S. at 304. A reasonable jury could find that confining residents in an un-air conditioned, inadequately ventilated jail during an extreme heat wave with no additional measures taken to alleviate the heat was a situation that was "patently likely to cause a constitutional deprivation." This is especially true when, as here, the inmates in question were cooled by only one fan and had limited access to cold water, and were ill at the time as evidenced by assignment to the Medical Tier. The fact that the City had recognized the threat to the public and had taken extra steps in order to protect its residents indicates that, at least in the City's opinion, additional precautions were necessary to protect

human health and safety from the consequences of the excessive heat in the first nine days of July 2012.

### (iii) City's Failure To Remedy

For the reasons discussed above, there is a genuine dispute of material fact respecting the efficacy and adequacy of measures taken before the heat wave of 2012. And, the record reflects no specific additional actions that the City took at the Jail once that heat wave started in July 2012.

### B.   Causation

Having offered sufficient proof for a jury to find that the City had an official policy or custom of deliberate indifference, Woodson must now present evidence that is sufficient to establish a causal relationship between the municipality's custom or policy and the complained of injury. Monell, 436 U.S. at 658.  "Specifically, at the summary judgment stage, a §1983 plaintiff must offer sufficient evidence to support a finding that an 'affirmative causal link' exists between the alleged custom or policy and the complained of injury."  Brown II, 327 F. Supp. 2d at 636.  An affirmative causal link "may be supplied by the tort principle that holds a person liable for the natural consequences of his actions." Shaw, 13 F.3d at 799.

The City argues that Woodson cannot establish a triable issue of fact with respect to causation.  It states that

26

"Woodson's experts will not testify, or offer any opinion, that Woodson's alleged heat-related injury was caused by overcrowding, poor ventilation, or inadequate drinking water...[and that] Woodson does not have evidence that links these alleged conditions to Woodson's injury." Docket No. 343 at 24. Further, it argues that the City's official policy could not have led to Woodson's injury because "there were measures that could have been taken to prevent Woodson from suffering heat stroke" inside the jail. Id. at 25. Specifically, it argues that "the actions taken by the City of Richmond also need to be considered in conjunction with the operational means available to the Sheriff to address concerns with the temperatures in the City Jail during the summer months." Id. at 19. Finally, it contends that Woodson's treating physician "is not offering an opinion on the cause of Woodson's injury." Id. at 24.

Woodson has raised a triable issue of fact on causation as to every factor except overcrowding. Woodson was confined in a single-occupancy cell in a tier with other single-occupancy cells. There is no allegation that Woodson himself was crowded in his living arrangements in the Jail. Thus, summary judgment on the issue of overcrowding is proper.

However, a triable issue of fact remains as to whether poor ventilation, inadequate drinking water, and extreme temperatures

27

contributed to Woodson's injury.   First, it should be pointed out that the City's allegation that Woodson offers no expert testimony on causation as it relates to poor ventilation and inadequate access to water does not warrant summary judgment. There is no requirement that causation must be established by expert testimony.

Admittedly, Woodson did not present abundant evidence on the question of ventilation in the Jail.   However, in 2009, the Moseley Architect Report stated that "the existing heating and ventilation units and exhaust fans do not adequately serve the main fail" and that "[t]here [was] insufficient ventilation and exhaust air in many of the housing units."   Planning Study for the Richmond City Jail at 81.   Further, "the fact that the ventilated air [was] not conditioned result[ed] in high humidity levels during the summer and further contribute[d] to poor indoor air quality."   Id.   After that report, in 2010, the City installed a new exhaust fan in the dining hall and repaired one rooftop exhaust fan.   Salomone Declaration at ¶6.   In addition, several fans were purchased, one of which ended up on the Medical Tier.   There is also evidence that the Medical Tier was excessively hot in July 2012.   On this evidence, a reasonable jury could find that the ventilation remained poor on the Medical Tier following the 2009 Architect Report and, further, that the poor ventilation continued to result in "high humidity

levels" and "poor indoor air quality" that contributed to Woodson's heat stroke. If air is not being ventilated out of an enclosed space, the space becomes stifling and the air becomes heavy with humidity. This raises the heat index. A higher heat index would make it more probable that an inmate subjected to those conditions would suffer a heat stroke.

Additionally, Woodson has presented a triable issue of fact as to whether inadequate access to drinking water contributed to his heat stroke. As discussed above, the record would support a finding that the inmates were confined without adequate water supplies, especially during the summer when the undisputed proof is that the water in their cells was hot and the Medical Tier was not provided with a cooler of water (as is shown for the night of July 8, 2012). The record in this case also supports a finding that there was an "affirmative causal link" between Woodson's lack of access to drinking water and his injuries. Medical records from MCV on July 9, 2012 at 2:15 p.m. state that Woodson arrived at the hospital "with hyperthermia due to overheating and dehydration." This evidence presents a triable issue of fact such that a reasonable jury could find that the lack of water in the Medical Tier contributed to Woodson's injuries on July 9, 2012.

Finally, the City's defense that "there were measures that could have been taken to prevent Woodson from suffering heat

stroke" is unconvincing.  This is a proximate cause argument –
essentially, that Sheriff Woody and his deputies did not do
enough to help Woodson once he started exhibiting symptoms of
heat illness and that their failure to act relieves the City of
any liability.  There is a proximate causation requirement in
§1983 litigation.  Martinez v. California, 444 U.S. 277, 285
(1980).  See also Brower v. County of Inyo, 489 U.S. 593, 599
(1989) (citing Martinez; plaintiffs cannot recover unless they
show constitutional violation was proximate cause of death);
Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012) ("Of
course, constitutional torts, like their common law brethren,
require a demonstration of both but for and proximate
causation...Accordingly, subsequent acts of decision-makers may
constitute intervening superseding causes that break the casual
chain between defendant's...misconduct and [the harm].").

   "But-for", or actual, causation "means [that] the former
event caused the latter."  Paroline v. U.S., 143 S.Ct. 1710,
1719 (2014).  "The concept of actual cause is not a metaphysical
one but an ordinary, matter-of-fact inquiry into the
existence...of a causal relation as laypeople would view it."
Id. (internal quotations omitted).  Here, it has not been argued
that the City's action or inaction was not a but-for cause of
Woodson's injuries.  Indeed, it is difficult to determine how
such an argument would be made, as the City was the entity

responsible for maintaining the Jail and ensuring that it was habitable under statutory law.

Proximate, or legal, causation "serves to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." Id. "Proximate cause requires only some direct relation between the injury asserted and the injurious conduct alleged." Staub v. Proctor Hosp., 562 U.S. 411, 131 S. Ct. 1186, 1192 (2011) "It is common to for injuries to have multiple proximate causes...A cause can be thought 'superseding' only if it is a cause of independent origin that was not foreseeable." Id.

The City argues that it is entitled to summary judgment on the issue of causation because Woodson's injury "could have been prevented." Docket No. 343 at 24. This is an argument that a third party's actions (whether it be the Sheriff's, the deputies', or Woodson's) could have prevented Woodson's heat stroke during its buildup and occurrence. This may well be true. For example, if Woodson had been removed to an air conditioned area, given adequate fluids, and allowed to remain there for the duration of the heat wave, he likely would not have suffered a heat stroke on July 9, 2012. However, this is not the question that proximate cause asks. Proximate cause does not ask if someone somewhere could have done something to

prevent the injury from occurring.   Instead, proximate cause asks whether someone _did_ do something that caused the injury to occur and whether this something was so unforeseeable as to sever any causal ties between the defendant's actions and the harm.   That is a fact issue to be decided by the jury.   Woodson has alleged sufficient facts to support a finding that the City's conduct (or inaction) was a proximate cause of the injuries that he sustained while housed in the Jail.

### CONCLUSION

For the reasons set forth above, the CITY OF RICHMOND'S MOTION FOR SUMMARY JUDGMENT (Docket No. 342) is granted in part and denied in part.

It is so ORDERED.

_____   /s/   _____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  February 11, 2015

32