

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

STEFAN WOODSON,

    Plaintiff,

v.                           Civil Action No. 3:13cv134

CITY OF RICHMOND,
VIRGINIA, et al.,

    Defendants.

### MEMORANDUM OPINION

This matter is before the Court on DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 295) filed by C.T. Woody ("Woody"). For the reasons set forth below, this motion will be granted in part and denied in part.

### BACKGROUND

**I.   Circumstances Leading Up To And On July 9, 2012**

On March 27, 2012, Stefan Woodson ("Woodson") was committed to the Richmond City Jail (the "Jail") for service of sentence. Woodson was housed in the Jail's Medical Tier because of several medical conditions ascertained on admission. The Medical Tier consists of twelve separate cells, each housing one inmate, and a long open common area. In the early morning hours of July 9, 2012 Woodson was transported to the emergency room after being found unresponsive in his cell on the Medical Tier at the Jail.

MCV Emergency Room Records.   The circumstances surrounding Woodson's illness are the subject of this action.

During the first nine days of July 2012, the city of Richmond experienced a severe heat wave.   Affidavit of Kalkstein, at ¶¶ 12-14, 17.   During this period, the National Weather Service issued many heat-related advisories. Id. at ¶¶ 11-14.   These high temperatures were further exacerbated by high humidity levels.   Id. at ¶25.   Inmates on the Medical Tier at the Jail were subjected to very high temperatures.   There was a barrel fan on the Medical Tier.   There was limited access to ice water.   There was an exhaust fan, of disputed efficacy, in Woodson's cell.

In the days leading up to July 9, 2012, Woodson complained to Jail employees that he was not feeling well.   On July 5, Woodson was examined by Dr. Motsumi Moja and employees of Correct Care Systems, LLC[1], who recorded a temperature of 102.3 degrees.   Chronic Care Periodic Exam Record.   Dr. Moja recommended that Woodson have his temperature checked again that night and in the morning and prescribed the use of Motrin and advised Woodson to follow up next week.   Id.   The doctor's recommendations notwithstanding, Woodson's temperature was not

---

[1] Correct Care Systems, LLC ("CCS") had contracted with the City of Richmond to provide medical services to inmates at the Jail.

checked again before July 9, and no other care or treatment was offered to him before that date.

During the course of the day on July 8, 2012, Woodson interacted with several Jail employees and informed them that he was feeling ill. The extent and frequency of that interaction is disputed. Deputy Sheriff Donald Palmer was on duty on the Medical Tier of the Jail from 0800 until 1600. He testified that Woodson informed him "that he was hot and not feeling well" in "the morning hours at some time" before lunch. Palmer Dep. at 34:1-7. In response, Palmer gave Woodson two Styrofoam cups of water and told the nurse performing morning pill pass that Woodson was hot and not feeling well. Id. at 30:17-21; 35. Palmer testified that he observed Woodson during the day interacting "normally" with other inmates. Id. at 36:3-5. At some point after lunch, Woodson drug his mattress out of his cell, laid in front of the fan, where he slept there until the dinner hour. Caballero Dep. at 46-47.

The next shift of Jail employees worked from 1600 until 2400. The deputies working on the Medical Tier during this shift included Deputy John Whitaker and Deputy Tristan Brown. Whitaker performed his duties on the Medical Tier from 1600 until around 1730 and directly interacted with Woodson once during a head count. Woodson did not speak to Whitaker during this interaction, but Whitaker testified that Woodson did nod at

him.   Whitaker Dep. 113: 8-13.   Brown performed at least two security checks on the Medical Tier during the period spanning approximately 1730 until 2200.   Brown Dep. at 9.   During that period of time at least two inmates advised Brown that Woodson was feeling lightheaded.   Id.   When so advised, Brown claims that he spoke with Woodson who "responded, spoke clearly, and did not mumble" and he subsequently contacted the medical department.   Id. at 10: 18-23.   However, after his round, Brown reported to Robert Cushionberry in the medical department that Woodson was not feeling well.   Id. at 16:4-10.   Cushionberry told Brown to give Woodson water and have him lie down.   Id. at 17:15-16. Brown followed these instructions.   Id. at 17:18-22.

A little before 2200, Whitaker returned to duty on the Medical Tier.   Whitaker Dep. at 90:1-3.   He was informed by Brown that Woodson was not feeling well and that Brown had informed the medical department. Id. at 95:21-96:6. In addition, several other inmates told Whitaker that Woodson was hot and not feeling well.   Id. at 90:4-14.   When informed of this, Whitaker asked Woodson if he was "all right" and he says that Woodson responded by nodding his head.   Id.   At this point, Whitaker contacted the medical department and Robert Cushionberry to inform him that Woodson was hot and not feeling well and needed to be seen by the medical department.   Id. at 96:20-25. Cushionberry told Whitaker that everyone was feeling hot and to

4

have Woodson drink water and lie down. Id. at 104:1-10, 108:5-8. Whitaker relayed this advice to Woodson and the other inmates. Id. at 109: 1-6. However, the inmates informed the staff that the water that was made available to them was hot. Id. at 3-6. Whitaker then went to the deputy dining room, filled up two Styrofoam cups of ice water, and handed the cups to the other inmates to give to Woodson. Id. at 109: 7-23.

For the rest of the shift, Whitaker claims that he performed the required twice hourly security checks and did not notice Woodson in any distress. Id. at 111:6-8; 101:2-13. However, Woodson disputes that the twice-hourly security checks required by jail policy were performed on the evening of July 8 and presents testimony from inmates that support that allegation. E.g., Caballero Dep. at 24:5-14. Thus, the parties dispute whether the deputies were performing the "required' 30 minute security checks in compliance with Jail policy on the evening in question. As the non-moving party, Woodson is entitled to the reasonable inference that the checks were not performed as required on the evening of July 8 and morning of July 9, 2012.

Woodson's condition deteriorated further during the course of the evening of July 8. While the exact timeline of events is not discernable from the evidence in the record, it is clear that, at some point before being sent to the hospital, Woodson

defecated and threw up on himself (Caballero Dep. at 25:3-15), was bleeding from the head (Id. at 25:9-15), and was gagging (Id. at 25:9-13). Additionally there is testimony that residents notified a Jail employee of Woodson's condition and "cursed" at this employee for not doing more to help Woodson. Id.; Pinkston Dep. at 25:1-26:13. The only identified Jail employees to have been on the Medical Tier that evening were Whitaker and Brown.

The next shift at the Jail ran from 2400 on July 8 to 0800 on July 9. Deputy Anthony Perry and Corporal Edward Moody were assigned to the Medical Tier for that shift and were told that Woodson had been feeling ill during previous shift. At this point, all inmates had been locked down into their cells for the night. Perry Dep. at 109:4-13. Perry stated that he performed security checks at 12:23 AM and 12:45 AM. Id. 109:17-21, 110:20-25. During each of these checks, Perry claims that Woodson indicated that he was "okay" by nodding his head to Deputy Perry when asked. Id. at 113: 7-25, 114:1-3. Moody stated that he performed security checks and noted that Woodson was breathing and lying in a normal sleeping position. Moody Dep. at 24:6-15. Woodson disputes that these checks occurred, and again is entitled to the reasonable inference that they did not. Caballero Dep. at 25:16-36:16. Woodson has offered evidence that inmates also told an unidentified Jail employee

that Woodson was sick and needed to be seen by medical. At this stage, the record is unclear whether those communications occurred only on the shift manned by Whitaker and Brown or also on the shift managed by Perry and Moody.

At 2:17 AM, Moody performed a security check and "observed [Woodson] lying across his bunk, in an awkward position, and appearing to be unresponsive." Moody Dep. at 32: 6-33:23, 48:7-11. A medical alert was called and Woodson was taken first to the medical clinic area. Id. Woodson was then transferred to MCV, where he was diagnosed with hyperthermia and was discovered to have an elevated body temperature of 105.8 degrees. MCV Hospital Records. An Emergency Department record estimated that Woodson's core body temperature reached a maximum of 108.5 degrees. Id.

## II.  Heat-Related Precautions

The adverse conditions at the Jail have been well documented in previous cases before this court. Sleeper v. City of Richmond, No. 3:12cv441, 2012 WL 3555412 (E.D. Va. Aug. 16, 2012); Brown v. Mitchell (Brown I), 308 F. Supp. 2d 682 (E.D. Va. 2004). According to Virginia state law, Woody is responsible for the day-to-day operations and maintenance at the Jail. Va. Code. Ann. §53.1-116 et seq.

During the July 2012 heat wave, Woodson was housed on the Medical Tier of the Jail. Woodson's Jail Records at 1. While certain areas of the Jail had recently been equipped with air conditioning, there was no air conditioning on the Medical Tier and the inmates there did not have access to those areas that were air conditioned, such as the inmate dining room. Allmon Dep. 69:9-20. Unlike the inmates in general population who were taken to the air conditioned dining hall for three meals a day, inmates confined on the Medical Tier took their meals while locked in their cells in the un-air conditioned Medical Tier. There is a dispute between the parties as to whether the Sheriff's office was responsible for the decision to confine Medical Tier inmates to their cells during meal time or whether CCS was responsible for the inmates' eating arrangements. Motions Hearing Transcript, January 9, 2015 at 36:23-37:7. As the non-moving party, Woodson is entitled to the reasonable inference that the Sheriff's department had instituted that policy.

In an attempt to alleviate the stifling conditions inside the Jail, administrators, including Woody, instituted several "cooling" measures following Woody's election as Sheriff in 2006. These measures included opening windows, placing large floor fans within the housing tiers, providing three meals a day

with liquids, providing "icebergs" to inmates[2], and placing coolers of cold water on housing tiers when outside temperatures rise to 95 degrees.   Affidavit of Woody; Woody Dep. at 28. Woodson however offered evidence that most of the fans did not provide ventilation, but were merely exhaust fans.  There was only one fan on the Medical Tier.   Caballero Dep. at 45:15-20. Additionally, he asserts that water coolers frequently ran dry and, while a cooler may have been present on the Medical Tier on July 8, 2012, it had run dry early in the day and the Jail employees had failed to refill them.  Palmer Dep. at 23:6-9; Perry Dep. at 47:1-2; Pinkston Dep. at 40:8-25; Martin Dep. at 14:20-22; Caballero Dep. at 63:7-14.

Finally, although the Medical Tier did not have access to air conditioned areas, Woody contends that cells on the Medical Tier did have sinks with hot and cold running water and the inmates there had access to a common shower facility when the tier was not locked down.   Affidavit of McRae, at 1.   However, there also is evidence that the water in the cell sinks was often hot during the summer and that the inmates typically relied on the deputies for access to cold water during these times.   Whitaker Dep. at 37:1-10; Quinney Dep. at 32:6-33:9; Caballero Dep. at 20:11-16; 22:22-23:5.   This is supported by

---

[2] Icebergs are "flavored ice in plastic bags".   Docket No. 296 at 9.

the fact that deputies had to leave the Medical Tier on July 8, 2012 to retrieve cold water for Woodson to drink.

## III. Compliance With DOC Standards And Training Requirements

The Virginia Department of Corrections ("DOC") does not require that jails keeps temperature readings or maintain a specific temperature during times of extreme heat or cold. Instead, the Virginia DOC mandates only that "air conditioning mechanical ventilation systems, such as electric fans, shall be provided when the temperature exceeds 85 degrees." 6 Va. Admin. Code §15-40-1160. The Jail was certified to be compliant with the above lighting and heating standard and as also compliant with all other "Life, Health, and Safety Standards" in 2011, 2012 and 2013.

The training academy run by the Sheriff's department is certified by Virginia Department of Criminal Justice Services ("DCJS"), is subject to inspection by the DCJS, and provides a wide range of training on varying topics. Affidavit of Overby; Final Curriculum 68th Basic Training Academy; DCJS Compulsory Minimum Training Standards and Performance Outcomes for Jail Officers. This academy includes training on rounds, patrols, inspections, security checks, logbooks, observation of inmates, preventive patrol techniques, unusual odors and sounds, head counts, intake and screening, special populations, and abnormal

10

behavior/mental illness. DCJS Compulsory Minimum Training Standards and Performance Outcomes for Jail Officers. In addition to certification and field training, deputies must receive 24 hours of in-service training every two years. Additionally, the Jail trains deputies in First Aid, CPR, and AED use, which includes material on heat related emergencies. Affidavit of Overby; First Aid Curriculum. If a new deputy has not completed basic training, he must receive two weeks of on the job training, including one-on-one supervision. Affidavit of Overby; "On the Job" training manual.

## IV.  Section 1983 Claim

On July 2, 2014, Woodson filed the Fourth Amended Complaint in this action. Docket No. 187. In the FAC, Woodson presents three claims against Woody. Count II is a claim under 42 U.S.C. §1983[3] alleging a violation of Woodson's Eighth Amendment[4] rights stemming from an official policy or custom concerning the operation of the Jail, including a failure to provide

---

[3] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress..."

[4] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

appropriate training for deputies employed at the Jail.   Id. at 37.   Count III is also a claim under §1983 that alleged a violation of Woodson's Eighth Amendment rights stemming from Woody's deliberate indifference to the conditions of Woodson's confinement, his deliberate indifference to Woodson's serious medical needs, and his supervisory liability for such deliberate indifference.   Id. at 39.   Finally, Count VI alleged a claim for gross negligence under Virginia state law.   Count VI was dismissed with prejudice as to all parties on December 17, 2014. Docket No. 519.   Woody has moved for summary judgment on all remaining counts.   Docket No. 295.   Woodson has responded. Docket No. 449.   Woody has replied. Docket No. 502.   A hearing on the matter was held on January 9, 2015 and the motion is now ripe for review.

## LEGAL STANDARDS

### I.   Summary Judgment Standard

Under Fed. R. Civ. P. 56, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).   In

_Celtotex Corp. v. Caltrett_[5], the Supreme Court stated that Rule 56(c) requires the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." _Id._ at 322.  In order to enter summary judgment "there can be no genuine issue as to any material fact, since a complete failure to proof concerning an essential elements of the nonmoving party's case renders all other facts immaterial." _Id._ at 323.

When reviewing a motion for summary judgment, a court must interpret the facts and any inferences drawn therefrom in the light most favorable to the nonmoving party.  See _Matsushita Elec. Indus. Co. v. Zenith Radio Corp._, 475 U.S. 574, 587 (1986); _Seabulk Offshore, Ltd. V. Am. Home. Assurance Co._, 377 F.3d 408, 418 (4th Cir. 2004).  In order to successfully oppose a motion for summary judgment, the nonmoving party must demonstrate to the court that there are specific facts that would create a genuine issue for trial.  See _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 250 (1986).  "Where...the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is

---

[5] 417 U.S. 317 (1986).

appropriate." <u>United States v. Lee</u>, 943 F.2d 366, 368 (4th Cir. 1991).

## II.  42 U.S.C. § 1983 Standard

Section 1983 of Title 42 of the United States Code (§1983) provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

In order to prove a claim for violation of constitutional rights through §1983, a plaintiff must establish that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." <u>Am. Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 49-50 (1999).

## DISCUSSION

## I.  Count II: Official Policy Or Custom Concerning Operations Of The Jail, Including Training

### A.  Official Policy Or Custom: Municipal Liability

#### (i)  Legal Standard

Count II of Woodson's Fourth Amended Complaint alleges a violation of the Eighth Amendment under §1983 stemming from alleged three unconstitutional official policies or customs concerning operation and maintenance of the Jail.  Docket No. 187.  To survive summary judgment, Woodson must raise a triable issue of fact that: (1) Woody, at the time of Woodson's injury, had an official policy or custom of operating and maintaining the Jail in a way that resulted in unconstitutional conditions; (2) that this official policy or custom reflects a deliberate indifference to Woodson's Eighth Amendment rights; and (3) that this custom or policy caused, or contributed to cause, Woodson's injuries.  Spell v. McDaniel, 824 F.2d 1380, 1385 (4th Cir. 1987); see also Brown v. Mitchell (Brown II), 327 F. Supp.2d 615, 643 (E.D. Va. 2004).

An unconstitutional official policy or custom "can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'" Lytle v. Doyle, 326 F.3d 463, 472 (4th Cir. 2003) (internal citations omitted).

15

### (ii) Analysis

Woodson alleges that Woody should be held liable on three different policies and/or customs that evinced Woody's deliberate indifference and contributed to Woodson's injuries. The first alleged policy is Woody's "policy [of] maintaining a jail that placed inmates at serious risk of harm." Oral Argument Transcript at 25:22-23 (January 9, 2015). The second alleged policy is "the decision to keep the inmates on the Medical Tier locked in their cells during mealtime and not allowing them access to the limited air conditioning at the jail." Id. at 26:5-8. The third alleged custom is Woody's decision not to investigate inmates' adverse medical outcomes. Id. at 27:4-6.

> **1. Policy: Maintaining The Jail In A Manner That Places Inmates At A Serious Risk Of Harm And Confining Medical Tier Inmates In Their Cells During Mealtimes**

The parties do not dispute that, after he was elected, Woody took certain steps in an attempt to alleviate the excessive summer heat conditions at the Jail. However, the parties disagree about the effectiveness of those measures in July 2012, whether Woody knew the measures were inadequate in July 2012, and whether his failure to institute further measures in July 2012 evinced a policy of deliberate indifference that caused, or contributed to cause, Woodson's injury in July 2012.

16

In 2004, this Court issued decisions in a case that involved several serious problems plaguing the Jail, including the lack of adequate ventilation and heat regulation. See Brown I, 308 F. Supp. 2d 682 (E.D. Va. 2004); Brown II, 327 F. Supp. 2d 615 (E.D. Va. 2004). In 2006, Woody was elected Sheriff of the City of Richmond. Thereafter, Woody began to take certain steps that were intended to address the excessive heat conditions at the Jail. Those measures included the purchasing and placement of several barrel fans at various places in the Jail,[6] purchasing and placing coolers for ice water on the tiers during the summer, allowing the inmates to receive three meals a day with fluids instead of limiting them to two, and distributing flavored ice bags during the heat. In addition, he worked with employees of the City to secure funding for exhaust fan repairs, electrical upgrades, and installation of air conditioning in the dining hall, laundry area, and kitchen of the Jail. All of the above measures, except for the installation of the air conditioning and the placement of the barrel fans, were taken before the death of inmate Grant Sleeper in 2010. All were taken before three heat-related illnesses that occurred at the Jail in 2011.

Woodson alleges that Woody knew when he entered office that the Jail posed a serious risk of heat-related illnesses to

---

[6] The City actually paid for the fans.

inmates because of the inadequate ventilation and high temperatures. Woodson does not dispute that Woody took the measures outlined above, but he argues that they were wholly inadequate to deal with the excessive heat conditions facing the inmates at the Jail in July 2012. Further, he argues that Woody knew that the measures were inadequate because of Sleeper's death in 2010 and the three reported heat related illnesses in 2011 under lesser temperatures and that Woody instructed no further measures after 2008, 2010 or 2011. All of this, says Woodson, shows that Woody was deliberately indifferent to the known risks of exposure to excessive heat at the Jail in July 2012.

Woodson also argues that Woody's decision to confine Medical Tier inmates in their cells during mealtimes, thus depriving them of access to the air conditioned dining hall, was a separate policy under which Woody could be held responsible. Although the Court agrees that such a policy existed and that the proper inference at this stage is that it was Woody's policy, the policy does not stand on its own as the basis for a claim, but rather should be considered as evidence of Woody's policy of maintaining the Jail in a manner that placed inmates at a serious risk of harm from excessive heat conditions in July 2012.

It is undisputed that inmates who were confined to the Medical Tier did not have access to the air conditioned dining hall during mealtimes, but instead took meals while locked in their cells. What is disputed, however, is whether Woody was responsible for the policy that kept Medical Tier inmates contained during meals. When asked whether Woody considered allowing all inmates access to the dining hall after air conditioning was installed, Colonel Allmon, a Sheriff's Department employee, stated that the Jail staff "cannot allow all the inmates to have access to the mess hall," including inmates on the Medical Tier. Allmon Dep. at 69:12-13. Woody disputes that he had an affirmative policy of keeping inmates on the Medical Tier out of the dining hall, instead alleging that the policy was to take general population inmates to the dining hall for three meals. Oral Argument Transcript at 60:4-7 (January 9, 2015). Additionally, Woody states that he allowed the medical department to determine who should be housed on the Medical Tier at the Jail and, as such, does not control which inmates do not have access to air conditioning during meals as a result of Medical Tier housing. Id. at 58:21-25.

Based on the record, there is a genuine dispute of fact about whether it was Woody or CCS responsible for confining Medical Tier inmates to their cells during mealtime, thus not allowing them to have access to the air conditioning in the

dining hall.   Because Woodson is the non-moving party, he is entitled to the inference that Woody instituted the policy confining the Medical Tier inmates during meals.

### a.   Existence Of A Policy Or Custom

As stated above, a policy or custom can be proven "through an express policy, such as a written ordinance or regulation [or] through the decisions of a person with final policymaking authority."   Lytle 326 F.3d at 472.   Here, Woody himself contends that he made the decisions about which measures to take in an attempt to alleviate the excessive heat conditions in the Jail.   In addition, Virginia's Administrative Code establishes that Woody is responsible for jail operations and maintenance. May v. Newhart, 822 F. Supp. 1233, 1235-36 (E.D. Va. 1993); Va. Code. Ann. §53.1-116 et seq.   Finally, testimony from Colonel Allmon created the reasonable inference that it was Woody's decision to keep inmates on the Medical Tier confined to their cells at mealtime rather than allow them access to the air conditioned dining hall.   Thus, a jury could find on this record that Woody's decisions regarding the appropriate heat-alleviation measures and the location of inmates during mealtime would qualify as a "policy" under the Lytle test.

b.   **Official Policy Or Custom Indicates Deliberate Indifference**

To survive summary judgment on the issue deliberate indifference, the Plaintiff must present a triable issue of fact as to two elements.

> First, the evidence must show that the official in question subjectively recognized a substantial risk of harm. It is not enough that the [defendant] should have recognized it; they actually must have perceived the risk. Rich v. Bruce, 129 F.3d 336, 340 n. 2 (4th Cir. 1997). Second, the evidence must show that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.' Id. As with the subjective awareness element, it is not enough that the official should have recognized that his actions were inappropriate; the official actually must have recognized that his actions were insufficient. See Brown v. Harris, 240 F.3d 383, 390-91 (4th Cir. 2001).

Parrish 372 F.3d 303 (emphasis in original).

The defendant's subjective knowledge as to both elements "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." Farmer v. Brennan, 511 U.S. 825, 842 (1994). Therefore, "a factfinder may conclude that [a defendant] knew of a substantial risk from the very fact that the risk was obvious." Id. However, in order to so do, the risk must be "so obvious that the fact-finder could conclude that the [defendant] did know of it because he could not have failed to know of it." Brice v. Va. Beach Corr.

21

Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (emphasis in original). "As the Supreme Court explained in Farmer, a plaintiff can make a prima facie case under this standard by showing 'that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it ...'" Parrish, 372 F.3d at 303 (citing 511 U.S. at 842). "Similarly, a factfinder may conclude that the official's response to a perceived risk was so patently inadequate as to justify an inference that the official actually recognized that his response to the risk was inappropriate under the circumstances." Id.

### (i)  Subjective Awareness

"A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 827. Of course, proof that the inference was drawn can come from circumstantial evidence and inferences properly drawable therefrom. Woody argues that he had no such objective awareness; Woodson contends otherwise.

Woody argues that the death of Grant Sleeper did not put him on notice that the conditions at the Jail had not been ameliorated by the measures that he put in place.  Grant Sleeper died while in custody at the Jail.  The circumstances of his death were contested by the parties, with Sleeper's representative contending that he died as a result of a heat stroke and the defendants, including Woody, asserting that Sleeper's death resulted from a combination of an abrupt discontinuance of psychiatric medication that made it more difficult for Sleeper to regulate his body temperature, the conditions under which he was confined, and the high temperature in the Jail.  However, it is uncontested on this record that Sleeper's death was, in some way, attributable to an exposure to heat that, either alone or in combination with medical side effects, caused severe heat related illness.  There is no dispute that Woody, who was the Sheriff at the time, was aware of Sleeper's death, the circumstances surrounding it, the subsequent lawsuit, including the positions of the parties and proofs therein.

Additionally, there is no genuine dispute as to whether Woody was aware that an inmate was hospitalized in 2011 for a suspected heat related illness.  While the Sheriff's office has no documents regarding the incident, Woody testified that he is notified by the medical department every time an inmate is sent

23

to the hospital from the Jail.   An internal CCS notification email sent from Kim Palmer to Shonicia Jones on July 23, 2011 establishes that, at some point before that date, a Jail inmate was sent from the Jail to the emergency room on suspicion of a potential heat related illness.[7]   Based on this information and Woody's statement that he is notified every time an inmate is sent to the hospital, Woodson is entitled to the reasonable inference that, in compliance with policy, Woody was aware of the inmate's hospitalization in 2011.

Finally, it is undisputed that Woody was aware of the excessive heat conditions in the Jail generally, and of the extreme heat conditions affecting Richmond during the first ten days of July 2012.   In the time leading up to July 9, 2012, Woody had given several interviews with local Richmond news organizations in which he highlighted the dangerous heat that plagued the Jail during the summer.   Further, Woody gave several interviews in which he described the conditions of the Jail.   In 2008, he stated that the Jail was "inhumane . . . when it's hot."   "Sheriff says Richmond Will Get a New Jail", Richmond Times Dispatch, June 12, 2008 (Docket No. 311-4).   In 2010, he

---

[7] The email reads in its entirety:

What: 3 heat related illnesses
Where: Richmond City Jail
2 treated on site; 1 sent to ER via EMS

Sent from my iPhone

stated that, when the temperatures reach "100 degrees outside...[the jail] can get up to 115 or 120 degrees inside the overcrowded jail." "Mortality rates decline in local jails nationwide", Richmond Times-Dispatch, July 7, 2010 (Docket No 311-J). Finally, again in 2010, he stated that "the living conditions [in the City Jail] are inhumane for all of us not just the one [sic] who live here, but for the ones who work here." "Beating the Heat in the Richmond City Jail," Rachel DePompa WWBT, July 22, 2010. Additionally, as a resident of the City of Richmond, he was personally aware that the first week of July 2012 presented exceptionally high temperatures.

Woody's knowledge of the allegations in the 2010 death of Grant Sleeper and the heat-related hospitalization in 2011, his statements to various media sources regarding the conditions in the Jail during the summer, and his knowledge of the extreme heat conditions affecting the City of Richmond during the first part of July 2012 provide enough evidence to allow a reasonable jury to determine that Woody was subjectively aware that, at the time Woodson was injured, the conditions at the Jail posed a substantial risk of harm to inmates who were confined therein. This is especially true for inmates who were confined on the Medical Tier who, according to the policy, were not permitted to have access to the air conditioned dining hall during meal times.

### (ii) Inadequate Actions

"[A]n officer's response to a perceived risk must be more than merely negligent or simply unreasonable." Parrish, 372 F.3d at 306-07. To survive summary judgment on this facet of the analysis, Woodson must have pointed to evidence in the record that would support a reasonable jury's finding that Woody knew that the steps he took were inadequate. This finding can be based on the fact that the risk at hand was "so obvious that the fact-finder could conclude that the [defendant] did know of it because he could not have failed to know of it." Brice, 58 F.3d at 105.

Woodson contends that, although Woody undisputedly took some action in the face of the extreme heat facing the Jail before July 2012, those actions had a negligible effect, if any effect at all, on ameliorating the excessive heat conditions inside the Jail, particularly on the Medical Tier, and particularly in July 2012. Woody argues, however, that he took several steps in an attempt to alleviate the conditions inside the Jail and that any argument that Woody should have done more to alleviate the conditions in the jail amounts to an attempt to impose a negligence standard in place of a deliberate indifference standard.

There is sufficient record evidence to support a finding that Woody was subjectively aware of the fact that his response

to the risks posed by the excessive heat conditions in the Jail were inadequate.   Indeed, in 2008 and 2010, Woody expounded on the extreme heat conditions in the Jail and stated that the conditions in the Jail were "inhumane" during the summer.   The statements in 2010 were made after the death of Grant Sleeper and after all measures except for the installation of air conditioning in certain areas of the Jail and the placement of a barrel fan on each tier were taken.   Woody additionally knew that inmates on the Medical Tier were not allowed to access the air conditioned dining hall.   Woody also was on notice that, at least in two instances, the measures taken by him were not adequate to protect against heat-related illnesses.   Further, Woody was aware of the heat wave in July 2012 and the accompanying severely high temperatures.

A reasonable jury could reasonably infer that Woody was subjectively aware that his actions were inadequate in July 2012.   He knew that the Jail was "inhumane[ly]" hot during summer months and that the temperatures in July 2012 were far above the summer temperatures in past years.   It could be inferred based on the evidence that he knew that the only "new" measure taken after 2010 that would have any impact on the Medical Tier inmates was the placement of a single barrel fan on the tier, because Medical Tier inmates were not permitted to access the air conditioned dining hall as a result of Woody's

mealtime policy.   The evidence as a whole would allow a fact finder to conclude "that the official's response to a perceived risk was so patently inadequate as to justify an inference that the official actually recognized that his response to the risk was inappropriate under the circumstances."  Parrish, 372 F.3d at 303 (citing 511 U.S. at 842).

### c.   Causation

"[A] policy or custom that is not itself unconstitutional...must be independently proven to have caused the violation.   Proof merely that such a policy or custom was 'likely' to cause a particular violation is not sufficient; there must be proved at least an 'affirmative link' between policy or custom and violation; in tort principle terms, the causal connection must be 'proximate,' not merely 'but-for' causation-in-fact."  Spell, 824 F.3d at 1387-88.

Woodson has argued that his injury would not have occurred had Woody taken appropriate steps in response to the perceived serious risk of harm to inmates on the Medical Tier at the Jail in July 2012.   Woodson has presented evidence that his injuries on July 9 stem from being exposed to very high ambient heat for days on end while confined on the Medical Tier.   While Woody has presented conflicting evidence on this point, a reasonable jury could determine that Woody's failure to appropriately mitigate

the inmates' severe heat exposure directly, affirmatively caused Woodson's injuries that was caused by heat exposure.[8]

## 2. Custom: Refusing To Investigate Adverse Medical Outcomes

The third and final custom or policy that Woodson alleges is Woody's repeated failure or refusal to investigate adverse medical outcomes that occur to inmates in the Jail. Woodson alleges that, had investigations been conducted when inmates fell ill with heat-related illnesses, more appropriate measures would have been taken within the Jail and he would not have been subjected to the high temperatures that occurred during the first week of July.

Woodson cites to two different incidents that Woody and his department failed to investigate before July 2012. First, Woodson alleges that an investigation should have been made in 2011 when one inmate at the Jail was sent to MCV with an apparent heat-related illness. As discussed above, there is no evidence that this email was ever sent to Woody. There is evidence in the record establishing that Woody is notified when an inmate is transported to the hospital. Thus, Woodson is entitled to the inference that Woody was aware that an inmate was sent to the emergency room with an apparent heat related

---

[8] Woody and the City intend to offer evidence that Woodson's injuries were caused by an infection. Woodson will offer proof to the contrary. Thus, there is a genuine dispute of fact on that aspect of causation as well.

injury in 2011.   The record shows no evidence that any inquiry was performed by Woody after that notice was received. Therefore, at the summary judgment stage, Woodson is entitled to the inference that no inquiry was performed.

Woodson also relies on Woody's failure to investigate the circumstances of Grant Sleeper's death in 2010.   Although, as discussed above, the circumstances of Sleeper's death are contested, it is uncontested on this record that Sleeper's death was, in some way, related to an exposure to heat that, either alone or in combination with medical side effects, caused severe heat related illness.   Woody, who was the Sheriff at the time, has stated that there was no investigation into the circumstances of Sleeper's death, thus making the non-existence of any inquiry an undisputed fact.

To establish the existence of a custom, Woodson must prove that there is a practice that is so 'persistent and widespread' [that it] constitutes a 'custom or usage with the force of law.'"   Lytle 326 F.3d at 472.   Woodson can point to only two separate instances in which he alleges that Woody failed to investigate adverse outcomes involving inmates that could reasonably involve heat related illness.

The failure to investigate two instances of heat related deaths cannot be considered to be persistent and widespread. In Carter v. Morris[9] the Fourth Circuit examined a case in which the plaintiff could point to only one other incident that was similar to her own in attempting to establish municipal liability under a policy or custom approach. In rejecting her argument, the Court of Appeals stated that, "even assuming that the [other] incident states a federal violation, Carter's evidence falls far short of proof of an unconstitutional municipal policy. At best Carter...offers only one other uninvestigated complaint of unlawful arrest in the City of Danville-and that resulting from apparently reasonable error. This evidence fails to show that the City of Danville is deliberately indifferent to the relevant rights of its citizens." Id. at 220. Woodson's claim is similarly weakly-supported. Because Woodson's "custom" claim is insufficiently supported on the record presented in this case, Woody is entitled to summary judgment in his favor on the issue of whether he maintained an official policy or custom of failing to investigate heat-related adverse outcomes involving inmates at the Richmond City Jail.

---

[9] 164 F.3d 215 (4th Cir. 1999).

31

### B.   Failure To Train

#### (i)   Legal Standard

To survive a motion for summary judgment on a failure to train theory, Woodson must raise a triable issue of fact that: (1) Woody's subordinates actually violated Woodson's constitutional rights; (2) that Woody failed to properly train his subordinates, thus illustrating a deliberate indifference to the rights of the persons with whom the subordinates come into contact; and that (3) this failure to train actually caused the subordinates to violate Woodson's rights. City of Canton v. Harris, 489 U.S. 387, 388-89 (1989); Doe v. Broderick, 225 F.3d 440, 456 (4th Cir. 2000) ("Only where a failure to train reflects a 'deliberate' or 'conscious choice...a 'policy' as defined by our proper cases – can [a defendant] be liable for such failure under §1983.")

#### (ii) Analysis

#### 1.   Violation of Woodson's Rights

To survive summary judgment on this first element, Woodson must raise a triable issue of fact that Woody's subordinates actually violated Woodson's rights. Young v. City of Mt. Rainer, 238 F.3d 567, 597 (4th Cir. 2001). Woodson has alleged that the treatment he endured while confined on the Medical Tier of the Jail violated his Eighth Amendment right to be free from cruel and unusual punishment when deputies failed to secure

medical attention for him as his condition deteriorated on July 8, 2012.   A claim of this type requires showing that the deputies were "deliberately indifferent to a serious medical need" Estelle v. Gamble, 429 U.S. 97, 104 (1976). "Specifically, the plaintiff asserting this type of Eighth Amendment claim must show that: (1) objectively the medical need was serious; and (2) subjectively the guards acted with a sufficiently culpable state of mind, that is, they failed to act in the fact of a subjectively known risk." Brown II, 327 F. Supp.2d 651-52.

Woodson has raised a triable issue of fact as to whether he was suffering from a serious medical need while housed in the Jail on July 8 and 9, 2012.   While Woody does have an expert who will opine that Woodson's high temperature and other symptoms were caused by sepsis rather than a heat stroke, there is sufficient evidence to create a question of fact as to whether Woodson was suffering from a heat-related illness when he was admitted to MCV on July 9, 2012.   Hospital records from MCV indicate that Woodson "presented to [the hospital] with hyperthermia, altered mental status, temperature 42.5 degrees Celsius.   From the hyperthermia he developed an encephalopathy and multi-organ failure with secondary hypoxic/ischemic brain injury."   MCV Emergency Room Records at 1.   Based on this evidence, a jury could very easily find that Woodson was

suffering from a serious medical need late on July 8 and on July 9 before he was taken to the emergency room.

There is a material dispute of fact that bears on the deputies' deliberate indifference in the face of Woodson's health issues. As noted above, the testimony of the deputies directly conflicts with that of the deposed inmates on the subject of whether the deputies performed their twice-hourly patrol duties as required by Jail operating procedures. Thus, Woodson is entitled to the reasonable inference that deputies did not perform all required security checks on July 8 and 9, 2012. Additionally, there is inmate testimony in the record establishing that Woodson was unable to communicate with deputies or inmates later in the day on July 8, that Woodson was profusely sweating, that he had fallen off of his bunk and was bleeding, that he could not hold a cup of water to his mouth, and that inmates attempted to, and did, alert deputies of Woodson's condition throughout the evening of July 8 and into the early morning of July 9. Allowing for all inferences to be drawn in favor of the non-moving part, all of these facts could be understood by a reasonable jury to indicate that, when they did complete their required security checks, the deputies were made aware of and subjectively recognized Woodson's serious medical condition and the risk posed to him by the extreme heat.

Finally, a reasonable jury could determine that deputies failed to act in the face of their subjective knowledge of Woodson's heat related illness. The undisputed facts are that the deputies only gave Woodson water and told him to lie down; the deputies knew that Woodson required medical attention and did not assure that he received it, even after telling the medical department that Woodson needed to be seen (a request that they knew had not been fulfilled). A reasonable jury could find that such actions were woefully inadequate in the face of Woodson's physical condition, particularly given the environmental conditions. Thus, condition one is satisfied.

### 2.   Failure to Properly Train

To establish a failure to train, a plaintiff must point to specific training deficiencies, and show either that an inadequately trained employee engaged in a pattern of unconstitutional conduct or that a violation of a federal right is a "highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." Bd. Of Cnty Comm'rs of Bryan Cnty v. Brown, 520 U.S. at 407-09. A supervisor must have "notice that a course of training is deficient in a particular respect...[to] be said to have deliberately chosen a training program that will cause violations of constitutional rights." Connick v. Thompson, 131 S. Ct. 1251, 1360 (2011). "When city policymakers are on actual

or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." Connick, 131 S. Ct. at 1360 (2011). "Actual knowledge may be evidenced by recorded reports to or discussions by a municipal governing body. Constructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them." Spell v. McDaniel, 824 F.2d 1380, 1387 (4th Cir.1987).

Woody argues that all deputies meet DCJS certification and field training standards and in-service requirements, are certified in First Aid/CPR/AED practices (including heat related illness training), and are trained "on the particulars of inmate observation, including looking for unusual behavior, and signs of illness or injury." Docket No. 296 at 22; Training Manual. Further, he argues that a failure to train must be based on more than "one isolated incident or on allegations regarding any particular deputy." Docket No. 296 at 22.

Woodson responds that Woody "should have known that the training the deputies received which met all the DCJA requirements, just as it did 10 years ago in Brown, was likely

36

to result in a constitutional violation." Id.[10]   Further, he points to the deposition of Deputy Overby, the director of training, who testified that deputies are not trained as to how to specifically handle heat-related emergencies, but rather that they are trained "for any signs of life or illness or anything like that." Overby Dep. at 24:5-25:19.   In addition, Overby testified that training on heat-related illnesses lasted "maybe 30 minutes." Id. at 27:3.

For many of the same reasons that this Court decided in Brown II that the sheriff was entitled to summary judgment on the plaintiff's failure to train claim, so too is Woody entitled to summary judgment on Woodson's allegations of a failure to train.

Based on the undisputed facts as discussed above, there is no basis upon which a reasonable jury could find that Woody failed to train his deputies such that an inadequately trained employee engaged in a pattern of unconstitutional conduct or that a violation of a federal right was a "highly predictable consequence."   All deputies receive First Aid, CPR, and AED training and recertification, which includes material on heat-related emergencies.   Affidavit of Overby at ¶8.   This training

---

[10] Woodson seems to have misunderstood the holding in Brown II. In that case, this Court found that the sheriff was entitled to summary judgment on the plaintiff's failure to train claim. Brown II, 327 F.Supp.2d at 651-56.

lasts eight hours and deputies are tested on their ability to respond to injuries to inmates and administer CPR and basic first aid.  Id.; Performance Outcomes at page 56, Performance Outcome 4.7.  In addition, deputies are trained in how to spot a prisoner in physical distress and to immediately alert the medical department.  Affidavit of Overby at ¶¶ 10-12; Performance Outcomes at 92, Performance Outcome 8.3 .  While deputies only receive about "30 minutes" of specific heat-related training, their emergency training is more fully fleshed out with a full eight hours of instruction.  Overby Dep. at 26:18 - 27:3. Further, deputies are trained on how to conduct mandated security checks and how to monitor for signs of illness and injury.  Affidavit of Overby.

Woodson contends that the training provided to deputies was deficient because it did not include enough instruction specifically addressing heat related illnesses and was lacking in "urgency" regarding the potential for such illnesses in an un-air-conditioned jail.  However, there is undisputed evidence on the record that deputies did receive 30 minutes of training specifically in relation to heat-related injuries, 8 hours of first aid training as a whole, and extended training on how to spot and respond to medical issues in the Jail.  Although it might be possible that more training could have been done regarding heat-related illnesses, "the fact that more or better

training could have been instituted is not enough by itself to establish a claim for deliberate indifference." Guerra v. Montgomery Cnty, 118 F. App'x 673, 676 (4th Cir. 2004) (per curiam).

The training educated deputies on how to procedurally supervise inmates' health, told them what signs to look for if an inmate was in distress, and mandated that they call the medical department if confronted with an emergency. No reasonable jury could find that such training had specific deficiencies related to heat-caused illnesses such that it created a situation in which a constitutional violation was a "highly predictable consequence." Thus, summary judgment in favor of Woody is appropriate on the failure to train claims in Count II.

## II.  Count III: Deliberate Indifference To The Conditions Of Confinement And/Or Supervisory Liability

In Count III, Woodson has alleged that Woody violated his Eighth Amendment rights by being deliberately indifferent to the unconstitutional conditions of confinement and that Woody is subject to supervisory liability. Docket No. 187. Woody moved only for summary judgment on the issue of supervisory liability in his memorandum supporting summary judgment. He was permitted to amend his motion for summary judgment at oral argument on January 14, 2015 to include a motion for summary judgment on the

individual deliberate indifference claim included in Count III as well. Thus, both contentions will be evaluated below.

### A.   Supervisory Liability

#### (i)   Legal Standard

"The principal is firmly entrenched that supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotations omitted). To survive summary judgment on the issue of supervisory liability, Woodson must present a triable issue of fact as to three elements: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Shaw, 13 F.3d at 799 (internal quotations omitted).

#### (ii)   Analysis

Woodson's claim for supervisory liability is based upon Woody's alleged failure to ensure that the deputies whom he supervised were performing their security rounds, as required by

Woody's policy.   There is a dispute of fact on the record as to whether these rounds were performed, with deputies testifying that they performed their rounds in compliance with department regulations, and inmates testifying that deputies rarely performed their required rounds, including on the evening of July 8, 2012.   Woodson's view is that, had the rounds been completed as required, the deputies would have observed Woodson deteriorating as his heat injury progressed on July 8 and July 9 and would have been able to intervene in the situation earlier.

### 1.    Actual Or Constructive Knowledge

Under this facet of the analysis, "the conduct engaged in by the supervisor's subordinates must be pervasive, meaning that the conduct is widespread, or at least has been used on several different occasions."   Randall v. Prince George's Cnty., Md., 302 F.3d 188, 206 (4th Cir. 2002).   This conduct must pose "a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff."   Id. at 206.   "Constructive notice can be alleged in multiple ways, including the existence of written reports of conditions at a detention facility, or a supervisor's high level of responsibility coupled with the violations alleged to have occurred on her or his watch."   Jones v. Murphy, 470 F. Supp. 2d 537, 546 (D. Md. 2007). Additionally, "constructive knowledge may be evinced by the fact that the practices have been so widespread or flagrant that in

the proper exercise of its official responsibilities the governing body should have known of them." Spell v. McDaniel, 824 F.2d 1380, 1387 (4th Cir. 1987).

In support of his claim that Woody was actually or constructively aware of the deputies' practice of failing to perform security checks, Woodson points to evidence supporting the allegation that not only did deputies fail to patrol on July 8 and 9, 2012, but that this practice was routine. See Caballero Dep. at 18:17-21 ("When somebody falls down in the city jail, you got to yell, Man down. Deputies make rounds every certain amount of time so and then they don't always do it for real. So you have to yell and bang on stuff and yell, Man down.") There is testimony supporting Woodson's allegations that the deputies' failures to conduct patrols occurred both frequently and specifically on the evening on July 8, 2012 when it is alleged Woodson's illness was progressing. Of course, the deputies dispute the allegations and state that they conducted their patrols as required by department policy. As evidence of this, they point to the patrol log book, which contains entries for what appear to be all required patrols.

Under Virginia law, "[the] responsibility for day to day operations of the jail falls to the sheriff...he is the keeper of the local jail and that legal custodian of those who are lawfully confined in it. [Additionally, a] sheriff maintains

42

the sole discretion to hire and fire his deputies." May, 822 F. Supp. at 1235-36. As stated above, "constructive knowledge may be evinced by the fact that the practices have been so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them." Spell, 824 F.2d at 1387. Woody, as Sheriff, was responsible for the daily operations of the Jail. This included, among other things, supervising the deputies.

There is testimony on the record that would support a jury's reasonable inference that the deputies' practice of failing to conduct the required security checks twice per hour was widespread and flagrant. If the practice was, indeed, was widespread as that evidence shows, there is enough evidence to permit a reasonable jury to find that Woody had constructive knowledge of the issue. Because Woody is responsible for supervising operations, and controlling deputies, at the Jail, the proper exercise of his duty would have included ensuring that his employees were adhering to the guidelines that had been established to ensure the protection of inmates and deputies alike. Thus, a reasonable jury could find, under the Spell standard, that Woody had at least constructive knowledge of his deputies' failure to perform their required security checks at a flagrant and widespread level.

### 2.   Inadequate   Response   Evincing   Deliberate   Indifference

Under this facet of the analysis, "a plaintiff ordinarily cannot satisfy his burden of proof by pointing to a single incident or isolated incidents, for a supervisor cannot be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." Randall, 302 F.3d at 206.   Further, if "employees deviate from or simply ignore their training, supervisory liability should not attach."   Brown II, 327 F. Supp. 2d at 652.   However, the deliberate indifference standard "may be satisfied by showing a supervisor's continued inaction in the face of documented widespread abuses."   Id.

As stated above, a reasonable jury could find that Woody had constructive knowledge of his deputies' failure to conduct adequate security checks in the Jail.   Woody has not presented any evidence showing that he did not have such knowledge.   Nor has he introduced any evidence illustrating what steps he took to ensure compliance with constitutional standards.   Although, as Woody argues, in Brown II, the Court explained that, "if, despite an adequate training regime, employees deviate from or simply ignore their training, supervisory liability should not ordinarily attach", this case presents a different situation. 327 F. Supp.2d at n.67.   Here, a reasonable jury could find that

Woody knew of a pervasive pattern of incredibly risky behavior by his deputies.   Instead of dealing with such behavior, it appears from the record that Woody did nothing to address the alleged failures or the risk caused by those failures.   A lack of reaction of that sort could be found to constitute an "inadequate" response that at least amounts to the "tacit authorization of the alleged offensive practices."   Shaw, 13 F.3d at 799. Thus, when viewing the evidence in a light most favorable to the plaintiff, a jury could find that Woody responded inadequately to the knowledge that his deputies were performing their tasks in a deficient manner, even if the training his office instituted trained them otherwise.

### 3.   Affirmative Causal Link

Under the final facet of supervisory liability, there must be an affirmative causal link between the defendant's action and the plaintiff's injury.   Woodson has offered evidence that, had the deputies completed their security rounds pursuant to department policy, they would have observed him deteriorating throughout the evening of July 8, and the early hours of July 9, and would have been able to get him proper medical treatment, thus preventing his ultimate serious injuries.   Woody does not argue, either at oral argument or in his briefing papers, that there is no affirmative causal link between his inaction and Woodson's injury.

Woody is not entitled to summary judgment on this issue. As stated above, he was in charge of the deputies and their work performance at the Jail. A reasonable jury could infer from this fact that, had Woody addressed the fact that deputies were not performing their security rounds in an effective manner, the deputies would have conformed to department policy and completed their security rounds appropriately. Further, a reasonable jury could find that, had the deputies been performing their security checks in compliance with department policy, they would have observed Woodson's deteriorating conditions and would have been able to prevent Woodson's serious injuries.

**B.    Individual Deliberate Indifference Liability**

Although Woody did not file for summary judgment on Woodson's claim that he was deliberately indifferent individually, a claim that is alleged in Count III, Woody's counsel was permitted to orally amend his motion for summary judgment at oral argument on January 14, 2015. At that point, Woody argued that he should be granted summary judgment on the issue of whether he was personally deliberate indifferent to Woodson's serious medical need. Woodson argued in opposition.

Count III presents two different theories of deliberate indifference liability under which Woodson argues that Woody is liable. First, Count III presents a claim that Woody was deliberately indifferent to unconstitutional conditions of

confinement in the Jail.   Docket No. 187 at ¶¶ 151-154.   Second, Count III presents a claim that Woody was deliberately to Woodson's serious medical needs.   Id. at ¶¶ 155-157.   As noted, Woody has only moved for summary judgment on the claim of whether he was deliberately indifferent to Woodson's serious medical needs.   Thus, Woodson's claim that Woody was deliberately indifferent to unconstitutional conditions of confinement is not challenged and survives the summary judgment stage.

### (i)  Legal Standard

Plaintiffs who allege an Eighth Amendment violation for a failure to provide such treatment must present triable issues of fact as to two elements in order to survive summary judgment. First, the plaintiff must establish that the alleged deprivation is objectively sufficiently serious so as to violate the Eighth Amendment.   Wilson v. Seiter, 501 U.S. 294, 298 (1991).   This element is established by showing that the plaintiff was suffering from a serious medical need at the time he interacted with the defendant.   A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."   Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008)

Second, the plaintiff must establish that the defendant acted with "deliberate indifference" to the right. Estelle v. Gamble, 429 U.S. 97 (1976). Deliberate indifference requires both that the defendant "subjectively recognized a substantial risk of harm" and "that his actions were 'inappropriate in light of the risk.'" Parrish, 371 F.3d at 303 (internal citation omitted). "A prison official shows deliberate indifference if he knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure reasonable safety." Odom v. S.C. Dep't of Corr., 349 F.3d 765, 770 (4th Cir. 2003) (internal citations omitted). Further, a mere "error of judgment [or] inadvertent failure to provide adequate medical care...[does] not constitute a constitutional deprivation redressable under § 1983." Boyce v. Alizaduh, 595 F.2d 948, 953 (4th Cir. 1979). In other words, negligence is not deliberate indifference. Farmer, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence.")

### (i)   Analysis

#### 1.   Serious Medical Need

Woody has not argued that Woodson was not suffering from a serious medical need on the evening of July 8 and the early hours of July 9.   Therefore, the issue will not be addressed for the purposes of Woody's summary judgment motion.

#### 2.   Deliberate Indifference

##### a.   Subjective Awareness

To survive summary judgment, Woodson must present evidence that Woody was subjectively aware of Woodson's serious medical needs.   This awareness can be demonstrated "in the usual ways, including inference from circumstantial evidence." Farmer, 511 U.S. at 842 (1994).   Woodson has argued that Woody was aware of Woodson's serious medical needs because, in deposition, Woody stated that he was generally aware that a person with drug problems, heart problems, and mental problems were more susceptible to heat.   Woody Dep. at 150: 13-17.

Woody in turn disputes that his general knowledge that a person with drug problems may be more susceptible to the heat rises to the level of specific knowledge that Woodson himself was at greater risk of a heat-related illness and that he was actually suffering from one during the events in question. Further, he argues that there is no evidence that he was aware that Woodson had been moved from general population to the

Medical Tier by CCS; that he knew of any of the medications that Woodson was on; or that he was aware at any time that Woodson had a fever.  Without any evidence that Woody was specifically aware of Woodson's medical situation, Woody argues that Woodson is unable to establish that he was subjectively aware of Woodson's serious medical needs and thus he argues that he is entitled to summary judgment on the issue.

Woody is correct.  Woodson has only presented evidence that illustrates Woody's generalized understanding of the fact that individuals with drug problems might be more susceptible to heat injury and that Woody was told by Woodson's mother that Woodson had used drugs in the past.  This evidence does not and could not give rise to a reasonable inference that Woody was subjectively aware of the serious medical needs of Mr. Woodson and the risk posed to him by high heat in the jail.  There is no evidence that Woody knew that Woodson himself was particularly susceptible to high levels of heat or that Woodson was suffering from symptoms of heat related illness during the heat wave in July.  Without this type of evidence of subjective awareness, Woodson is unable to sustain his claim that Woody was deliberately indifferent to Woodson's serious medical conditions.  Thus, Woody is entitled to summary judgment on the claim.

### III. Qualified Immunity

Woody has raised an affirmative defense of qualified immunity to Claims II and III. "The doctrine of qualified immunity, a federal common law precept applicable in Section 1983 cases, shields official defendants from monetary liability so long as the official's conduct did not violate 'clearly established' statutory or constitutional rights of which a reasonable person in the defendant's position would have known." Brown II, 327 F. Supp. 2d at 647 (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985); Harlow v. Fitzgerald, 457 U.S. 2806 (1985); Weller v. Dep't of Soc. Sevs. For City of Balt., 901 F.2d 387, 398 (4th Cir. 1990)). The purpose of the qualified immunity doctrine is to ensure that officials "are not liable for bad guesses in gray areas" but are only "only liable for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992).

There are two steps in a qualified immunity analysis. Parrish, 372 F.3d at 301. First, the Court must determine whether, when considering the facts in the light most favorable to the Plaintiff, the facts alleged allow a finding that Defendant's conduct violated Plaintiff's constitutional rights. Second, then the court must determine whether the right at issue was "clearly established" at the time of the constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001).

The first requirement of the qualified immunity analysis is satisfied in this case.   As explained above, the Eighth Amendment "is violated when conditions at a jail deprive inmates of one or more basic human needs." Brown II, 327 F. Supp. 2d at 248 (citing Wilson v. Seiter, 501 U.S. 294, 300 (1991); Williams v. Griffin, 952 F.2d 820, 826 (4th Cir. 1991)).   When taken in the light most favorable to Woodson, the record on this case allows for a finding that Woody maintained a policy of operating the Jail in a manner that placed inmates at an excessive risk of exposure to excessive heat in July 2012; that Woody was aware of his deputies' failure to adhere to policy in such a manner as to evince deliberate indifference and failed to address this issue; and that Woody acted with deliberate indifference with respect to the unconstitutional conditions of confinement in the Jail.

The success of Woody's qualified immunity defense therefore turns on whether the right at issue was "clearly established" at the time of the facts at issue.   "In resolving whether a right was clearly established at the time of the alleged deprivation, the Court must define the allegedly violated right 'at a high level of particularity.'"   Brown II, 327 F. Supp. 2d at 648 (quoting Wilson v. Kittoe, 337 F.3d 392, 403 (4th Cir. 2003)). The contours of the violated right must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right."   Anderson v. Creighton, 483 U.S.

635, 640 (1987). "This, in turn, requires identifying the specific conduct of the defendant being challenged by the plaintiff and then determining whether a reasonable official in the defendant's position would have realized that this specific conduct violated the plaintiff's rights." Brown II, 327 F. Supp. 2d at 649 (citing Pritchett v. Alford, 973 F.3d 307, 312 (4th Cir. 1992)). In other words, "existing precedent must have placed that statutory or constitutional question beyond debate." Carrol v. Carman, 135 S. Ct. 348, 2014 WL 5798628, at *2 (2014). Courts in the Fourth Circuit look only to decisions of the Supreme Court of the United States, the Fourth Circuit[11], and the highest court in the state in which the case arose. Kittoe, 337 F.3d at 402.

That the conduct at issue must be clearly established to violate the constitution does not, however, mean that a court must have decided such under factually identical circumstances. "Clearly established does not mean that the very actions in question have previously been held unlawful; rather, it merely means that, in light of preexisting law, the unlawfulness of the official's conduct was reasonably and objectively apparent."

---

[11] The Supreme Court has not definitely decided whether Circuit precedent can constitute "clearly established federal law, but has only assumed such fact for the sake of argument. Carroll v. Carman, 135 S. Ct. 348, 350 (2014); Reichle v. Howards, 132 S.Ct. 2088, 2093-2094 (2012).

Brown II, 327 F. Supp. 2d at 649.   Thus, it is necessary to determine whether "the allegedly deprived right is reasonably apparent from broader applications of the core constitutional principal in question."   Id.   In the Fourth Circuit, the defendant state official bears "the burden of proof and persuasion with respect to a defense of qualified immunity." Myers v. Baltimore Country, Md. 713 F.3d 723, 730-31 (4th Cir. 2013).

It is well established that "[t]he qualified immunity determination should normally be made at the summary judgment stage in the litigation."   Ware v. James City County, Virginia, 652 F. Supp. 2d. 693, 702 (E.D. Va. 2009).   However, "'if there are genuine issues of historical fact respecting the officer's conduct,' the United States Court of Appeals for the Fourth Circuit has stated, 'summary judgment is not appropriate, and the issue must be reserved for trial.'"   Id. (citing Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992)).

In this case, the core constitutional principal is that a prisoner's Eighth Amendment rights can be and are violated when prison conditions deprive that prisoner of one or more basic human needs.   Rhodes v. Chapman, 452 U.S. 337, 347 (1981) ("Conditions must not involve the wanton and unnecessary infliction of pain..."); Hutto v. Finney, 437 U.S. 678, 682 (1978); Strickler v. Waters, 989 F.2d 1375, 1382 (4th Cir.

1993).   "That  core  Eighth  Amendment  prohibition  against  cruel

and  unusual  punishment  has  been  refined  to  require  that

officials  may  not  house  prisoners  under  conditions  that  deprive

them  of  one  or  more  basic  human  needs,  such  as  the  basic  human

need  for  reasonable  safety,  adequate  physical  space,  and  the

need  for  some  degree  of  ventilation  and  fresh  air."  Brown II,

327  F. Supp.  2d at  650  (internal  citations  omitted).

    The  Supreme  Court  has  held  that  "some  conditions  of

confinement  may  establish  an  Eighth  Amendment  violation  'in

combination'  when  each  would  not  do  so  alone,  but  only  when  they

have  a  mutually  enforcing  effect  that  produces  the  deprivation

of  a  single,  identifiable  human  need."  Seiter,  502  U.S.  at  304.

The  example  given  by  the  Supreme  Court  in  the  Seiter  case  as  a

"totality  of  the  circumstances"  constitutional  violation  was  "a

low  cell  temperature  at  night  combined  with  a  failure  to  issue

blankets."  Id.  This  has  been  reinforced  by  Fourth  Circuit

precedent.  Williams,  952  F.2d  at  825-26.  Controlling  precedent

has  further  established  that  a  prison  officer  responsible  for

the  conditions  at  a  facility  must  take  corrective  action  if  he

becomes  aware  that  the  conditions  in  that  facility  are  depriving

inmates  of  a  basic  human  need.  Wilson,  501  U.S.  at  300;

Strickler,  989  F.2d  at  1382;  Williams,  952  F.2d  at  826  ("[O]nce

prison  officials  become  aware  of  a  problem  with  prison

conditions, they cannot simply ignore the problem, but should take corrective action.")

Although there are genuine disputes of material fact as to Woody's conduct, the undisputed facts taken in a light most favorable to the plaintiff would permit a jury to find that Woody knew that inmates in the Jail were subjected to extraordinary heat conditions generally, and especially in July 2012; that there had been at least two instances of heat-related illness between 2010 and July 2012; that inmates confined to the Medical Tier did not have access to cooler temperatures in the dining hall; that Richmond was facing an extreme heat wave in the first ten days of July; and that temperatures inside the Jail often reached levels much higher than those experienced outside. Additionally, the disputed facts, when taken in the light most favorable to the plaintiff, would permit a jury to find that Woody was responsible for the behavior of the deputies; knew that they routinely failed to complete required security checks; and did not take any steps to address the problem. A reasonable jury could infer from these facts that Woody was aware that any measures he had taken in the past in an attempt to alleviate the heat or supervise his deputies were grossly inadequate to meet the excessive heat of July 2012 and that "housing inmates under such conditions was violative of their rights." Brown II, 327 F. Supp. 2d 650. "Simply stated,

in light of the clearly established legal authority respecting inmates' rights to be housed in prison conditions that meet their basic human needs, [a reasonable jury could find that] a reasonable official in [Woody's] position would have realized that it was a violation of the Constitutional to continue to house inmates in a jail that was so [inhumanely hot] that it presented an unacceptable high risk of [causing heat related illnesses]." Id. at 650-51.

The disputed record in this case, when construed in the light most favorable to the plaintiff, establishes that Woody's alleged action and inaction violated Woodson's clearly established constitutional right to prison conditions that met his basic human needs. Thus, Woody's defense of qualified immunity on the remaining aspects of Counts II and III will be rejected.

## CONCLUSION

For the reasons set forth above, the MOTION FOR SUMMARY JUDGMENT (Docket No. 394) filed by C.T. Woody, is granted in part and denied in part. It is granted as to the failure to train claim and the alleged custom of failing to investigate adverse outcomes in Count II and as to the claim of deliberate indifference to a serious medical condition in Count III. The motion is denied with respect to the alleged policy of

maintaining the jail in a deficient manner in Count II and the supervisory liability and deliberate indifference to unconstitutional conditions of confinement in Count III.

It is so ORDERED.

/s/                    *REP*
_____
Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date:  February 12, 2015